IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NORMAN L. NICHOLS, JR.                    *

    Plaintiff                              *

v.                                        *        CIVIL NO.  JPM02CV3523

CAROLINE COUNTY BOARD                     *
OF EDUCATION
                                          *
    Defendant                              *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND REQUEST FOR HEARING

Defendant Caroline County Board of Education ("Board"), by its attorneys, pursuant to Fed. R. Civ. P. 56, moves for summary judgment, in whole or in part, in its favor against Plaintiff Norman Nichols because there is no dispute of material fact and the Board is entitled to judgment in its favor as a matter of law.  In support of this Motion for Summary Judgment, the Board incorporates the attached Memorandum in Support.

WHEREFORE, for the reasons set forth in the attached Memorandum in Support, the Board respectfully requests that its Motion for Summary Judgment in this matter be granted.

### REQUEST FOR HEARING

The Board requests a hearing on its Motion.


_____/s/_____
Leslie Robert Stellman
(Federal Bar No. 1673)

_____ /s/ _____
Steven B. Schwartzman
(Federal Bar No. 04686)
HODES, ULMAN, PESSIN & KATZ, P.A.
901 Dulaney Valley Road - Suite 400
Towson, Maryland  21204
410-339-6746
410-938-8909 fax

Attorneys for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this _____ day of October, 2003, a copy of the foregoing Motion for Summary Judgment, Memorandum In Support Thereof, Order, and the Notice of Filing of Lengthy Exhibit were electronically filed in the United States District Court for the District of Maryland and mailed first-class, postage prepaid to Frederick P. Charleston, Esquire, 2430 North Charles Street, Suite 201, Baltimore, Maryland  21201.

_____ /s/ _____
Steven B. Schwartzman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NORMAN L. NICHOLS, JR.                    *

     Plaintiff                          *

v.                                        *        CIVIL NO.  JPM02CV3523

CAROLINE COUNTY BOARD                     *
OF EDUCATION
                                  *

     Defendant                          *

  *     *     *     *     *     *     *     *     *     *     *

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Norman L. Nichols, Jr. ("Nichols"), Plaintiff, has filed suit against his former employer, Caroline County Board of Education ("Board").  Mr. Nichols alleged that the Board discriminated against him based on his race (African-American); sex (male); and religion (Jehovah's Witnesses).  He also alleges that the Board retaliated against him in reprisal for his filing an earlier federal court Title VII suit in which he did not prevail.  (*See* Exh. 1, Nichols v. Board of Education of Caroline County, 123 F. Supp. 2d 320 (D. Md. 2000), *aff'd*, 2001 WL 882956 (4th Cir. 2001).  Lastly, Mr. Nichols alleges that the Board violated his First Amendment rights by ordering him to refrain from discussing topics with religious overtones in his music classroom.

Because the allegations of the Amended Complaint fail to set forth a claim upon which relief may be granted, the Board now files this motion.

## I.
## <u>FACTS</u>[1]

### A.    Prior Federal Court Litigation.

For more than 30 years, Mr. Nichols has been employed by the Board as a teacher of general and choral music at various schools in Caroline County.  From September 1990 to the present, Mr. Nichols has been assigned to teach at Colonel Richardson Middle School ("CRMS").  When he was hired, he was certificated to teach music in grades 7 - 12. He subsequently received his certificate to be an administrative supervisor in 1980.  (Amended Complaint ¶ 5).  From time to time, Mr. Nichols, as with other teachers, has been assigned to teach areas outside his area of certification.  (Amended Complaint ¶ 8).

In 1995, Deborah Chance ("Ms. Chance") became principal of CRMS and Charles Petrick ("Mr. Petrick") became Assistant Principal.  Both Ms. Chance and Mr. Petrick are Caucasian.  In 1999, Mr. Nichols filed suit against the Board alleging that Ms. Chance and Mr. Petrick discriminated against him in violation of Title VII.   (Exh. 1).

In that lawsuit, Mr. Nichols alleged that Ms. Chance and Mr. Petrick discriminated against him, based on his race, and "required plaintiff to submit to additional discipline, restrictions and requirements not requested of other similarly situated employees," and subjected him to "continual attempts to interfere with his teaching and denigrate his abilities within the school system."  <u>Id.</u> at 324.  The Court dismissed the case on Defendant's Motion for Summary Judgment, holding that:

> On the record before it, this Court has concluded that plaintiff Nichols has not produced evidence establishing that defendant took adverse employment action against him as a result of any of the incidents relied

---

[1]  The Board disputes the facts as set forth in the Amended Complaint.  However, for the purposes of this motion, the Board recognizes that the facts presented in the Amended Complaint are to be viewed in a light most favorable to Mr. Nichols.  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986).

> upon. It is apparent from the record here that plaintiff Nichols is a disgruntled teacher who has had many conflicts with the principal and the assistant principal of the school where he has been employed. However, plaintiff's differences with his superiors have not resulted in any disciplinary actions taken against him which might be characterized as ultimate employment decisions under Title VII. Nor is there any indication that plaintiff's superiors acted with a racial motive when they called him to account from time to time. Nichols, therefore, cannot proceed to trial in this case on his claim of disparate treatment.

Id. at 326. The court also rejected Mr. Nichols' claims of a hostile work environment, stating:

> Finally, there is no evidence that any of the alleged acts of harassment were in any way connected with plaintiff's race. . . . That Nichols is an African-American and that his superiors are Caucasian is hardly proof that their actions were racially motivated. The Court cannot attribute a racial character to the disagreements and misunderstandings between the parties here based merely on Nichols' conjectural opinion. See Hawkins v. Pepsico, Inc., 203 F.3d 274, 280-81 (4th Cir. 2000).

Id. at 327. The court's decision in this case was affirmed by the U. S. Court of Appeals for the

Fourth Circuit in an unpublished decision. (*See* Case No. 01-1010, July 2001, attached hereto as

Exh. 2).

**B.    Facts Leading to the Second Class Certification and MSBE Appeal.**

In 1998, the Board reassigned Ms. Chance and appointed Janet Fountain, an African-

American, as Principal of CRMS. (*See* Exh. 8, Janet Fountain Dep., p. 9:2-9). Ms. Fountain had

taught school in Caroline County for 16 years and served as assistant principal at two different

schools. (Exh. 8, pp. 8:18-21; 9:20-21; 10:1-8). She had known Mr. Nichols since prior to 1975

when they met through church. (Exh. 8, pp. 13:19-21; 14:1-12) (Mr. Nichols was previously a

Baptist). Id. In 1977 or 1978, they dated for a year or so. (Exh. 8, pp. 13:19-21; 14:1-4; 15:5-

17). When the relationship ended, Ms. Fountain harbored no ill will or bitterness toward Mr.

Nichols. (Exh. 8, p. 16:2-6). They fell out of contact until Mr. Fountain was appointed CRMS

principal. (Exh. 8, pp. 15:18-21; 16:1).

Mr. Nichols initially reacted positively when he learned that Ms. Fountain had been assigned as principal:

> . . . But I do know the first year she came there, I had told her initially that, you know, I was glad that she was there, because I had known Janet as a professional and she always impressed me as a person who was about the right thing when it came to doing the right thing by her professionals and her peers and what have you and the kids. We got along well.

(*See* Exh. 11, Deposition of Mr. Nichols, p. 73:11-17).

Shortly after Ms. Fountain began at CRMS, Mr. Nichols made her aware of his federal court lawsuit. As Ms. Fountain testified:

> Whenever we would meet about an observation or to talk to him about anything he would remind me that he had a lawsuit with the county and the county had cut off his legs and expected him to run.

(Exh. 8, p. 18:3-7).

At the same time that Ms. Fountain took over as CRMS principal, Gene Smith was assigned as assistant principal. (*See* Exh. 9, Deposition of Gene Smith, p. 7:13-20). Mr. Smith was not aware of Mr. Nichols' federal court suit at that time. (Exh. 9, pp. 28:14-21; 29:1-18). As he testified:

> I just know that when I first took over as assistant principal Mr. Nichols had talked about some of the problems he had experienced with prior administrators working in Caroline County and that my talk with him was I didn't know anything about that, I didn't really want to know about that, I wanted to start fresh working with him and go from there and build our relationship based on not knowledge of the past, but working from the point that I started.

(Exh. 9, p. 31:7-16).

During that first year, the 1999 - 2000 school year, Ms. Fountain and Mr. Smith took part in observing and evaluating Mr. Nichols' performance, along with Rosalyn Fradel, Supervisor of Instruction. (Exh. 8, pp: 24:12-21; 25:15-21; 26:1-3). Mr. Nichols was teaching computer

literacy at the time, in addition to his music class. Maryland's State Board of Education, as well as the Defendant Board's own policies, require that in conducting evaluations the principal and a second evaluator are to observe each teacher at least two times during the school year.[2] The observations are in effect, spot checks. The end-of-year evaluation is based on the observations plus other considerations that developed over the year. (Exh. 8, p. 38:1-19).

There were a total of four observations conducted of Mr. Nichols during the 1999- 2000 school year. Ms. Fountain and Mr. Smith observed Mr. Nichols in his music class and Ms. Fradel observed the computer literacy class. (*See* Exh. 12, 1999-2000 evaluation and supporting observations). There was "no significance" in Ms. Fradel's decision to observe the computer literacy class, as opposed to the music class. (Exh. 8, p. 28:3-6). On or about June 6, 2000, the three evaluators met and reached a consensus that Mr. Nichols had met or exceeded expectations for the year. (Exh. 8, pp. 37:5-19; 38:2-7; Exh.12). Importantly, this satisfactory evaluation took place almost one year after Mr. Nichols filed his EEOC charge naming the Board and Ms. Chance as "respondents."

At the beginning of the 2000 - 2001 school year, Ms. Fountain reassigned Mr. Nichols to teach a health and nutrition class instead of computer literacy (in addition to his music classes). Because CRMS is a small school, several teachers, including Mr. Nichols, were assigned to teach in other classes than their certificated area. (Exh. 8, pp. 49:19-21; 50:1-8). Ms. Fountain decided to reassign Mr. Nichols because she had had concerns about Mr. Nichols' approach to computer literacy. The students had complained that Mr. Nichols' course was uninteresting and rigid. (Exh. 8, pp. 45:19-21; 46:1-11). Ms. Fountain was confident that Mr. Nichols could teach

---

[2] The Maryland Code of Regulations ("COMAR") provides the minimum requirements for an evaluation of a professional certificated teacher and requires that the evaluation be based on at least two observations. COMAR 13A.07.04.02. The Board has had varying policies on whether the second evaluator should be the assistant principal or a content or instructional supervisor. (Exh. 8, p. 26:4-15).

the health and nutrition course because it was basically a "canned program," with prepared written teacher materials. (Exh. 8, p. 46:12-18; Exh. 11, p. 92:13-21). Although Ms. Fountain thought that Mr. Nichols would not need assistance in teaching the course, she offered him additional resources, including the opportunity to work with a teacher in the northern end of the county who had taught the course. (Exh. 8, pp. 47:12-20; 49:15-18; Exh. 9, pp. 52:5-16; 53:21; 54:1-21; 55:1-6). Mr. Nichols declined this offer. (Exh. 8, p. 47:16-19; Exh. 9, p. 55:4-6).

Ms. Fountain made the decision to reassign Mr. Nichols on her own, without consulting with anyone. (Exh. 8, pp. 55:18-21; 56:1-2; Exh. 9: 49:18-21, 50:1-4).[3] Mr. Nichols alleged that Ms. Fountain was racially biased in assigning Patrick Barrett, a Caucasian teacher, to teach computer literacy, while she assigned Mr. Nichols to teach health and nutrition. Mr. Nichols has charged that Ms. Fountain's decision was based on "so-called stereotypes" regarding race. (Exh. 11, pp. 88:5-12; 89:7-12; 89:21; 90:1-2; 287:1-17). However, Mr. Nichols admitted that he knows of no actual comments or conversations supporting this belief. (Exh. 11, p. 88:15-20). He has no direct knowledge or evidence that Ms. Fountain's decision was racially motivated -- only his feeling. (Exh. 11, p. 289:8-14).

During the 2000 - 2001 school year, Ms Fountain and Mr. Smith observed Mr. Nichols a total of four times, three times in health and nutrition and once in music. (Exh. 13; Exh. 8, p. 48:13-15). Ms. Fountain observed Mr. Nichols both times in the health and nutrition course, primarily because she had placed him in this new course and wanted to determine how he was doing and to give him any necessary feedback or assistance.

---

[3] A principal does not need the approval of the superintendent to reassign teachers within a school. (Exh. 10, pp. 36:12-21; 37:1-6). The right to reassign is recognized as a fundamental managerial prerogative, both by Maryland law and supporting court decisions. Md. Ann. Code, Education Article §6-201; Hurl v. Board of Education of Howard County, 107 Md. App. 286 (1995).

> Q [by Mr. Charleston]:  Why was he observed more in an area in which he was not certified?
>
> A [by Ms. Fountain]:  One of the reasons was to give him the assistance.  I'm the one who put him in a new assignment, so I felt I needed to make sure he was successful in that assignment.
>
>  Q:    So you felt by observing him more gave him assistance?  Is that what you're saying?
>
> A:  It was an opportunity for me to get into the classroom both formal and informal to discuss my expectations for the health [class,] and I was there for the music also, but I didn't do a formal on-site.

(Exh. 8, pp. 48:13-21, 49:1-6).   She observed him a second time, because she had had

reservations after the first evaluation and wanted to see if he had made improvements.  (Exh. 8,

p. 57:2-15).[4]

Mr. Smith also conducted two observations, one in music and one in health and nutrition.

He had no grand scheme for determining when to observe:

> Q [by Mr. Charleston]:  Why did you not observe him a second time in music so he would have two [observations] in music and two in health and nutrition?
>
> A [by Mr. Smith]:  There was no reason other than the fact that it was one of the classes that wasn't during a lunch shift.
>
> Q:  Would Mr. Nichols, having been a music teacher, be expected to perform better in music than in health and nutrition?
>
> A:  I would think that the expectation would be the same irregardless of what he is teaching as a certified professional.
> Q:  So you felt that it didn't matter which one you observed him in, he should be performing up to snuff?
>
> A:  Yes, sir.

---

[4] It is the principal's sole determination as to how often observations are to take place and in which courses they are to be conducted.  (Exh. 10, p. 40:10-14).  Mr. Nichols believes that Ms. Fountain deliberately chose to observe him in areas outside of music.  (Exh. 11, pp. 101:18-21; 102:1-14)  But he does not have the "vaguest idea" why.  (Exh. 11, p. 102:13-14).

Q:  But you had an option, did you not, of observing him in music, but you chose not to?

A:  I had an option of choosing to observe him during any of the seven periods.  I just chose the fifth period.

(Exh. 9, pp. 70:19-21; 71:1-18).

Ms. Fountain and Mr. Smith rated Mr. Nichols as unsatisfactory in the evaluation conducted at the end of the 2000-2001 school year.  (Exh. 13).  Mr. Nichols' history through that school year reflected, among other things, excessive disciplinary referrals of students, a lack of control over classroom activities, and the inappropriate imposition of religious content into his lessons despite admonishment from school officials to cease this activity.  (Exh. 13; Exh. 6).  By memorandum dated May 25, 2001, and as a result of the unsatisfactory evaluation, Ms. Fountain recommended to Superintendent Larry Lorton, that Mr. Nichols' certificate be placed on second class status for the 2001 - 2002 school year.  That memorandum stated:

The purpose of this memo is to recommend that Norman L. Nichols, teacher, be placed on a second class certificate for the 2001-2002 school year.  Mr. Nichols' performance this year has been unsatisfactory as I have indicated on his end-of-year evaluation form.

Pending your decision, I will work with Mr. Nichols to develop a professional improvement plan for the coming year.

(*See* Exh. 14, May 25, 2001 Memorandum).[5]

On May 30, 2001, Superintendent Lorton accepted Ms. Fountain's recommendation to reclassify Mr. Nichols' certificate to second class.  (*See* Exh. 15, May 30, 2001 Letter of Dr. Lorton).  Dr. Lorton advised Mr. Nichols of the reclassification and told Mr. Nichols that he

---

[5] Under Maryland law, a teacher's certificate is either a first class or a second class certificate.  Md. Code Ann., Educ. § 6-102 (a).  The law further requires each local superintendent to "classify the certificate of each teacher employed by the school system of his county at least once every 2 years."  § 6-102 (c).  In determining the class of the certificate, the local superintendent is to consider the teacher's scholarship, executive ability, personality, and teaching efficiency.  § 6-102 (d).

needed to improve his performance to an acceptable level during the 2001 - 2002 school year in order to remove the second class designation. Dr. Lorton advised that the failure to do so could result in Mr. Nichols' termination. Id.

Mr. Nichols appealed the decision to downgrade his certificate to the local school board. On August 7, 2001, the Board of Education of Caroline County held a hearing. On October 25, 2001, the local board unanimously affirmed Dr. Lorton's decision, holding:

> The evidence and testimony presented established that the Superintendent's decision was based on the unsatisfactory evaluation provided by the Principal of CRMS, and by the Appellant's record which included, among other things, large numbers of disciplinary referrals to the Principal which indicate a lack of classroom control, repeated incidents involving the improper imposition of sectarian beliefs, and the significant need for improvement in the Appellant's teaching skills. . . . While the Appellant fairly debated the quality of his teaching skills, and eloquently challenged the Superintendent's conclusions in defense of his disciplinary referral record, he failed to meet the burden of establishing that the Superintendent's decision was arbitrary, capricious, or unreasonable.

(*See* Exh. 3, Decision of the Board of Education of Caroline County, p. 2). Pursuant to Section 4-205(c) of the Education Article of the Annotated Code of Maryland, Mr. Nichols appealed this decision to the Maryland State Board of Education ("MSBE").

On March 27, 2002, the MSBE affirmed the local board's decision, concluding that:

> Based upon our review of the record in this case, we find that the superintendent had sufficient reason to place Appellant on a second class certificate. Appellant's classroom observations and overall performance evaluation for the 2000 - 01 school year, as well as his previous work history, demonstrate deficiencies in performance in a variety of areas related to Appellant's teaching efficiency, executive ability, and personality. These are all appropriate considerations for a reclassification of Appellant's certificate.

(*See* Exh. 4, MSBE Opinion No. 02-11, p. 4).

Mr. Nichols had also contended in this appeal that the Board's reclassification was improper because it had stemmed from four observations, three of which were conducted in his health and nutrition classes which are outside his area of certification.[6]  The State Board rejected this argument holding that "[t]his [COMAR] provision does not require that those evaluations be based on two observations within the individual's area of certification."  Id. at p. 4.  Finally, the State Board concluded:

> Although Appellant claims he was subject to harassment, retaliation, and intimidation, he has failed to present any evidence to support these allegations.  While Appellant has submitted an affidavit indicating his belief that the reclassification of his certificate was a response to his filing a discrimination lawsuit against this school system, this is a bald assertion that is insufficient to create a dispute of material fact.  As explained above, we find that the superintendent had a clear and reasonable basis for reclassifying Appellant's certificate.

Id. at p. 6.  The MSBE denied Mr. Nichols' request for reconsideration of that decision.  (See Exh. 5, MSBE Memorandum).  Mr. Nichols did not appeal the State Board's decision.[7]

### C.    Facts Leading to Mr. Nichols' Termination and Second MSBE Appeal.

In an attempt to remedy Mr. Nichols' performance, Ms. Fountain placed Mr. Nichols on a Performance Improvement Plan ("PIP" or "Plan").  (Exh. 8, p. 93:13-17).  Ms. Fountain advised Superintendent Lorton of her plan but did not seek his approval, nor was his approval necessary.

---

[6] Under COMAR 13A.12.02.02B(1), a certificated teacher may be assigned to two classes outside of the teacher's area of certification.

[7] Mr. Nichols alleged in his Amended Complaint that, as a result of the reclassification, the Board denied him an incentive bonus of $2,000.  (Amended Complaint ¶ 13).  However, the Board actually offered Mr. Nichols the $2,000 stipend, but Mr. Nichols turned it down. (Exh. 11, pp. 24:17-21; 25:1-20).  Mr. Nichols had initially wrote to Dr. James Orr, Personnel Supervisor, "I find the gesture of awarding me this $2,000 not only leaving much to be desired but also repulsive." (Exh. 11, p. 27:4-17).  Mr. Nichols ultimately changed his mind and the Board awarded him the $2,000.  (Exh. 11, pp. 29:5-21; 30:1-8).

(Exh. 8, pp. 93:16-21; 94:1-4; 98:13-21; 99:1-10).[8]  Ms. Fountain's purpose in creating the Plan

was to provide Mr. Nichols with a written guide for him to use in order for him to improve in

those specific areas that she identified as needing improvement in his May 25, 2001 evaluation.

Mr. Nichols, as well as Ms. Fountain and Ms. Fradel, signed the Plan on June 7, 2001.[9]  (*See*

Exh. 16, Performance Improvement Plan, including memo addressing amendment to the Plan).

The Plan required, among other things, the Mr. Nichols submit lesson plans to Ms. Fountain one

week in advance by Thursday of the preceding week.  Id.

> As Ms. Fountain then explained:

> . . . Mr. Smith and I sat down together, talked about it with the
> instructional supervisor [Ms. Fradel] those things that we had observed
> and we mentioned to Mr. Nichols what we expected when we came into
> the classroom.  He did it, I did, the instructional supervisor.  I said, okay,
> how are we going to do this.  We decided to let him know what his
> responsibilities are, [and] let him know what the indicators of success
> would be.

(Exh. 8, p. 87:12-20).    As Mr. Smith testified:

> My perspective on [the PIP] was that it was a plan designed to help Mr.
> Nichols improve within the classroom and that was what it was designed
> to do with the idea that we would assist in helping to move his status from
> unsatisfactory to satisfactory.

(Exh. 9, p. 68:2-6).

On August 28, 2001, Mr. Nichols met with John Perry and Ms. Fountain to discuss his

performance under the Plan.  Mr. Nichols was not prepared or willing to discuss his lesson plans,

classroom management plan or outline.  He spoke only of his appeal to the local board of the

---

[8] Dr. Lorton reviewed the Plan but did not sign it.  As he testified, he was not responsible for the series of events that led to the imposition of the PIP, nor did he intend to be responsible for its implementation.  He did not want to give Mr. Nichols the impression that he was heavily involved in the evaluation process by signing the PIP.  (Exh. 10, p. 75:3-16).

[9]  Ms. Fradel soon thereafter left to become the principal of Federalsburg Elementary School for the 2001 - 2002 school year.  (Exh. 8, pp. 103: 12-21; 104:1-3).  John Perry succeeded her as Instructional Supervisor.  (Exh. 8, p. 134:14-19).

second class certification status and his view that the Plan was not validly implemented.  (*See* Exh. 17, Memo of Ms. Fountain regarding August 27 meeting; *see also* Exh. 18, Memo of Ms. Fountain regarding August 28 meeting; *see also* Exh. 19, August 30, 2001 Memo regarding grading policy).

On September 6, 2001, Mr. Nichols again met with Mr. Perry and Ms. Fountain.  Again, Mr. Nichols was not prepared for the meeting and wanted only to discuss his appeal to the local board.  (*See* Exh. 20, Memo regarding September 6, 2001 meeting).

Formal classroom observations were conducted in Mr. Nichols' music classroom on September 11, 25, October 16, November 26, and December 11, 2001.  (*See* Exh. 24, 2001- 2002 Evaluations and supporting observations).  On September 28, 2001, Mr. Nichols met with Ms. Fountain and Mr. Perry to discuss his progress under the Plan.  Ms. Fountain and Mr. Perry raised several concerns over Mr. Nichols' lesson plan for the week and wanted to discuss his instructional progress and classroom management plan.  Mr. Nichols was neither prepared nor willing to discuss classroom management and discipline issues.  (*See* Exh. 21, Memo regarding September 28 meeting).  As Ms. Fountain described, every time they held one of these meetings, Mr. Nichols refused to sit down or discuss what needed to be discussed.  (Exh. 8, pp. 147:4-21; 148:1-21).

On November 21, 2001, Ms Fountain issued Mr. Nichols a written reprimand after he again refused to discuss his progress under the Plan at a November 6, 2001 meeting and claimed that the PIP was designed only to intimate and harass him.  (*See* Exh. 22, November 12, 2001 Letter of Reprimand).  The reprimand read as follows:

> This letter represents a written reprimand for your actions and behaviors of November 6, 2001. . .  You have been specifically directed by the Superintendent and by me to fulfill the obligations and responsibilities as

> stated in the Performance Improvement Plan.  You are expected to professionally address your Performance Improvement Plan as scheduled. Continued failure to take your certificate status and Performance Improvement Plan seriously and failure to confront the issues and conditions reasonably, rationally, and professionally may result in further disciplinary action.

Id.

On November 30, 2001, Ms. Fountain held another meeting with Mr. Nichols and Mr. Perry.  Mr. Nichols initially refused to discuss the Plan and spoke only of being harassed and intimidated, but later indicated that he was willing to proceed with the meeting.  (*See* Exh. 23, Memo regarding November 30 meeting).

On December 19, 2001, Ms. Fountain and Mr. Perry gave Mr. Nichols a mid-year evaluation.  They rated his performance as "needs improvement" in three areas:  Instructional Effectiveness, Scholarship/Knowledge, and Professional Ethics/Interpersonal Relationships. They awarded him an overall rating of unsatisfactory.  (Exh. 24).

Mr. Nichols had two more classroom observations on February 22 and March 4, 2002. (Exh. 24).  Ms. Fountain performed the February 22, 2002 observation and identified six areas of unsatisfactory performance and five areas that needed improvement.  Id.  Mr. Perry observed Mr. Nichols on March 4, 2002 and found his performance to be satisfactory.  Id.

On February 28, 2002,  Ms. Fountain had another meeting with Mr. Nichols and Mr. Perry to discuss progress under the PIP.  Mr. Nichols advised Ms. Fountain that he was not prepared for the meeting and that he had been unable to comply with the Plan because of his emotional distress over his perceived harassment and intimidation by the Board.  (*See* Exh. 25, February 28, 2002 Memo regarding meeting).  Mr. Nichols had not submitted his lesson plans in advance since the week of October 8, 2001.  (*See* Exh. 26, February 28, 2002 Memo regarding

lesson plans). On March 19, 2002, Ms. Fountain reprimanded Mr. Nichols for failing to submit his lesson plans. (*See* Exh. 27, March 19, 2002 Letter).

Ms. Fountain also reprimanded Mr. Nichols about an inappropriate Easter assignment which he gave to his music class. (Exh. 27). Mr. Nichols gave his class an assignment that required the students to use the Bible as a source to describe Jesus' crucifixion and resurrection, to give their interpretation of those events, and to write the chapter, verse, and name of the Bible used. Id. On March 22, 2002, Ms. Fountain met with Mr. Nichols and Mr. Perry for a scheduled meeting. At the meeting, Mr. Nichols accused Ms. Fountain of being unable to be impartial or objective because they had had a dating relationship twenty-seven years before. As she wrote:

> During this discussion, you stated that I am unable to be either impartial or objective in dealing with you because we had a dating relationship in the past. I responded that I deal with you in a professional manner and that I was shocked and displeased that you would question my professionalism. Frankly, what you brought up occurred 27 years ago and it has absolutely no bearing on how you are performing in the classroom.

Id.

On March 25, 2002, Dr. Lorton directed Mr. Nichols to refrain from giving assignments that interjected his personal religious beliefs into the music course.

> We received at least two calls from parents strongly objecting to an alleged assignment you gave your music classes on or about March 13 related directly to the Christian Easter observance which, among other things, required students to reference Biblical passages. I have talked with your principal about this and she has confirmed the alleged lesson.
>
> Your Professional Improvement Plan specifically requires you to refrain from your well known and long standing practice of inappropriately inserting your personal religious beliefs into the classroom and subjecting the children for whom you are responsible to those views. In addition, this practice has been the subject of various conferences and hearings over the last year or two at least.

(*See* Exh. 29, March 25, 2002 Letter).   Dr. Lorton requested a response and explanation justifying the assignment by April 5, 2002.  Id.

On April 3, 2002, Ms. Fountain and Mr. Perry gave Mr. Nichols his end-of-year evaluation.  (Exh. 24).  They rated his performance as "needs improvement" in three areas: Instructional Effectiveness, Scholarship/Knowledge, and Management Skills.  They rated his performance in the area of Professional Ethics/Interpersonal Relationships as unsatisfactory. Overall, they gave him an unsatisfactory rating.  Id.[10]

On April 5, 2002, Mr. Nichols responded to Dr. Lorton.  Mr. Nichols refused to justify the Easter assignment and instead invoked the "5th Amendment." When asked at the administrative hearing on his discharge to explain this reply, Mr. Nichols testified:

> Q [by Mr. Stellman]: ... But then my question is why when Doctor Lorton asked you to explain this particular assignment, you didn't give him a written response anywhere close to what you provided us today, but instead took the 5th Amendment?
>
> A [by Mr. Nichols]:   You know why I did that, sir?  I'm going to be perfectly candid with you as I was in my testimony on the State level.  I viewed Dr. Lorton's motive to be asking me to put in writing as an attempt on his part to get something down in black and white that he could ultimately use toward me….

(Exh. 11, pp. 165:20-21; 166:1-15).

On April 19, 2002, Dr. Lorton told Mr. Nichols that he intended to recommend to the Board that Mr. Nichols be terminated on the grounds of incompetency, neglect of duty and/or insubordination.  (*See* Exh. 30, April 19, 2002 letter).[11]  On May 8, 2002, Dr. Lorton advised Mr. Nichols of the recommendation and placed him on administrative leave.

---

[10] There were more observations in general during the 2001-2002 school year because the PIP was in place and Mr. Nichols was observed in the same manner as non-tenured teachers in order to carefully monitor his progress.  (Exh. 8, pp. 135:17-21; 136:1).

Mr. Nichols appealed the termination decision to the local board of education. Rather than have the matter heard before the local board, the parties agreed that the matter should proceed directly to the State Board, which referred the case to Maryland's Office of Administrative Hearings ("OAH"). On April 21, 2003, after a six-day hearing, Administrative Law Judge Michael J. Wallace issued a decision, holding:

> [Mr. Nichols] also asserted that his observations and evaluations were less than satisfactory only because he is African-American. Specifically, he stated that Ms. Fountain's evaluations were not favorable to the Appellant because of racial considerations, but I find this argument to be without merit. Ms. Fountain herself is also African-American. He further argued that Ms. Fountain's evaluations were less than satisfactory because she had a vendetta against the Appellant over a dating relationship that started and ended in 1975. Again, he provided no evidence in support of this assertion.
>
> The Board presented the testimony of Ms. Fountain as well as Mr. Perry, who I found to be inherently credible witnesses. Both stated that they conducted several observations and attempted to have numerous meetings with the Appellant but that the Appellant failed to improve his performance to any appreciable degree during the course of the year. They also stated and the evidence supports the fact that the Appellant was, for the most part, uncooperative with their attempts to critique his performance and their offers of suggestions to help improve his performance. I cannot find their evaluations were based on anything other than their respective objective observations of the Appellant's performance. As such, the Appellant's assertion that their observations and evaluations were arbitrary and capricious is without merit.
>
> \*      \*      \*
>
> Overall, the Appellant's work habits were not seen favorably. His teaching procedures and methodology needed improvement on many levels including instructional effectiveness, management skills and professional ethics/interpersonal relationships. His history also showed

---

[11]   Section 6-202 of the Education Article of the Annotated Code of Maryland provides, in relevant part:

Suspension or Dismissal of Teachers, Principals, and Other Professional Personnel: (a) Grounds and procedures for dismissal - (1) On the recommendation of the county superintendent, a county board may suspend or dismiss a teacher, … for: (i) immorality; (ii) Misconduct in office, . . . (iii) Insubordination; (iv) Incompetency; or (v) Wilful neglect of duty.

problems involving excessive disciplinary referrals of students, lack of control over classroom activities and the imposition of his personal religious beliefs on his students despite repeated warnings from school officials and direction to cease such activities.

(*See* Exh. 6, pp. 22, 27).  On July 23, 2003, the State Board affirmed the decision to terminate Mr. Nichols' employment.  (*See* Exh. 7).   Mr. Nichols once again chose not to appeal this ruling to the courts.

## II.
## STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56(c) summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue and to any material fact and that the moving party is entitled to judgment as a matter of law."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party moving for summary judgment is entitled to a grant of summary judgment if no issues of material fact remain for the trier of fact to determine at trial.  A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation.  Anderson, 477 U.S. at 248.

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact.  Anderson, 477 U.S. at 248-49. This burden "is particularly strong when that nonmoving party [also] bears the burden of proof." Pachaly v. City of Lynchburg, 897 F.2d 723, 725 (4th Cir. 1990).  The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).  See O'Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542, 545 (4th Cir. 1995), *rev'd on other grounds*, 517 U.S. 308 (1996).  "When a

motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56 (e).  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson, 477 U.S. at 252.

### III.
### ARGUMENT

**A.  DISCRIMINATION (Race):  Mr. Nichols has failed to meet his burden to establish that he was meeting the Board's legitimate expectations of performance or pretext.**

To establish a prima facie case of discriminatory discharge, Mr. Nichols must show that: (1) he is a member of a protected class; (2) he suffered from an adverse employment action; (3) at the time the Board terminated his employment he was performing at a manner that met his employer's legitimate expectations; and (4) the position was filled by a similarly qualified applicant outside the protected class.  King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003) (citing Brinkley v. Harbour Recreation Club, 180 F.3d 598, 607 (4th Cir. 1999)).  Mr. Nichols cannot prevail because he cannot prove that he was meeting the Board's legitimate expectations at the time of his discharge (or ultimately that the Board's decision was pretextual).

As set forth in elaborate detail above, during the 2000 - 2001 school year, both Ms. Fountain, an African-American, and Mr. Smith, a Caucasian, concluded that Mr. Nichols' performance was unsatisfactory.  They placed him on a second class certificate and offered him guidance through a performance improvement plan.  Mr. Nichols' performance remained unsatisfactory throughout the following year.  The Board has attached the various observations and evaluations of Ms. Fountain, Mr. Smith, and Mr. Perry concluding that Mr. Nichols'

performance was unsatisfactory. (*See* Exhs. 13 and 24).    The Board has further detailed Mr. Nichols' lack of cooperation through the PIP process, as reflected in the attached memoranda of Ms. Fountain.  (See Exhs. 17, 18, 19, 20, 21, 22, 23, and 26).  The State Board has upheld both the decision to place Mr. Nichols on second class certification and the decision to terminate his employment for incompetence, misconduct in office, and insubordination. (Exhs. 4 and 7).  The Board submits that these findings are sufficient to demonstrate conclusively that Mr. Nichols was not meeting the Board's legitimate expectations of performance.

The King case, as in the present case, turned on the plaintiff's inability to demonstrate this third factor -- that at the time of his discharge, the plaintiff was performing at a level that met his employer's legitimate expectations. Id.  In King, the plaintiff was a probationary teacher employed by the Department of Defense ("DOD").   During his employment King was reprimanded and counseled on multiple occasions by different supervisors for using profanity around students and belittling them.  Id. at 147.  Ultimately, one of King's supervisors concluded that King's job performance was inadequate.  After a subsequent unsatisfactory evaluation by a different supervisor, the DOD terminated King's performance.

King filed suit alleging that the DOD terminated his employment because of his race and in retaliation for his having filed a charge of discrimination.  The U.S. Court of Appeals for the Fourth Circuit ("Fourth Circuit") upheld the grant of summary judgment to the DOD.   The Fourth Circuit ruled that the DOD had offered substantial evidence that King was not meeting its legitimate job performance expectations, chronicling, in detail, King's poor performance and his supervisors' numerous concerns.  According to the court, King's response to the evidence was limited to his own claim of satisfactory employment and testimony from other teachers that King's lesson plans were no worse then theirs.  Id. at 149.  Neither testimony could sustain a

19

challenge to the DOD's proffer that King was not meeting its legitimate performance expectations.[12]  Because King could not establish that his job performance satisfied the DOD's legitimate expectations, he could not establish a prima facie case, and summary judgment was therefore appropriate.

In <u>Martin v. Montgomery County Public Schools</u>, 223 F. Supp. 2d 742 (D. Md. 2002), the U.S. District Court for the District of Maryland granted summary judgment to the Montgomery County Public School System ("MCPS") in regard to the claim of a probationary teacher whose contract was not renewed, allegedly because of racial discrimination.  The record had reflected that the plaintiff did not perform satisfactorily as a teacher.  On his first performance evaluation, the plaintiff received several "needs improvements."  In his deposition the plaintiff offered nothing more than his subjective opinion that the MCPS' performance evaluations were unfair.  <u>Id</u>. at 743.  These subjective opinions were insufficient to establish that his job performance was satisfactory and thus could not defeat summary judgment.  <u>Id</u>.

Mr. Nichols has not introduced any evidence, other than his own subjective opinion, to demonstrate that his performance met the Board's legitimate expectations.  Further contradicting his claim of race discrimination, Mr. Nichols' primary evaluator, Ms. Fountain, is African-American.  Ms. Fountain personally observed Mr. Nichols' performance on various occasions,

---

[12] King's own testimony was not sufficient to establish a genuine issue as to whether King was meeting the DOD's expectations.  <u>Id</u>. at 149 (citing <u>Evans v. Technologies Applications & Serv. Co.</u>, 80 F.3d 954, 960-61 (4th Cir. 1996) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." (citations omitted)).  The court noted that for King to establish that his work met the DOD's legitimate expectations of performance, he had to offer qualified expert opinion testimony as to (1) DOD's legitimate job performance expectations and (2) analysis and evaluation of King's performance in light of those expectations.  <u>Id</u>. at 149-50.

signed the unsatisfactory performance evaluations, and recommended his second class certification. Ms. Fountain eventually recommended that Mr. Nichols be terminated.[13]

Mr. Nichols testified at the State Board hearing that Ms. Fountain was the instigator of all of the alleged unlawful actions:

> Q [by Mr. Stellman]: I see. You believe that Mr. Perry and Ms. Fountain were setting you up for failure. Was that what you were concerned with?
>
> A [by Mr. Nichols]: Let me say this much. Mr. Perry came in on the end. In fact, he was not my supervisor when the decision was made to downgrade my second class certificate.
>
> Q: I understand. So he wasn't part of that fraudulent process, as you call it, was he?
>
> A: No, no, no. But Ms. Fountain was the instigator -- I saw [her] as the instigator.
>
> Q: You saw her as the instigator.
>
> A: The instigator of it all.

(*See* Exh. 32, Nichols' MSBE testimony, pp. 64:22-25; 65:1-8).

According to Mr. Nichols, Ms. Fountain did not seek to criticize his performance during the 1999-2000 school year when she was first appointed principal at CRMS because it would have been too "obvious." (Exh. 32, p. 963:2-23). The following colloquy then ensued:

> Q [by Mr. Stellman]: Continue that answer, why you believe, what motivation Janet Fountain had the second year after she was more comfortable as your boss to start to harass you.

---

[13] Mr. Nichols has alleged, without support, that Ms. Fountain was biased because of their dating relationship some 27 years ago. Even if the court were to find that Ms. Fountain was biased because of her prior relationship with Mr. Nichols, Mr. Nichols has not established that the alleged unfair treatment was based on his <u>race</u> or <u>gender</u>. The courts have held that a plaintiff cannot convert personal animosity into an actionable claim under Title VII. <u>See</u> <u>EEOC v. Reynolds Metal Co.</u>, 212 F. Supp. 2d 530, 535 (E.D. Va. 2002) (holding no Title VII action when the complained of conduct took place between two employees who had previously engaged in a consensual affair); <u>Succar v. Dade County Sch. Bd.</u>, 229 F.3d 1343, 1345 (11th Cir. 2000) (affirming district court's grant of summary judgment and holding that the defendant's harassment of plaintiff was not the result of the plaintiff's gender but because of her former intimate place in the defendant's life).

21

A [by Mr. Nichols]:  . . . I felt that she was again because of my race she was choosing a Caucasian man to do what I was doing which I was capable of doing. And I felt that because she was trying to accommodate his buddy that no, this is not right.  And for that reason that's why I felt that.

Q: I'm a little confused.  At first you said it was because of this axe that she had to grind.

A:  Yes, sir.

Q:  Which had to do with the dating relationship.

A:  Yes, sir.

Q:  But then you just said because of your race Ms. Fountain, who's an African-American --

A:  Uh-huh.  It's in my gut to respond in kind.  I've been conditioned, if you will, to respond in kind to any type of discriminatory action that I see as discriminatory.  And I don't care who it is imposing that action upon me.  I will respond in kind. . . .

(Exh. 32, pp. 964:22-25; 965:1-25; 966:1-5).

Mr. Nichols admitted that no one from the principal to the assistant principal to the Superintendent of Schools ever said anything to him to lead him to believe that his race played a role in the decision to downgrade his certificate or the decision to recommend termination.  (Exh. 11, p. 114:10-20).  He does not claim that anyone at the Board ever made comments evidencing discrimination or retaliation:

Q [by Mr. Stellman]:  Did Ms. Fountain ever make any statements to you during either of your last two years at Colonel Middle to indicate that she was unhappy because you had filed a lawsuit against the Board?

A [by Mr. Nichols]:  No.

Q:      Did Ms. Fountain make any statements at all indicating she was unhappy because of your practice of the faith, Jehovah Witness faith?

A:      No.

Q:      Did Ms. Fountain ever make any statements to you to indicate her displeasure because she preferred female teachers over male teachers?

22

A:      Not that I can recall.

Q:      Finally, do you have any recollection of Ms. Fountain making any statements derogatorily related to your race?

A:      No.  I can't remember any specific statements at this time that she made, no.

Q:      Had you ever heard any administrator, Board member, or official of the school board make any derogatory remarks regarding your race while employed at the Board of Education of Caroline County?

A:      No, I cannot.

(Exh.11, pp. 230:14-21; 231:1-15).

Mr. Nichols contends that the Board unfairly disadvantaged him by observing him outside of his certificated area (music).  Ms. Fountain testified without contradiction that there is no requirement that a teacher be observed more often in his/her area of certification than while teaching a class out of his/her area of certification.  (Exh. 8, p. 69:17-20).  The decision to observe and the decision as to which class to observe is made by the principal and/or the assistant principal.  (Exh. 11, p. 81:4-10).

As Dr. Lorton testified at his deposition in this case:

The purpose of the observation/evaluation process, the purpose of the professional improvement plan in Maryland . . .  the primary [reason for] the second class certificate along with all the other support that teachers are provided, both new and tenured, is to make the quality of classroom instruction better.  So the whole purpose of all of this stuff is really two fold:  One is to document the quality of what goes on in the classroom and where needed to improve, period.

(Exh. 10, p. 61:12-21).  In short, the evidence shows a teacher must be competent to teach in every area in which he/she teaches, regardless of the teacher's area of certification.  (Exh. 10, p. 65:4-9).  The Maryland State Board of Education so found in upholding Nichols' second class rating even though he was largely observed teaching non-music courses.  (Exh. 4, at p. 4).

23

The Maryland State Board of Education finding to that effect was reinforced during the following deposition testimony by former Superintendent Lorton:

> Q [by Mr. Charleston]:   To your knowledge, while you were at Caroline County either in your pre-superintendent position or in the superintendent's position, was there a practice or a policy that indicated that observations were to be done primarily in the field of certification of the teacher?
>
> A [by Dr. Lorton]: There is nothing written as far as I know that requires that. I think the expectation would be that observations would at least include that or should emphasize that portion of it, but the reality is that whatever a teacher is assigned is subject to the same standard. So whether it takes place in their certification or their adjunct class it really doesn't make any difference. The standards are the same.

(Exh. 10, pp. 166:13-21; 167:1-6).[14]

Mr. Nichols has pointed to the Board's treatment of Patrick Barrett as evidencing racial discrimination. Dr. Lorton approved a PIP for Mr. Barrett, a Caucasian teacher at CRMS. (Exh. 10, pp. 81:15-21; 82:1-2). Mr. Nichols contends that Mr. Barrett was afforded better treatment because he was placed on a PIP but did not have his certificate downgraded. (Exh. 11, pp. 145:12-19; 232:19-21; 233:1-21; 234:1-12).

> Q [by Mr. Stellman]:  So your principal concern, comparing yourself to Mr. Barrett, as I understand it, is that Mr. Barrett was given a Performance Improvement Plan but not placed on second class certificate status?
>
> A [by Mr. Nichols]:   Uh-huh.  Yes.  Yes.

(Exh.11, p. 234:8-12).

According to Dr. Lorton, Mr. Barrett protested his being placed on a PIP. However, Mr. Barrett was nearing retirement age and offered to retire at the end of the year, in return for the

---

[14] And the fact that an evaluation is subjective does not make it unlawful, as the Fourth Circuit found in <u>Vaughan v. Metrahealth Cos., Inc.</u>, 145 F.3d 197, 201-02 (4th Cir. 1998).

Superintendent agreeing to remove the PIP from Mr. Barrett's file.  (Exh. 10, pp. 83:6-21; 84:1-

14).  Dr. Lorton agreed:

> Q [by Mr. Charleston]:  Why did you agree to remove the PIP [for Mr.
> Barrett]?
> A [by Dr. Lorton]:  Well, at Mr. Barrett's request he offered -- and he and
> I talked.  We had met and talked at length and he basically asked that if he
> submitted his resignation which was really a retirement in his particular
> case and it was during the course of the implementation, so that he knew
> during the course of the year that he was going to retire at the end of the
> year and had planned to retire at the end of the year, that, in fact, if he did
> retire would I remove that from his file and I agreed to do that.  It was
> very similar to conversations that Mr. Nichols and I had in his situation as
> well.
>
> *       *       *
>
> Q:  And I think -- are there any other PIP's that you can recall approving
> other than those two?
>
> A:  No, sir.  The only ones I would see would be the ones where there is
> some contest, some difference of views.

(Exh. 10, pp. 84:2-14;85:1-5).  Clearly, Mr. Nichols has not stated a claim of disparate treatment

with respect to Mr. Barrett.  The Board chose not to follow through on corrective action with

regard to Mr. Barrett because Mr. Barrett offered to resign.  Dr. Lorton offered a similar deal to

Mr. Nichols:

> So yes, I called Mr. Nichols and asked him to come in and meet.  And I
> proffered an administrative leave with pay.  I proffered the concept of
> resignation, the opportunity to retire. . . I was trying to find a way to see if
> between a combination of opting for retirement, some extended leave with
> pay, that we could find a way to -- that he could find a way to perhaps opt
> out and leave gracefully, leave with dignity, leave with a reputation intact
> and avoid the very thing that we are involved here now.

(*See* Exh. 33, Dr. Lorton's State Board testimony, p. 767:3-15).

Unless Mr. Nichols can introduce sufficient evidence of his satisfactory performance

during the relevant school years, he cannot proceed on any of his Title VII claims (race, religion

or gender).  His own perception of his performance is not relevant for these purposes.  King, supra; Evans, supra.  Surely, there is nothing in the record to suggest that Ms. Fountain, Mr. Smith, Mr. Perry, and Dr. Lorton did not truly believe that Mr. Nichols' performance was unsatisfactory.  Furthermore, it is not the court's duty to second guess the propriety of the Board's legitimate nondiscriminatory reason, as long as the proffered reason is not false. DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998).

Assuming arguendo, that Mr. Nichols could establish that his work performance did meet the Board's expectations, he has utterly failed to meet his burden to demonstrate that the Board's articulated reasons for its employment actions were pretextual.  The U.S. Supreme Court clarified the plaintiff's burden at the pretext stage in Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000), reiterating that evidence of pretext, combined with the plaintiff's prima facie case, does not compel judgment for the plaintiff because "[i] is not enough . . . to disbelieve the employer; the fact finder must [also] believe the plaintiff's explanation of intentional discrimination."  Id. at 146 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993)).  The Reeves Court did note that, under the appropriate circumstances, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  Id.  This clearly is not such a case.  Mr. Nichols has presented no evidence to suggest that the Board's reason for terminating his employment for poor performance was a pretext for unlawful discrimination, much less racial discrimination.

**B. DISCRIMINATION (Religion):  Mr. Nichols has failed to meet his
burden to establish discrimination based on religion or that the
Board's prohibition against discussing topics with "religious overtones"
violated Title VII.**

Mr. Nichols alleges that the Board subjected him to adverse action, including discharge,

for discussing religious matters in the classroom.  He alleges that the Board violated Title VII by

including in his PIP an admonishment to "refrain from discussion of topics that have religious

overtones."  (Amended Complaint ¶ 16).  Mr. Nichols alleges that no other teacher was under a

similar restraint.  Id.

To prove a claim of religious discrimination under the disparate treatment theory, Mr.

Nichols must demonstrate that the Board treated him differently than other employees because of

his religious beliefs.  Chalmers v. Tulon Co. of Richmond, 101 F.3d 1012 (4th Cir. 1996).   The

evidentiary burdens placed on the employee under this theory mirror those placed on employees

alleging employment discrimination based on race or sex.  Id. at 1017.   Accordingly, to satisfy

his burden at the summary judgment stage, Mr. Nichols must establish that his job performance

was satisfactory and provide "direct or indirect evidence whose cumulative probative force

supports a reasonable inference that [the] discharge was discriminatory."  Id. (citing Lawrence v.

Mars, Inc., 955 F.2d 902, 905-06 (4th Cir.), cert. denied 506 U.S. 823, (1992)).

Absent direct evidence of discrimination, an employee may use the burden-shifting

scheme as set out in McDonnell Douglas v. Green, 411 U.S. 792 (1973).  This might consist of

evidence that the employer treated the employee more harshly than other employees of a

different religion, or no religion, who had engaged in similar conduct.  See Chalmers at 1017.

Mr. Nichols' claim of religious discrimination must fail because he cannot demonstrate that the

Board took action against him because of his Jehovah's Witness faith.  The fact remains that the

Board has established that Mr. Nichols was not meeting the Board's standards therefore, Mr. Nichols cannot meet his prima facie burden.

Furthermore, the Board has given Mr. Nichols great latitude with regard to his religious practices in the classroom. Mr. Nichols had a table in his classroom in which he was allowed to display religious materials, including a Bible, the Watchtower, and Wake magazine. (Exh. 11, pp. 121:17-21; 122:1-21). He viewed the table as his own personal reading spot, yet it was a card table in the back of the room, behind his desk, much like other teachers used for student reading materials. (Exh. 11, p. 122:1-21). The table was in full view of students who could see its contents if they were standing at Mr. Nichols' desk. (Exh. 11, p. 123:2-16). On one occasion he even offered religious material to a student:

> Q [by Mr. Stellman]: Did you ever offer such material to the students either during class or after class?
>
> A [by Mr. Nichols]: There was . . . one incident that I recall wherein this student came to me and was very distraught about her situation. She had lost a very close relative. And I was so moved with the look on her face, and the despondent look and the downtrodden look. I believe I offered her at that time a tract, in as much as, you know, I had observed her having adopted a sense of Christianity or what have you or being a very Christian-oriented type person. I offered her this tract.

(Exh.11, pp. 122:21; 124:1-11). When pressed Mr. Nichols later admitted that looking back, it was the wrong thing to do. (Exh. 11, pp. 124:21; 125:1-9).

Still, Mr. Nichols admits that the Board did not prohibit him from practicing his religion.

> Q [by Mr. Stellman]: Did anybody in the school, from the Vice-Principal to the Principal to the Central Office ever say to you at any time that they were going prohibit or discourage you from the table, from having literature on the table?
>
> A [by Mr. Nichols]: No, they did not. Nobody that I recall told me to get rid of the table or get rid of the material, whatever. I don't recall.

Q:  No one ever told you that you couldn't quietly read the literature that
you brought with you about your faith on your own free time even if [in]
school, correct?

A:  No.  Nobody told me that.

(Exh. 11, p. 127:7-18).

The Maryland State Board of Education addressed the allegations of religious
discrimination.  In that proceeding, Mr. Nichols asserted, as he does here, that the Board was
engaging in a pattern of religious discrimination by directing him not to make any statements in
his classes that had a religious overtone.  (Exh. 6, p. 23).  He asserted that it was not illegal to
provide instruction about religious music and that other teachers who said the Pledge of
Allegiance or quoted religious figures like Solomon violated this prohibition and were not
sanctioned.  Id.  The State Board found that the evidence established that Mr. Nichols had a
history of infusing his personal religious beliefs into his lessons and assignments that had little or
no relation to music.  Id. at 24.  The particular Easter assignment "had nothing to do with
religious music and everything to do with the Appellant advancing his own religious beliefs in
the classroom."  Id. at 25.  The State Board thus concluded:

> Considering this in the wake of repeated warnings to keep religious
> instruction out of the classroom including the insertion of a provision in
> the [Performance Improvement] Plan to this effect, I can only view the
> Appellant's actions to be a willful neglect of duty and an act of
> insubordination.

Id. at 25.

At deposition, Mr. Nichols could identify only two instances of teachers who discussed
religion in the classroom and were not disciplined.  One incident involved Dr. DeWitt, a reading
consultant who, during the course of Mr. Nichol's health and nutrition class, had a student recite
the "serenity prayer" ("God grant me the serenity to accept the things I cannot change, and the

courage to change the things I can") (Exh. 11, pp. 130:10-19; 131:1-18). Mr. Nichols could not

recall the context in which Dr. DeWitt discussed the serenity prayer or how it was woven into the

fabric of the lesson. (Exh. 11, p. 133:9-16).

The second incident that Mr. Nichols is aware of involves the history teacher (Harry

Hopkins) in a nearby classroom. Mr. Nichols recalled Mr. Hopkins "mentioning some matters

relating to the Muslim religion" during the 2000 - 2001 school year. (Exh. 11, p. 136:2-10). Mr.

Nichols assumes that it was discussed as a religious historical phenomenon. (Exh. 11, pp.

137:17-21; 138:1). He is not aware of any other teachers discussing religion in the classroom.

(Exh. 11, pp. 138:4-8; 139:16-20).

In Dr. Lorton's view, the prohibition in the PIP was meant "simply not to infuse lessons

with a singular religious view." (Exh. 10, p. 105:13-14; Exh. 16).

> It doesn't necessarily suggest and I don't think anybody ever, ever
> suggested there is not a place for the use of non secular topics and themes,
> and in this case music in lessons, but it cannot and should not be used in a
> way that provides a singular view, singular perspective . . .

(Exh. 10, p. 105:15-21). This instruction arose out of Mr. Nichols' heavy reliance on Christian

music and themes as part of his lesson plans and homework during Easter. (Exh. 10, p. 110:6-

21). Dr. Lorton testified, "The fundamental issue is the appropriateness of the use of the, what

Christians call the Easter event, [to] the exclusion of any other major religious observance in the

implementation of a public school classroom lesson." (Exh. 10, p. 116:13-17). As Dr. Lorton

observed, "[t]here are all kinds of religious observances, both Christian and non-Christian that as

far as I knew had not been part of, were not part of and were never given comparable recognition

by Mr. Nichols in his classroom." (Exh. 10, p. 117:18-21; 118:1).

Mr. Nichols admitted that his assignment asked students to describe and discuss their vision with respect to the crucifixion and resurrection, and to quote biblical sources and identify those sources.  (Exh. 11, p. 157:3-10).  He told the students to make a list of sacred songs and suggested that they go to their songbooks in their home, church, or house of worship.  (Exh. 11, p. 161:14-21).[15]  Mr. Nichols also discussed religious music at Christmas, going into a discussion of Christmas music and other religious observances.  (Exh. 11, p. 163:9-21).

> Q [by Mr. Stellman]:  At either Christmas or Easter, did you address the other co-religious holidays then occurring?
>
> A [by Mr. Nichols]:   Like?
>
> Q:      Hanukkah, Passover, Kwanzaa?
>
> A:      Yes, we mentioned those at Christmas time.   There is the Hanukkah situation with kids and there is Passover when Easter comes around.   Then we look at some of the things that are entailed in observing Passover.   What was Passover all about, what happened, you know, the death angel passed over the houses that were marked with blood, you see, and kids go out with a better idea of what these things mean.  If they were to come in contact with a person who was practicing Judaism, they would know that this individual, they could appreciate the fact that this individual celebrates Passover, and they know what Passover is all about.  They have a better understanding of the individual.   That is what education is all about.  You see, religion has divided a number of people down through the centuries.
>
> Q:      You weren't teaching a course in comparative religion, were you?
>
> A:      No, I wasn't.

---

[15] The assignment was described as follows at the State Board hearing:

Q [by Mr. Stellman]:  But on the other hand, do you recall providing a homework project on the spring of 2002 on the topic of Easter, asking what the purpose of the holiday is and why we celebrate Jesus rising from the dead, and then asking the children to explain their families' traditions about how they celebrate Easter with a reading assigned from the bible. Do you recall that assignment?

A [by Mr. Nichols]:  I recall making that assignment. That cannot be denied.

(Exh. 32, p. 79:5-13).

(Exh. 11, pp. 164:8-21; 165:1-9).  Mr. Nichols was aware of parent complaints regarding the assignment.  (Exh. 11, pp. 173:4-6; 312:13-19):

> Q [by Mr. Stellman]:  You agree that when you gave the assignment about the Easter holiday, there were complaints that were lodged by some parents and/or students to the administration?  Do you agree?
>
> A [by Mr. Nichols]:  As a result of that assignment being given?
>
> Q:  Yes.
>
> A:  Yes.

(Exh.11, p. 312:13-19).

Mr. Nichols cannot prevail on his Title VII claim.  The Board had a right to impose a restriction on Mr. Nichols' teaching a singular religious view in his classroom.  Sante Fe Independent School District v. Doe, 530 U.S. 290 (2000); Lee v. Weisman, 505 U.S. 577 (1992) (prohibiting religious observances in public school based upon the Establishment Clause and the coercive nature of such observances or exercises).  He has not identified any other teacher who has given an assignment comparable to his Easter assignment whom the Board did not discipline. Not only did Mr. Nichols give this assignment in 2000- 2001 but, despite the Board's explicit instructions, and parent complaints, he gave the assignment again in 2001 - 2002.  The Board was thus warranted in imposing the restriction on Mr. Nichols and in disciplining him when he ignored it without justification.

### C.  DISCRIMINATION (Sex):  Mr. Nichols has failed to meet his burden to  establish discrimination based on sex.

The standard of proof for gender discrimination under Title VII is the same standard as set forth in the preceding sections.  Mr. Nichols apparently alleges that Ms. Fountain took adverse action against him because of his gender.  For the reasons stated above, Mr. Nichols

cannot establish his prima facie case of discrimination and summary judgment is appropriate on this count as well.

### D. RETALIATION:  Mr. Nichols has failed to demonstrate any causal connection between protected activity and the adverse action.

To establish a prima facie claim of retaliation in violation of Title VII, a plaintiff must show that: (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action.  See Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989); Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994).  Once this is shown, the burden is on the employer to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions. Id.  The plaintiff must then demonstrate that the employer's reason was mere pretext for retaliation by proving both that the reason was false, and that discrimination was the real reason for the challenged conduct.  Jiminez v. Mary Washington College, 57 F.3d 369, 377-78 (4th Cir.), cert. denied, 116 S. Ct. 380 (1995) (quoting St. Mary's Honor Ctr. v. Hicks, 508 U.S. 502, 515 (1993)).  The plaintiff always has the ultimate burden of persuading the trier of fact that the defendant engaged in retaliatory conduct.  Beall v. Abbott Laboratories, 130 F.3d 614 (4th Cir. 1997).

Mr. Nichols alleges in the Amended Complaint that he first filed charges of discrimination with the Equal Employment Opportunity Commission in June 1999.  (Amended Complaint ¶ 7).  Mr. Nichols then alleges that the retaliation began in January 2001, when his superiors first began to observe him in areas outside his area of certification.  (As addressed above, the Maryland State Board of Education found no fault with the Board's observing Mr. Nichols in areas outside of his area of certification.  (Exh. 4)).

33

The evidence establishes that when Ms. Fountain arrived at CRMS she was aware of Mr. Nichols' federal court suit. Yet according to Mr. Nichols, Ms. Fountain waited a full school year before she began to retaliate against him. According to Mr. Nichols, the first year went "just fine." (Exh. 32, p. 963:9-13). But, he testified that he understands how people work and "you can't go right into a situation all of the sudden and attack someone initially" because it is "too obvious." (Exh. 32, p. 963:19-23). It is difficult to understand whether Mr. Nichols contends that Ms. Fountain took action against him because of the lawsuit or because she was still holding a flame for him. Id. In any event, the length of time between his filing of the EEOC charge and the purported retaliatory events is sufficiently long as to weaken any inference of causation. See King v. Rumsfeld, at 151 (King's firing came two months and two weeks after the DOD received notice of the EEOC charge and such time was "sufficiently long so as to weaken significantly the inference of causation between the two events").

Once the Board has proffered a legitimate, non-retaliatory discharge motive -- that Mr. Nichols was not meeting its job performance expectations -- the burden shifts back to Mr. Nichols to demonstrate pretext. King at 151 (citing Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir. 1980) (following the employer's proffer of a legitimate, non-retaliatory reason for an adverse employment action the burden of persuasion remains with the plaintiff to prove that the employer's reason is pretext, a cover-up for retaliation)). In King, the court concluded that the plaintiff had not proffered evidence to sufficiently demonstrate retaliatory intent and to establish that the unrebutted poor performance discharge motive was pretext. Id. at 154.

Mr. Nichols asserts that the Board set him up to fail by observing him in a health and nutrition class as opposed to a music class, thus establishing pretext. As stated above, the Maryland State Board of Education upheld the Board's observation/evaluation process as

34

compliant with State law. A teacher should be competent in every class in which he teaches. There is no evidence to support the conclusion that Ms. Fountain observed Mr. Nichols in the health and nutrition class in retaliation for his engaging in protected activity. Mr. Nichols cannot demonstrate pretext; therefore, summary judgment is appropriate.

> ### E.  FIRST AMENDMENT:  Mr. Nichols has not stated a claim under the First Amendment because he has not alleged that he engaged in protected speech.

To prevail on his First Amendment retaliation claim, Nr. Nichols must show (1) that he engaged in protected expression regarding a matter of public concern;  (2) that his interest in First Amendment expression outweighs his employer's interest in efficient operation of the workplace;  (3) that he was deprived of some valuable benefit;  and (4) that a causal relationship exists between his protected expression on matters of public concern and the loss of the benefit. Peters v. Jenney, 327 F.3d 307, 322-23 (4th Cir. 2003) (citing Goldstein  v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 351-52 (4th Cir. 2000);  Huang v. Board of Governors of the Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir.1990)).  The "causal relationship" inquiry focuses on whether Mr. Nichols would have been terminated 'but for' his protected speech and involves two steps.  In the first step, the employee bears the burden of establishing the requisite causation to prove that the protected speech was a motivating factor or played a substantial role in inducing the adverse action.  See Hall v. Marion Sch. Dist. No. 2, 31 F.3d 183, 193 (4th Cir. 1994).  "If the employee is able to prove such, the second step shifts the burden to the employer to put forward evidence that it would have [taken adverse action] even in the absence of the protected speech."  Id.

The initial question for the court in deciding a public employee's entitlement to the protection of the First Amendment is whether his speech addresses a matter of public concern.

Erskine v. Board of Education, 197 F. Supp. 2d 399, 404 (D. Md. 2002) (citing Seemuller v.

Fairfax County School Board, 878 F.2d 1578, 1581 (4th Cir. 1989).  The speech of public

employees "upon matters only of personal interest" is not protected by the Constitution.  Id.  A

communication made "in the course of carrying out legitimate job duties" is not of public

concern.  Id. at 405.  See Connick v. Myers, 461 U.S. 138 (1983); Waters v. Churchill, 511 U.S.

611 (1994).

Mr. Nichols believes that the Board violated his First Amendment right by restricting him

from discussing religion in the classroom:

> Q [by Mr. Stellman]:  In the Complaint, the Federal Complaint that you
> filed, Exhibit 7, you allege that Defendant's adverse treatment violated
> your right to freedom of speech as protected by the 1st Amendment.
> What is the basis of that claim, freedom of speech?
>
> A [by Mr. Nichols]:    That has to do with the mentioning of anything that
> has religious overtone to it.   That is the basis of that particular claim.    It
> not only violated the 1st Amendment, but also, it was in violation of the
> negotiated agreement.  I don't have a copy of it here.  I think it is 4-point
> something in the negotiated contract where academic freedom is
> expressed, and teachers are allowed to say basically anything that they
> want to say to, of course, achieve the overall objective of their lesson.
> Here I was being prohibited from doing that, which again was in violation
> of the Board's own non-discrimination clause.

(Exh. 11, pp. 311:16-21; 312:1-12).

The undisputed record shows that Mr. Nichols gave an Easter lesson in 2000 - 2001

which prompted parent complaints.  Keeping in mind that Mr. Nichols was a general music

teacher, his choosing to teach a religious Easter class was not a matter of public concern and was

not consistent with the Board's approved curriculum.  Mr. Nichols did not have a right to impose

lessons that contradicted the Board's educational purposes.  As the court held in Newton v. Slye,

116 F. Supp. 2d 677, 684 (W.D. Va. 2000):

> Public school officials have control of the curriculum of the school irrespective of teachers' First Amendment rights.   Teachers may not claim constitutional rights in order to take control of the curriculum.   See Boring v. Buncombe County Bd. of Educ., 136 F.3d 364, 369 (4th Cir. 1998).   In Boring, the court found that a teacher's selection of a school play was curriculum related.  Thus, it did not involve a matter of public concern, and therefore was not First Amendment protected speech.   The Fourth Circuit acknowledged that "schools are typically not public forums" and unqualifiedly joined the Fifth Circuit in concluding that: "Although, the concept of academic freedom has been recognized in our jurisprudence, the doctrine has never conferred upon teachers the control of public school curricula."   Id. at 369 (quoting Kirkland v. Northside Indep. Sch. Dist., 890 F.2d 794, 800 (5th Cir. 1989)).

Id. at 684.  Mr. Nichols did not have a First Amendment right to give an Easter assignment asking his music students to describe their thoughts on the crucifixion and resurrection of Christ, or compelling even non-Christian students to quote, chapter and verse, from the New Testament. The assignment was in no way Constitutionally-protected speech.   See Wiley v. Franklin, 468 F. Supp. 135, 151 (E.D. Tenn. 1979) (court found that assigning the Bible as part of a public school curriculum plainly crossed the Establishment Clause line by "tending to advance the Christian religious faith" and "tend[ing] to inhibit other religious faiths").

## IV.
## CONCLUSION

WHEREFORE, Defendant Caroline County Board of Education respectfully requests that its Motion for Summary Judgment in this matter be granted.

_____/s/_____
Leslie Robert Stellman
(Federal Bar No. 1673)

_____/s/_____
Steven B. Schwartzman
(Federal Bar No. 04686)
HODES, ULMAN, PESSIN & KATZ, P.A.
901 Dulaney Valley Road - Suite 400
Towson, Maryland  21204
410-339-6746
410-938-8909 fax

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NORMAN L. NICHOLS, JR.                    *

     Plaintiff                              *

v.                                        *    CIVIL NO.  JPM02CV3523

CAROLINE COUNTY BOARD                     *
OF EDUCATION
                                          *
     Defendant                             *

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## **ORDER**

UPON CONSIDERATION of the Motion for Summary Judgment and Memorandum in Support filed on behalf of Caroline County Board of Education, any opposition thereto, good cause having been shown, it is this ___ day of _____, 2003, ORDERED:

That said Motion be and the same hereby is GRANTED, and that this case be and hereby is DISMISSED.


_____
The Honorable J. Frederic Motz
United States District Court Judge