**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **NORMAN L. NICHOLS, JR.** | : | |
| | : | **Civil Action No.** |
| | | **JFM-02-CV-3523** |
| **Plaintiff** | : | |
| **v.** | : | |
| | : | |
| **CAROLINE COUNTY BOARD** | : | |
| **OF EDUCATION** | : | |
| **Defendant** | : | |
| | : : : | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Norman L. Nichols, Jr., by his undersigned attorney, respectfully files this Opposition to Defendant's Motion for Summary Judgment.

## I.    INTRODUCTION

Plaintiff brought this action in October, 2002 alleging violations of Title VII of the 1964 Civil Rights Act as amended 1991, 42 U.S.C. 2000e et seq. ("Title VII") and violations of his rights to freedom of speech and religion under the First Amendment to the United States Constitution.

Defendant has now filed a Motion For Summary Judgment with respect to all of Plaintiff's claims. In its moving papers, Defendant has included various administrative rulings issued against Plaintiff as he administratively defended himself against the unfair treatment from certain of Defendant's administrators and employees. While the Court is not precluded from considering these rulings, neither is the Court bound to take them into account. In that regard, Plaintiff would respectfully request that they be of no influence on this Court's reflections on the

instant motion for the primary reason that Plaintiff was not represented by counsel during those proceedings due to financial constraints.

For the reasons set forth below, genuine issues of material facts clearly exist as well as issues of motive and intent, which a jury must be allowed to decide, and the motion for summary judgment must be denied.

## II.  **FACTUAL  BACKGROUND**

The following facts are supported by either Plaintiff's Declaration (Pl. Exh 1) or Exhibits, or the Defendants' Exhibits. While many facts are in agreement, there are clearly significant material facts in genuine dispute, thereby defeating Defendant's efforts to avoid having a jury hear these facts.

Plaintiff Norman Nichols is a fifty-nine (59) year old African-American male resident of Federalsburg, Maryland. Having been born and reared in Caroline County, he became a member of the Jehovah's Witness religion and has been a member since 1991.

From September, 1967 until April 24, 2003, he was a full-time teacher with the Caroline County School Board of Education ("Board"). Initially certified to teach music in grades 7-12, he subsequently received his certificate to be an administrative supervisor in 1980.

On a continuing basis throughout his tenure with the Board, the Board, through its agents, officers, and employees engaged in different actions against Plaintiff, which were based upon unlawful considerations of race, sex and/or religion and denial of freedom of speech. The first of these instances occurred at the end of the 1968-69 school year when the Principal of Colonel Richardson High School rescinded his decision to allow the Plaintiff to dedicate a song at graduation to a female African-American teacher who had taught at Colonel Richardson for sixteen (16) years and who died during the school year. This would have involved merely

putting seven (7) words under the selection that was to have been sung at the graduation services. The deceased was the high school music teacher and mentor of the Plaintiff.

Moreover, as will be clearly shown throughout this Opposition, in its dealings with Mr. Nichols, the Board and/or now retired Superintendent Larry Lorton has consistently violated the Board's own rules and regulations as well as the Education Article of the  MD Anno. Code and the Code of Maryland Regulations "COMAR".

Beginning in September, 1998, Plaintiff was required by his principal at Colonel Richardson Middle School (Deborah Chance – Caucasian female), to present a doctor's note for an accumulated sick day taken while at least one similarly situated white male employee was not required to do so. On June 21, 1999, as a result of this requirement and other actions taken by Charles Petrick, assistant principal (white male), Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination on the basis of his race. After receiving a Notice of Right To Sue on or about August 6, 1999, Plaintiff filed a lawsuit in this court against the Board (Nichols v. Board of Education of Caroline County, 123 F. Supp. 2d 320 (D. Md., 2000). On November 28, 2000, the Honorable Alexander Harvey granted the Board's motion for summary judgment, thereby dismissing Plaintiff's claims. (Def. Exh. 1). The Fourth Circuit Court of Appeals affirmed this decision on August 7, 2001. (Def. Exh. 2).

Following Judge Harvey's decision, the Board requested that he impose sanctions against Plaintiff in the form of attorney's fees. The request was denied. (See Pl. Exh. 2).

In September, 1999, Janet Fountain, an African-American female, was appointed principal of Colonel Richardson Middle School by Superintendent Larry Lorton. She hired Robert Eugene Smith, a Caucasian male, as her assistant principal. (Pl. Exh. 3, Fountain Depo., p. 22). Ms. Fountain believed Mr. Smith was

probably aware of Plaintiff's then pending lawsuit against the Board. (Pl. Exh. 3, Fountain depo., P. 23.)

Plaintiff was initially pleased with Ms. Fountain's replacing Ms. Chance because he had known her for a long time both socially and professionally, and fully expected fair treatment from her as opposed to any retaliation for filing his charge of discrimination and lawsuit against the Board. As will be shown later in this Opposition, her "fair" treatment ended after his lawsuit was dismissed. Plaintiff recalls on at least one occasion discussing his pending lawsuit with her, but he was under the impression she was already aware of it, (as well as other administrators and teachers). Ms. Fountain admitted in her deposition that she became aware of Plaintiff's 1999 federal lawsuit while it was pending because among other things she had to gather materials to help the Board's respond to the lawsuit. (See Pl. Exh. 3, Fountain depo., p. 17-19).

From time to time during his tenure, the Board would assign teachers to teach classes outside of their areas of certification as well as those within their areas of certification. During the decades of the 1970's and 1980's, Mr. Nichols was assigned courses outside his area of certification (music). In the 1990's, he was only assigned to teach music courses until the 1999-2000 school year.

At the beginning of the 1999 – 2000 school year (while Plaintiff's 1999 federal court case was still pending), he was assigned to teach music (his specialty) and computer literacy. The previous year he taught all music courses.

As part of the procedure to determine the adequacy of a teacher's performance, Board policy required the principal (or a designee) to conduct "observations" of each teacher in the system during each school year. During the 1970's and 1980's, when Mr. Nichols was assigned to handle courses both within and outside his area of certification, he had always been observed solely in his area of certification. (See Pl. Exh. 4 – Observation from 1980, etc.). As indicated

previously, Mr. Nichols taught only music during the 1990's – hence he was observed only in music during that period.

In addition, Board of Education policy and/or practice only required a minimum of three (3) observations for a tenured teacher. (Pl. Exh. 5).

During the 1999-2000 school year (while Plaintiff's 1999 federal court lawsuit was pending), the classroom observations of his teaching style and content changed. He was observed two [2] times in music and one [1] time in computer literacy). (Def. Exh. 13). Although he received basically positive ratings (as had always been the case), he states in his Affidavit that he began to feel that the climate for him had not significantly changed with the change in principals (especially since the observation policy had changed towards him).

At the end of the 1999 – 2000 school year (again while Plaintiff's 1999 federal court lawsuit was pending), he received a satisfactory final evaluation. (Def. Exh. 13).

Despite the fact that he was rated satisfactory in the computer literacy class during the 1999-2000 school year, he was reassigned by Ms. Fountain to teach health and nutrition (along with music) for the 2000-2001 school year. Fountain's explanation for switching him from the computer literacy class was that some of his students said his class was "not interesting and too rigid… " and not fun".(Pl. Exh. 3, Fountain depo. p. 43, 46). The person selected to replace Plaintiff was John Barrett, a Caucasian male who had previously taught the course. (Pl. Exh. 3, Fountain depo., p. 52-54). This action made the Plaintiff feel that he was not competent to teach computer literature and that it was the old issue of a Caucasian being chosen over an African-American that came to the foreground in Plaintiff's mind. Ms. Fountain made the change even though she was aware that Plaintiff had made computer literacy part of his professional development plan for the next five (5) years. When Plaintiff

brought this to her attention, Ms. Fountain responded he would just have to change his plan. (See Pl. Exh. 1- Affidavit).

The Plaintiff maintains the transition from computer literature to health and nutrition would have been more understandablel if he had ill-performed during the 1999-2000 school year in the computer literature area. However, as the record shows, Plaintiff met or exceeded all expectations according to the 1999-2000 evaluation rating form. (Def. Exh. 12). In addition, Ms. Fountain never observed Plaintiff in computer literature, but instead based a decision to change him on alleged complaints from one or more students that the course was not "fun". (See Pl. Exh. 3, Fountain depo., p. 43.)

Plaintiff's first observation for the 2000-2001 school year did not occur until January 5, 2001, about one and one-half (1&1/2) months after his federal lawsuit was dismissed, and approximately three (3) weeks after Judge Harvey denied sanctions to the Defendant. (Pl. Exh. 2). This first observation was in Health and Nutrition, and he was given 19 satisfactory ratings, 6 "needs improvements", and no unsatisfactory ratings. (Def. Exh. 13).

On February 21, 2001, Mr. Nichols was observed again in Health and Nutrition, and given 23 satisfactory ratings, 2 "needs improvement "and no unsatisfactory ratings. Ibid.

On April 2, 2001, he was finally observed in his certificated field, music. He was given 21 satisfactory ratings, 4 "needs to improve" and no unsatisfactory ratings. Ibid.

On May 21, 2001, Mr. Nichols was given a fourth observation (in health and nutrition), and he was given 16 satisfactory ratings, 9 needs to improve and no unsatisfactory ratings. Ibid. This fourth observation was contrary to previous Board policy and practice in two ways: Mr. Nichols, a tenured teacher, was observed four (4) times instead of three (3); of these four observations, only one was in his area of

certification. Additionally, in this observation, he was criticized for not having a "daily" lesson plan. Mr. Nichols explained to Asst. Principal Smith (the assistant principal who conducted the observation) that he had a plan and had inadvertently left it at home. He never asked Mr. Nichols to bring the plan to him to verify its existence. The Observation made by Mr. Smith on May 21, 2001, which was out of the Plaintiff's certified area, was cited in the MD. State Board of Education Opinion No. 02-11 (Def. Exh. 4), thus giving the appearance that the areas needing improvement/unsatisfactory were areas noted for the entire year. This implication is false, inasmuch as the other observations for that year verify otherwise (Def. Exh. 13).

It should be noted that in her deposition, Ms. Fountain acknowledged that a downgrading of a teacher should be in the area in which he is certified. (See Pl. Exh. 3, Fountain Depo., p. 105). Yet, Ms. Fountain observed this Plaintiff primarily out of his area of certification during the 2000-2001 school year and subsequently downgraded his certificate in music based upon the observations and put him on a Professional Improvement Plan ("PIP").

The "needs improvements" made in each of these observations were misleading and simply designed to pave the way for Plaintiff's ultimate loss of employment. During each of these observations, Plaintiff performed and taught in the same manner and style with which he had engaged for over thirty (30) years with some modifications made along the way. If his style and manner were inadequate (which Plaintiff strongly contends they were not), why was he not informed earlier in his career so he would have had an opportunity to correct them before 2000-2001? The opportunity for the Defendant to note and require him to do so had always been there, if there had been a legitimate concern on the part of the Defendant.

Despite the fact that based upon the above observations, Mr. Nichols performance was overwhelmingly satisfactory (79 satisfactory ratings, 21 "needs to

improve", and zero unsatisfactory ratings), for the first time in his thirty (30) year career, Mr. Nichols received an unsatisfactory evaluation rating. Ms, Fountain and Dr. Lorton then used the unsatisfactory ratings to place him on an extremely detailed, gruesome and humiliating six (6) page Performance Improvement Plan (PIP) also for the first time in his career. (See Def. Exh. 16).

Not content with giving Plaintiff an unsatisfactory rating, Dr. Lorton and Ms. Fountain then took the unprecedented action of downgrading his teaching certificate (in music) from first class to second class based upon observations made primarily out of his area of certification. Ms. Fountain admitted in her deposition in this case that the downgrading of Mr. Nichols' certificate allowed her and Dr. Lorton to treat him like a non-tenured teacher during the 2001-2002 school year and require him to undergo eight (8) observations as opposed to the five (5) to which tenured teachers on a second class certificate were subjected. (Pl. Ex. 3. Fountain depo., p. 134-135, 139). Ms. Fountain admitted in her deposition that any downgrading of Plaintiff would have to be in his certification field – music. (See pl. Exh. 3, Fountain depo,. p. 105). Yet the downgrade resulted in Plaintiff being placed on a PIP which was based upon observations made primarily out of his area of certification. (See Pl. Exh. 3, Fountain depo, p. 104-105).

Plaintiff appealed the downgrading of his certificate to the Board. The Board upheld the downgrading. And in so doing, violated his substantive due process rights to a fair and impartial hearing. For example, the hearing officer selected by the Board to preside over Plaintiff's appeal was from the same law firm (Miles and Stockbridge) which represented the Board in the 1999 case brought by Plaintiff in federal court. Clearly, he could not have been an objective, unbiased hearing officer. (See Def. Exh. 3).

Moreover, the downgrading of Plaintiff's certificate was done in blatant violation of both State of Maryland and Board's rules, regulations and past practices

and policies. For the first time in the history of the Caroline County Board, a teacher's certificate was downgraded based upon classroom observations outside his field of certification. The downgrading was upheld by the State Board of Education without allowing Plaintiff to be heard on a contested case basis, thus precluding discovery. If the Board's action is allowed to stand, the certification rights of all teachers in Caroline County as well as the State, will be greatly impacted. This simply cannot be allowed to happen. (See Pl. Exhs 1, 28 and 29).

As a result of having his certification downgraded to second class, Plaintiff was denied an incentive bonus of $2,000 at the end of the 2000-2001 school year and every year thereafter. Based upon the evidence provided in this case, this was the first time in history that a tenured teacher in Caroline County had been placed on a PIP and had his certificate downgraded at the same time. In May, 1991, a similarly situated teacher, Craig Henry (Caucasian male, and who had not filed a discrimination complaint against the Board) received the same rating numbers as Plaintiff (2,2,2,3) and while he was placed on a PIP, his certificate was not downgraded. (Pl. Exh. 16).

One of the reasons given for Plaintiff's unsatisfactory evaluation and loss of first-class certification was that he had engaged in a discussion of religion in his classroom. In fact Plaintiff had utilized religious topics in previous years (especially in his music courses) and had not been disciplined or reprimanded for such use. For example, every year during the Christmas season, religious songs about the birth of Jesus were part of Plaintiff's class curriculum.

Plaintiff began the 2001-2002 school year on the PIP and taught throughout that year on that status. During this period, Ms. Fountain used the PIP to observe Plaintiff a total of eight (8) times, three (3) more than the required number for a tenured teacher with a second class certificate.

Moreover, during the 2001-2002 school year, Plaintiff was treated with utter disdain and malice, as if he had not taught for over thirty years without an unsatisfactory evaluation. An example of the malicious and harassing treatment was his being required to meet frequently with Ms. Fountain and provide the most basic of information to her. This treatment was humiliating and embarrassing and only served to exacerbate the working conditions and did impact upon the quality of Plaintiff's performance. It was strictly designed to provide a seemingly overwhelming paper trail to support the future ultimate sanction against him: discharge.

Additionally, while his performance during each of the observations in question was, at a minimum, satisfactory, the harassment and humiliating treatment accorded him by Principal Janet Fountain and Superintendent Larry Lorton made it extremely difficult for him to function. As a result, he began to experience more and more physical problems. (See Exhs. 23 & 24).

On December 14, 2001, Dr. Lorton told Mr. Nichols that "effective immediately", he was being suspended for three days without pay on the charge of insubordination". The suspension stemmed from Plaintiff's alleged refusal to meet with Ms. Fountain. Plaintiff responded to Dr. Lorton's letter by advising him that his actions were in violation of Section 6-202(a)(2) of the Annotated Code of Maryland which states that "Before removing an individual, the county board shall send the individual a copy of the charges against him and give him an opportunity within 10 days to request a hearing". Plaintiff's efforts to appeal the suspension were unfairly thwarted by Dr. Lorton when he delayed the payroll deduction past the ten (10) day period for filing an appeal to the Board. (See Pl. Exhs 1, 7(a) - 7(f). This was another illustration of Lorton's ignoring of the law when dealing with Plaintiff.

In the 2001-2002 school year, Plaintiff was observed six (6) times in music and only two (2) in health and nutrition. (See Def's Exh. 24).

Mr. Nichols' observations for the 2001-2002 school year were as follows:

   a. 9/11/01 - his health and nutrition class was observed by John Perry, Supervisor of Instruction. He received 17 satisfactory ratings, 5 "needs improvement" and 3 unsatisfactories;

   b. 9/25/01 – His music class was observed by Ms. Fountain and he received all satisfactory ratings (25);

   c. 10/16/01 – Music class was observed by Mr. Perry who noted 16 satisfactory ratings, 9 "needs improvement", but no unsatisfactories;

   d. 11/26/01 – Ms. Fountain observed Plaintiff's music class and noted 19 satisfactory ratings, 6 "needs improvement" but no unsatisfactories;

   e. 12/11/01 – Mr. Perry observed Plaintiff's music class. He gave Mr. Nichols 24 satisfactory ratings, one (1) needs improvement and no unsatisfactories;

   f. 2/22/02 – Mr. Nichols' music class was observed by Ms. Fountain. This was the worst observation of the eight (8) given. Mr. Nichols received 14 satisfactory ratings, 5 "needs improvement", and 6 unsatisfactories. As a result of this observation, of which he totally disagreed, he was convinced that Ms. Fountain and Dr. Lorton were determined to have him discharged. However, based upon his final two observations, he believed they had changed their minds. Those two observations are as follows:

   g. 3/4/02 – His music class was observed by Mr. Perry and he found Plaintiff to be <u>satisfactory in every category (25)</u>;

   h. 4/10/02 – Mr. Nichols' final observation for the 2001-2002 school year was done by Ms. Fountain during his health and nutrition class. She noted 20 satisfactory ratings, 5 "needs improvement" and no unsatisfactories.

  As a result of his final two observations, Plaintiff was surprised when on April 19, 2002, Dr. Lorton advised him that he intended to recommend his termination, and immediately placed him on administrative leave until May 3, 2002. (Def. Exh.

30). Again, his performance during the 2001-2002 school year was overwhelmingly satisfactory – 160 satisfactory ratings, 31 "needs improvement, and 9 unsatisfactory ratings.

Subsequently, on May 8, 2002, Dr. Lorton in fact recommended Plaintiff's termination. The letter of recommendation indicated among other things that he was being terminated for incompetency, neglect of duty and/or insubordination. One of the terms of the PIP which Plaintiff allegedly violated, was an admonishment to "Refrain from discussion of topics that have religious overtones." Again, no other similarly situated teacher was under such a restraint. In fact, Plaintiff overheard Harry Hopkins, a teacher whose class was next door to his, discussing the Buddhist Religion in his classroom. He was neither admonished nor disciplined for not refraining from "… discussion of topics that have religious overtones".

During the 2001-2002 school year, Dr. Dewitt (first name unknown), a reading counselor, directed a student to recite the Serenity Prayer ("God grant me the serenity to accept the things I cannot change, the courage to change the things I can and the wisdom to know the difference") in Mr. Nichols' health and nutrition class and was neither admonished nor disciplined for it.

Also, either Mr. Smith, the assistance principal at Colonel Richardson Middle School, or Lois Andrews, the school secretary, would include the phrase each morning "one nation under God" while leading the students in the Pledge of Allegiance. Mr. Smith also quoted from Solomon of the Bible and other religious figures. Neither Mr. Smith nor Ms. Andrews were admonished or disciplined for obvious reference to Christian phrases and terminology. (Pl. Exh. 8, depo. of Gene Smith, p. 19-21).

The May 8 letter indicated it was only a recommendation and that Plaintiff had ten (10) days from the receipt of the letter to appeal this recommendation to the

Board. Board rules and policy require that when an appeal is filed, the Board delay any action on the recommendation until the hearing is held.

Following Lorton's notice of recommended termination, Plaintiff filed a complaint with the EEOC on or about June 21, 2002, alleging discrimination based upon race, color, sex, religion and retaliation with respect to the unsatisfactory ratings, being placed on a PIP, the downgrading of his certification from first class to second class, and discharge (Pl. Exh. 16). On July 30, 2002, the EEOC issued him a Notice of Right To Sue.

However, once again the Board recklessly violated its own rules and State law when it came to dealing with Mr. Nichols. Before Mr. Nichols filed his appeal, the Board had already voted to accept Lorton's recommendation and its ruling was reported in the Board's executive minutes of May 7, 2002. (Pl. Exh. 9). The Board then scheduled a hearing on August 1, 2002, to hear Plaintiff's appeal.

Of course, there was no way the Board could fairly and objectively hear Mr. Nichols' appeal since it had already affirmed it. This was not the first time the Board had violated Mr. Nichols' right to a fair and objective due process hearing on a recommended termination. In 1972, then Superintendent Wilbur Hoopengardner recommended Plaintiff's termination for misconduct in office. The Board immediately accepted the Superintendent's recommendation before it gave Mr. Nichols a hearing. In 1972, however, the Board then proceeded to hold a hearing. A State hearing examiner ultimately determined that the Board acted wrongfully when it held the hearing despite its earlier affirmance of Plaintiff's discharge. (Pl. Exh. 10-1972 MD. State Board of Educ. Decision, pp. 101-102). Mr. Nichols was subsequently exonerated of the charge and reinstated. (See also Pl. Exh. 1).

When Mr. Nichols and his counsel arrived on August 1, 2002 for the scheduled hearing, they objected to the Board hearing the appeal given its earlier affirmance of Dr. Lorton's recommendation. In support of their objection, they

presented the Board with a copy of the 1972 decision. As a result, the Board entered into an agreement with Plaintiff to request that the appeal be heard by an administrative law judge ("ALJ") from the Maryland State Office of Administrative Hearings instead of the Board. (Pl. Exh. 11-8/1/02 Agreement). In its Memorandum in Support of Its Motion For Summary Judgment (at page 16), the Board acknowledges the fact that the Board itself did not hear the appeal, but understandably does not provide the above explanation as the real reason for it's exclusion.

In the August 1st agreement, the parties also agreed that Plaintiff would remain on the payroll until the State Board of Education decided his appeal. (Pl. Exh. 11). Dr. Lorton decided, however, not to place Plaintiff back into a classroom during this period. Instead, he was assigned to duties in the central office.

On August 30, 2002, Dr. Lorton sent a memorandum to Plaintiff, setting forth the conditions of his employment. Even in that document, Dr. Lorton discriminates against the Plaintiff by denying him automatic deposit privileges, and limiting him to four (4) sick days as opposed to ten (10) as all other teachers were issued. (Pl. Exhs 1& 12).

Plaintiff's OAH hearings took place in January – February, 2003. On April 21, 2003, the ALJ recommended that Lorton's recommended termination be upheld. (Def. Exh. 6). Thereafter, On April 24, 2003, in complete and total contravention of the August 1st agreement, Superintendent Lorton hand-delivered a letter to Plaintiff advising that based upon the ALJ's recommendation, he was immediately removing Plaintiff from the payroll. (Pl. Exh.13). Plaintiff was then for the third time during Lorton's tenure, abruptly removed from his workplace. This action was a clear and undisputed violation of the terms of the August 1st Agreement, which provided that Mr. Nichols would remain on the payroll unless and until the State Board made a

14

final decision on the recommended firing. (Pl. Exh. 11). The State board did not make its decision until July 23, 2003. (Def. Exh. 7.).

After Plaintiff complained to Dr. Lorton that he had violated the August 1, 2003 Agreement, Lorton, then, on May 13, 2003 sent him a letter indicating that he was rescinding the termination, and instead, placing him on suspension without pay pending the State Board ruling. (See Pl. Exh. 14). He gave no reason for this action other than he felt he had the authority to do so. Once again, Lorton took an action against plaintiff that had no legitimate basis.

The State Board affirmed the decision to terminate Mr. Nichols on July 23, 2003 (Def. Exh. 7). Hence, Plaintiff's termination became final on that date.

From August 1, 2002 (the date of Mr. Nichols' reinstatement) to July 23, 2003, Plaintiff performed satisfactorily in the central office staff position, meeting all the conditions set forth in Lorton's letter of August 30, 2002. (Pl. Exh. 15a, b, &c)).

## II.    GENUINE ISSUES OF MATERIAL FACTS IN DISPUTE

1.    Whether Plaintiff's date of termination was May 8, 2002 or April 24, 2003.

2.    Whether Plaintiff was meeting the legitimate expectations of his employer at the time of his termination on April 24, 2003.

3.    Whether Plaintiff's teaching method, style and course content in the 2000-2001 school year differed significantly from that utilized by him during his first 30 years as a teacher in the Caroline County School system.

4.    Whether Plaintiff's teaching method, style and course content in the 2001-2002 school year differed significantly from that utilized by him during his first 30 years as a teacher in the Caroline County School system.

5.    Whether Defendant's expectations of Plaintiff were legitimate in light of it's unlawful and discriminatory downgrading of Plaintiff's certificate from first to second class and the placing of him on a performance Improvement Plan (PIP).

6.    Whether the observations of Plaintiff during the 2000-2001 and 2001-2002 school years justifiably warranted subsequent unsatisfactory annual evaluations.

7.    Whether Plaintiff met the legitimate demands of Superintendent Lorton and Principal Fountain while he was on a PIP during the 2001-2002 school year.

8.    Whether all tenured teachers other than Plaintiff were observed solely in their area of certification before being placed on a PIP.

9.    Whether Plaintiff's termination should be deemed legal when said termination was based upon a discriminatory act (observing Plaintiff primarily out his area of certification before placing him on a PIP and downgrading his certificate).

10.    Whether the Caroline County Board of Education provided the Plaintiff with a meaningful hearing and/or substantive or procedural due process hearing relating to the downgrading of Plaintiff's certificate.

11.    Whether the Board's decision to downgrade Plaintiff's music certificate based upon his alleged imposition of his personal religious views upon his students was unlawful and discriminatory.

## III.   **RELEVANT LAW AND STANDARD OF REVIEW**

Pursuant to Rule 56 of the Federal  Rules of Civil Procedure, summary judgment can only be granted where "there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law" Rule 56 (c).  The burden of proof is on the moving party to demonstrate the absence of any genuine issue of material fact.  Adickes v. S.H. Kress & Co., 398 U.S.  144, 157 (1970); Celotex Corp. v. Caltrett, 477 U.S. 317, 322 (1986)   In

reviewing a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party (in this case the Plaintiff). Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), at 587 ("summary judgment should be granted unless "the record taken as a whole could … lead a rational trier of fact to find for the non-moving party,").

Moreover, the "facts themselves, and the underlying inferences to be drawn from the underlying facts, must be viewed in the light most favorable to Plaintiff, as the party opposing the motion. " Ross v. Communications Satellite Corp., 759 F.2d 355 (4th Cir.1985), at p. 364, citing U.S. v. Diebold, 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962) and Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. 464, 473, 82 S. Ct. 486 (1962). Furthermore, "...The non-moving party is in a favorable posture, being entitled "to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative influences from it drawn in his behalf; and finally, to be given the benefit of all favorable legal theories involved by the evidence as considered." Ross, supra, at p. 364, citing Charbonnages deFrance v. Smith, 597 F.2d 416 (4th Cir. 1979).

Also, as stated by the Fourth Circuit Court of Appeals in Paroline v. Unisys Corp., 879 F.2d 100, 109 (4th Cir. 1989) "questions of intent are quintessentially for the fact-finder under most circumstances... the evidence, if believed by the fact-finder, could support an inference that ... failed to act in the face of known intolerable conditions... but specifically tried to make life at the office less pleasant for Paroline."(Emphasis added.). Additionally, this court stated that  summary judgment should be sparingly used when there are issues involving motive and intent, such as is always the case in employment discrimination litigation.  Magill v. Gulf & Western Industries, 736 F.2d 976-979, (4th Cir. 1984), Two cases from the seventh circuit

have followed this line of reasoning. See Collier v. Budd Co. 66 F.3d 886, 892 (7th Cir. 1995) (summary judgment motions in employment discrimination cases must be approached with added vigor since credibility and intent are often central issues); Courtney v. Biosound, Inc., 42 F.3d 414, 418 (7th Cir. 1994) (cautioning that evidence directly supporting claims of intentional discrimination is rare and that affidavits and depositions should be carefully scrutinized for circumstantial proof).

## IV.   ARGUMENT

Plaintiff will respond to Defendant's arguments in the order presented by Defendant, using the same numbering and order.

### A.   DISCRIMINATION  (RACE)

In its moving papers, Defendant cites the cases of King v. Rumsfeld, 328 F.3rd 145, 149 (4th Cir, 2003) and Brinkley v. Harbour Recreation Club, 180 F.3[rd] 598, 607 (4th Cir. 1999) as establishing the proper tests for making out a prima facie case of discriminatory discharge based upon race. That test is as follows:

1.    The employee is a member of a protected class;

2.    He suffered from an adverse employment action;

3.    That at the time the employer took the adverse employment action, he was performing at a level that met his employer's legitimate expectations; and

4.    That the position was filled by a similarly qualified employee outside the protected class.

Once the prima facie case has been made, the burden of persuasion shifts to the employer to produce a legitimate non-discriminatory reason for the adverse action. McDonnell-Douglas v. Green, 411 U.S. 792 (1973).

If the employer successfully produces the legitimate non-discriminatory explanation, the employee then must show that the employer's proffered reason was pretextual. McDonnell-Douglas v. Green, supra; Reeves v. Sanderson

Plumbing Prods., Inc., 530 U.S. 133 (2000) (under the appropriate circumstances, a "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.)"

As will be clearly set forth below, there exist sufficient material facts in genuine dispute with respect to the facts in this litigation for this motion to be denied and Plaintiff to have his day in court.

Plaintiff contends that he was discriminated against because of his race with respect to the unsatisfactory ratings, being placed on a PIP, and the downgrading of his certification from 1st class to second class. The issue of unsatisfactory rating and PIP will be discussed in reference to his termination but the issue of downgrading will be handled separately.

### 1.    DOWNGRADING

As indicated above, Plaintiff's certification was downgraded from class one to two. This occurred after his first ever overall unsatisfactory evaluation. Based on the evidence provided in this case, no teacher had ever been downgraded after his first unsatisfactory evaluation. (Pl. Exh. 17, Lorton depo., p. 59, 68). In addition, no teacher before Plaintiff had ever been downgraded after being observed outside his or her area of certification. (Also see Pl. Exh. 17, Lorton dep., pp. 61-62).

Ms, Fountain recommended Plaintiff's certificate be downgraded in the same memorandum to Dr. Lorton as her recommendation that he be placed on a PIP. (Def. Exh. 14). Again, according to the evidence in this case, no teacher prior to plaintiff had ever been placed on a PIP and downgraded at the same time.

Ms. Fountain testified that although she recommended the downgrading, she did not know the criteria for downgrading. (See Pl. Exh. 3, Fountain depo. at pp. 104-105.) Upon what, then, did she make the recommendation? Clearly, her actions

cannot be justified. A jury certainly could find that her act of recommending a downgrade without any idea of whether it was justified was pretextual. Or, the jury could find she was simply following the dictates of Dr. Lorton who also admitted he was not aware of any written criteria to be used in downgrading a tenured teacher from a first class certificate status to second class status. (See Pl. Exh. 17, Lorton Depo., p. 59).

Moreover, as indicated above, Fountain testified that when a teacher is being considered for downgrading, he should be observed in his area of certification (pl. Exh. 3, Fountain depo., p. 105).

Lorton testified that when downgrading a teacher's certification, it is appropriate to consider his total performance, and not be limited to his performance in his area of certification. (Pl. Exh. 17, Lorton depo., p. 66-67). However, that statement makes no sense. Why would the State certify a teacher in a specific area, and then allow that certification to be downgraded based on non-certification area performance? Based upon Lorton's reasoning, Plaintiff could have been downgraded in music because he was a poor health and nutrition teacher. Such a result defies all logic.

Section 6-102 (c) of the MD. Annotated Code states with respect to downgrading the following:

(c) " County Superintendents To Classify Certificates. Each County Superintendent shall classify the certificate of each teacher employed by the school system of his county at least once every two years."

(d) Standards for Classification. - In determining the class of the certificate of each teacher, the County Superintendent shall consider: (1) scholarship; (2) executive ability; (3) personality; (4) teaching." (Pl. Exh. 18):

That section does not authorize the downgrading of a teacher's certificate based upon observations out of the teacher's area of certification. If the State

allowed or intended School Boards to use such observations to downgrade, it would have so stated in this section. See Testerman v. EDS Tech. Prods. Corp., 98 F.3d 297, 72 FEP 959 (7th Cir. 1996) (if plaintiff could cast employer's asserted reasons for terminating into doubt, summary judgment would be improper).

### 2.    DISCHARGE

In its memo, Defendant contends that Plaintiff cannot make out a prima facie case, specifically with respect to the third prong required by King, in that he "cannot prove that he was meeting the Board's legitimate expectations at the time of his discharge…". Def's Memorandum at p. 18. In addition to King, Defendant relies upon the case of Martin v. Montgomery County Public Schools, 223 F. Supp. 2d 742 (D.Md. 2002). Defendant is clearly wrong.

First, as indicated above, Plaintiff was not "terminated" until April 24, 2003. (Pl. Exh. 13). See also Lorton's deposition testimony (Pl. Exh. 17, Lorton depo., p. 192-193). As indicated above, on August 30, 2002, Superintendent Lorton sent Plaintiff a Memo setting forth his job functions and the employer's expectations. On 9/3/02, 10/23/02, and 12/10/02, as indicated above, Plaintiff was rated satisfactory in job performance by his supervisor, John Perry. (Pl.'s Exh. 15). Hence, at the time of his termination, there is no evidence he was not performing satisfactorily. If Defendant contends that notwithstanding his satisfactory evaluation, Plaintiff was not meeting the Board's legitimate expectations, then what those expectations were is a mystery, and hence, cannot be legitimate. Obviously, an employee cannot be held responsible for not meeting legitimate expectations if he has not been advised in advance of said expectations. Plaintiff would contend that for the purposes of making out his prima facie case, only his job performance at the time of his termination on April 24, 2003 can lawfully be considered, (See Pl. Exh. 17, Lorton's depo., pp. 192-193; and Pl. Exh. 3, Fountain depo., p. 135).

If, however, Defendant contends that Plaintiff's performance in the 2001-2002 school year is the relevant period for determining whether he makes out a prima facie case, Plaintiff's Affidavit and the exhibits in this case shows that even in such an instance, the third prong is satisfied. It is satisfied in that the expectations upon which Defendant relies were not "legitimate", i.e., they were expectations created solely to apply to Plaintiff, and no other similarly situated (tenured) teacher. And those expectations for the 2001-2002 school year did in fact stem from discriminatory acts which were perpetrated by Defendant.

In fact, Plaintiff clearly had met any legitimate expectations during his nearly thirty (30) years of teaching. He has testified without dispute that his method and style of teaching in the 2000-2001 and 2001-2002 school years were not substantially different from the method and style which he had engaged in prior years (with some modifications) when he was always rated at least satisfactory. Defendant has not offered any evidence to the contrary, i.e., evidence which would show that prior to the 2000-2001 school year, he had not always been rated satisfactory and that his method and style remained consistent or improved throughout that period. (See pl. Exh. 1).

Hence, Plaintiff is unlike the plaintiff in King or Martin in two critical ways: first, Mr. Nichols was not a probationary employee as were King and Martin (although Defendant may contend that he was because at the time of his discharge, his certificate had been downgraded from a first to second class certificate – an action which was discriminatory and has been clearly shown to be unprecedented in Board history in that it was based upon observations and evaluations which were clearly outside his certification area [music] {see Defendant's Exh. 13}; and occurred at the same time as he was placed on a Performance Improvement Plan.

As indicated previously herein, the simultaneous downgrading of his certificate and placing him on a PIP had never before occurred in the history of the Caroline

County School Board (at least in the memory of current Board officials). While there is evidence that Caucasian teachers had been downgraded, and placed on a PIP, none had ever been subjected to both actions at the same time.(Pl. Exh.17, Lorton dep. 95-96). Neither had the Caucasian teachers been observed primarily out of their areas of certification before being placed on PIP. All Caucasian teachers were observed solely in their areas of certification before being placed on a PIP. And, the Plaintiff was not observed solely in his area of certification before being placed on a PIP. (See Pl. Exh. 1).

The second critical difference between King, Martin, and the Plaintiff is that there was apparently no evidence (or even allegations) that King's and Martin's employers' expectations were not "legitimate." Hence, because they could not establish that they met "legitimate" expectations, they could not make out a prima-facie case. As indicated above, because Defendant cannot prove that Plaintiff's performance and conduct was any different than it was when he was receiving satisfactory evaluations and ratings, it cannot prove he did not meet "legitimate" expectations during the 2000-2001- and 2001-2002 school years.

Moreover, the discriminatory and unlawful downgrading of Plaintiff's certificate and placing him on a PIP nullifies any subsequent actions taken against Plaintiff by Defendant.

The inability of Defendant to prove that Mr. Nichols was not meeting "legitimate" expectations negates the need for Nichols to show that the reasons for his discharge were pretextual.

However, assuming Defendant successfully articulates a legitimate non-discriminatory reason for Plaintiff's termination, Plaintiff submits that the following evidence more than shows Defendant's actions against him are simply pretexts for discrimination/termination:

1.      Craig Henry, a Caucasian male and a teacher at Riverview Middle School. While Mr. Nichols was terminated after <u>two</u> school years of alleged unsatisfactory performance, Mr. Henry was not terminated after five (5) years of documented problems from date of recommended removal. In addition, he was ultimately terminated amid accusations of promoting a personal business venture, using school equipment and class time to do so in an effort to achieve personal financial gain. Mr. Henry resigned in lieu of his pending termination. (See Pl. Exh. 6). As previously noted, Mr. Nichols certificate was downgraded. Mr. Henry's was never downgraded even when he had the same evaluation numbers as Plaintiff. (See Pl. Exh. 1).

2.      At the OAH hearing concerning his termination, Plaintiff was also accused of placing disruptive students in the hall outside his class. However, another teacher at Colonel Richardson Middle School, Elaine Stein, a Caucasian female (and not of the Jehovah's Witness faith nor having filed a discrimination complaint against the Board) also placed students outside her class but was neither admonished nor disciplined for it. She also stated that "in the last few years, no, I don't recall anybody ever saying no, we could not do that." Finally, she stated that because her room was adjacent to Plaintiff's, there existed the possibility that someone could have observed one of her students in the hall and thought it was Plaintiff's student. (See Pl. Exh. 20, OAH testimony of Elaine Stein, p. 558-560).

3.      Documents and materials provided by the Board in this lawsuit show that Plaintiff has been treated different from similarly situated tenured Caucasian teachers in the following ways:

a.      In the 2000-2001 school year, Plaintiff was observed four (4) times; whereas, all other tenured teachers were observed three (3) times or less (see Pl. Exhs 1 and19. The indication in this exhibit that John

24

Barrett was observed six (6) times was erroneous. Defendant's counsel subsequently acknowledged that he was only observed three (3) times) Moreover, Teachers Glass and Kling (who show more than three (3) observations) were not tenured teachers (See Pl. Exh. 1);

      b.     While over the years other teachers have been placed on PIPs and/or had their teaching certificates downgraded, Plaintiff was the only one who was placed on a PIP <u>and</u> downgraded at the same time. (See Pl. Exhs 1and 17, Lorton depo., p. 95-96);

      c.     Plaintiff was the only tenured teacher placed on a PIP whose observations (upon which the PIP was based) were primarily outside his area of certification (see Pl. Exh. 1);

      d.     Since 1990, of all the tenured teachers who were placed on a PIP, or who were downgraded, Plaintiff had more years of service than any of them; yet he was the only one observed in excess of the three (3) minimum required observations for the 2000-2001 school year. Some were not even observed the minimum three (3) times; (See Pl. Exhs 1and 19);

      e.     In the 2000-2001 school year, Plaintiff  was the "senior" music teacher employed by the Board. Yet he was observed four (4) times during that school year whereas Earl Jester (Caucasian male music teacher with less experience) was only observed two (2) times. (See Pl. Exhs 1& 19).

      f.     During the 2000-2001 school year, Ms. Fountain observed John Barrett on only three (3) occasions, while she observed Mr. Nichols on four (4) occasions (See Pl. Exhs 1 and 19). In addition, Barrett's placement on a PIP for the 2002-2003 school year, was based solely upon observations in his area of certification (art) during the 2001-2002 school year.

(the same school year in which he also taught computer literacy). (See Pl. Exh. 1).

In summary, Plaintiff was clearly treated differently from similarly situated Caucasian teachers with respect to the all important observations and certification. The method with which Plaintiff was observed, evaluated and rated were clearly discriminatory and unlawful. Since the PIP, certificate downgrade, and termination were based upon these unlawful acts, the PIP, certificate downgrading and termination are likewise unlawful.

**B.     DISCRIMINATION  (RELIGION)**

Defendant cites the case of Chalmers v.Tulon Co. of Richmond, 101 F.3d 1012 (4th Cir. 1996). As expected, Chalmers holds that the burdens of proof in a claim of discriminatory discharge based upon religion mirrors that of cases involving discrimination on the basis of race or sex. As such, Chalmers states that a Plaintiff must establish that his job performance was satisfactory and provide "direct or indirect evidence whose cumulative probative force supports a reasonable inference that the discharge was discriminatory.

Defendant also correctly states that in the absence of direct evidence of discrimination, Chalmers sanctioned usage of the McDonnell-Douglas v. Green burden shifting scheme to establish evidence that the employer treated Plaintiff more harshly that other employees of a different religion, or no religion, who had engaged in similar conduct. As indicated below, Plaintiff clearly can make such a showing.

First, Plaintiff would adopt and incorporate by reference (as if repeated verbatim here) his arguments previously set forth herein regarding the unlawful and discriminatory downgrading of his certification, and the placing of him on a PIP.

Second, as indicated in his Affidavit, Mr. Nichols is a member of the Jehovah's Witness religion and has been so since 1991. In his Affidavit, he states that

> "The tenets of my faith require that I "witness" to other persons in an effort to spread the teachings of the faith. In witnessing, I (along with other members) often go door to door seeking to discuss our faith and to leave pamphlets or other documents with individuals to read at their leisure. As a result, my religious affiliation is very well known in the community."

Dr. Lorton testified at his deposition that he was aware of Mr. Nichols' religious affiliation before the negative actions against him began in January, 2001. (Pl. Exh. 17, Lorton depo, p. 10-11). Moreover, Lorton testified that Mr. Nichols had a past history and practice of using "heavy Christian theme" in his music classes; and that he had not been disciplined for it (Exh. 17, Lorton depo, p. 12-14); and that he could not dispute Mr. Nichols' representation that he had never been disciplined with respect to how he ran his music class prior to the 2000-2001 school year (Pl. Exh, 17, Lorton depo., p. 21). Lorton further testified that he knew of no other teachers of the Jehovah Witness faith in the Caroline County School System. (Pl. Exh. 17, Lorton depo., p. 173). Similar testimony was provided by Gene Smith. (Pl. Exh. 8, Smith depo., p. 10-11).

As indicated above, there are three distinct instances wherein Mr. Nichols was treated different from other teachers, administrators and /or employees with respect to "discussing topics of religious overtones.

1.      In fact, Plaintiff states in his Affidavit that he overheard Harry Hopkins, a teacher whose class was next door to his, discussing the Buddhist Religion in his classroom. To the Plaintiff's knowledge, he was neither admonished nor disciplined for not refraining from "… discussion of topics that have religious overtones".

2.      Dr. Dewitt, a reading counselor, had a student to recite the Serenity Prayer to students in Mr. Nichols' class ("God grant me the serenity to

accept the things I cannot change, the courage to change the things I can and the wisdom to know the difference"). To the Plaintiff's knowledge, he was neither disciplined nor admonished. (Pl. Exh. 1)

       3.     Also, either Mr. Smith, the assistant principal at Colonel Richardson Middle School, or Lois Andrews, the school secretary, would include the phrase each morning "one nation under God" while leading the students in the Pledge of Allegiance. Mr. Smith also quoted from Solomon of the Bible and other religious figures. Neither Mr. Smith nor Ms. Andrews were admonished or disciplined for obvious reference to Christian phrases and terminology. (Pl. Exh. 8; depo. of Gene Smith, p. 19-21).

Additionally, the general music text at the high school level which is used in Caroline County Schools has a whole chapter on religious music. (See Pl. Exh. 21, Chap. 12 - Religious Music).

### C.    DISCRIMINATION (SEX)

A prima facie case of discrimination on the basis of sex would be made out following the same format set forth in the King case, except that the basis for the discrimination would be Plaintiff's sex (male) as opposed to his race. As such, to make out a prima facie case, he must show the following:

       1.     The employee is a member of a protected class (males);

       2.     He suffered from an adverse employment action;

       3.     That at the time the employer took the adverse employment action, he was performing at a level that met his employer's legitimate expectations; and

       4.     That the position was filled by a similarly qualified employee outside the protected class.

Plaintiff meets the criteria for a prima facie case for the same reasons set forth in his analysis of his race claim, i.e., that he especially satisfies the third prong in that the expectations upon which Defendant relied to terminate Plaintiff were not "legitimate", i.e., they were expectations created solely to apply to Plaintiff, and no other similarly situated (tenured) teacher; and expectations which stem from an illegal action taken on the part of the Board, I.e., discrimination.

In fact, Plaintiff clearly had met any legitimate expectations during his nearly thirty (30) years of teaching. He has testified that his method and style of teaching in the 2000-2001 and 2001-2002 school years was not substantially different from the method and style which he had engaged in prior years (with some modifications) when he was always rated at least satisfactory. Defendant has not offered any evidence to the contrary, i.e., evidence which would show that prior to the 2000-2001 school year, he had not always been rated satisfactory.

Assuming Defendant successfully articulates a legitimate non-discriminatory reason for Plaintiff's termination, Plaintiff would show such a reason was pretextual by comparing himself with Candy Craft, a teacher at Federalsburg Elementary School. Ms. Craft was placed on a PIP on August 10, 1994 for the 1994-1995 school year. However, while on the PIP, she remained on her first-class certificate. It was not until the end of the 1994-95 school year following the unsuccessful completion of her PIP that her certificate was downgraded. She too was placed on a PIP as a result of being observed solely in her area of certification prior to being placed on the PIP. As indicated previously, Plaintiff was not. (See Pl. Exh. 1).

### D.    RETALIATION

As indicated in Defendant's Memorandum, a prima facie claim of retaliatory discharge is made by showing that (1) the plaintiff engaged in a protected activity, such as filing s com[plaint with the EEOC (or filing a lawsuit under Title VII); (2) the

employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action. Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1999). If plaintiff successfully sets forth a prima facie case, it must be rebutted by the employer's legitimate non-retaliatory reasons for the discharge. Williams v. Cerberonics, Inc., supra. See also Ross v. Communications Satellite Corp., 759 F.2d 355 (4th Cir. 1985).

Upon the employer's enunciation of a legitimate non-retaliatory reason for the discharge, the burden then shifts back to the plaintiff to show that the employer's reason is a pretext, a cover-up for retaliation. Womack v. Munson, 619 F.2d 1292, 1296 (4th Cir. 1980).

Defendant of course argues that there is no causal connection between the Board's actions and Mr. Nichols' discharge. The initial protected activity on Mr. Nichols' part occurred when he filed a claim of discrimination with the EEOC in June, 1999, and subsequently filed the lawsuit against the Board which was dismissed on a summary judgment grant on November 28, 2000. Mr. Nichols contends that the first clear act of retaliation against him occurred on January 5, 2001 (less than 45 days after his lawsuit was dismissed and less than three (3) weeks after Judge Harvey's denial of sanctions to Defendant) – when he received his first negative observation. (Def's Exh. 13). This observation, completed by Janet Fountain, was Plaintiff's first observation of the 2000-2001 school year, and was not conducted in his certificated field (music) but instead in health and nutrition. Ms, Fountain, while not noting any unsatisfactories, did note six (6) needs improvement.

By the end of the school year in May, 2001, Plaintiff had gone from a fully satisfactory teacher over a span of about 30 years to an unsatisfactory one who was placed on a PIP and had his certificate downgraded. According to Defendant, Plaintiff, a 30 year veteran with nothing but satisfactory performance during that time, was all of a sudden unable to function any better than a raw rookie.

Defendant, of course, cites the fact that over a year passed from the time of the first filing with EEOC before a negative action was taken, as evidence that the motive was not retaliation. However, as indicated above, Plaintiff's charge quickly became a lawsuit, which was not resolved until November 28, 2000. Moreover, the issue of sanctions was not decided until December 15, 2000. (PL. Exh. 23). After that date, Dr. Lorton and Ms. Fountain felt free to begin the dasdardly moves to rid the system of Plaintiff. The proof that November 28, 2000 and certainly December 15, 2000 were critical dates is evidenced by Defendant's decision not to give Mr. Nichols his first negative observation until January 5, 2001.

Of course, once the negative ball began to roll, it did not stop until Mr. Nichols was terminated on April 24, 2003. During that period, he made history: he was the first tenured teacher in Defendant' memory to suffer the triple <u>whammy</u> of receiving an unsatisfactory evaluation based upon observations made primarily out of his area of certification, having his certificate downgraded to second class based upon observations made out of his area of certification and allegedly imposing his religious beliefs upon his students. Subsequently, he was placed on a Performance Improvement Plan based upon observations primarily out of his area of certification.

Clearly, the timing, suddenness and outrageousness of the actions taken against Mr. Nichols just after his lawsuit ended create sufficient questions for the jury as to whether these subjective actions were in fact taken honestly and in good faith or in retaliation for his protected activity.

### E.    FIRST AMENDMENT (SPEECH AND RELIGION)

Defendant correctly states that Plaintiff must show the following to prevail on a claim of first amendment violation:

1.    That he engaged in protected expression regarding a matter of public concern;

      2.      That his interest in first amendment expression outweighs his employer's interest in efficient operation of the workplace:

      3.      That he was deprived of some valuable benefit;

      4.      That a causal relationship exists between his protected expression on matters of public concern and the loss of the benefit. Peters v. Jenney, 327 F.3rd 3077, 322-23 (4th Cir. 2003) (citing Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 351-52 (4th Cir. 2000); and Huang v. Board of Governors of the Univ. of North Carolina, 902 F.2d 1134, 1140 (4th Cir. 1990).

Defendant contends that it did not infringe upon Mr. Nichols' first amendment rights to freedom of speech and religion belief and expression when he was restricted from any discussions or topics having religious overtones. However, as indicated above other teachers and employees were allowed to speak of religious matters without sanction. Additionally, Dr. Lorton testified that he received complaints from parents about their children being subjected to the use of the "under God" provisions of the Pledge of Allegiance. Of course, their complaints were ignored. (See Pl. Exh. 17, Lorton depo, p. 132-133).

But when a parent complained about an assignment given by Plaintiff, Lorton went to great pains to punish Plaintiff.

Hence, religious discussion was only a problem when Plaintiff was doing the discussing. Other teachers, none of whom were of the Jehovah's Witness faith were not so restricted. Clearly, a jury could find that Plaintiff's religion was the source of his restriction, and not what he actually discussed with his students.

# V.   CONCLUSION

If Defendant's Motion for Summary Judgment is not denied, then Maryland State Board of Education Opinions 02-11 (Def. Exh. 4) and 03-26 (Def.'s 7) will be sanctioned, and it will completely alter the observation and evaluation process of all certified teachers in the State of Maryland if not the entire country. This would then

erode and undermine the present certification system in Maryland – rendering it null and void. Moreover, Plaintiff has clearly shown that Defendant's proffered reasons for his treatment are simply not true. As such, he is entitled to have a jury decide whether the false reasons are in fact based upon unlawful discrimination. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000).

Accordingly, for the above reasons or whatever other reasons the Court deems just and proper, Plaintiff requests the Court deny Defendant's motion for summary judgment and allow this matter to be heard before a jury.

Respectfully Submitted,

____/s/_____
Frederick P. Charleston, Esq.
Bar No. 02933
2530 N. Charles St., Suite 201
Baltimore, Maryland 21218
(410) 662-0010

## REQUEST FOR HEARING

Plaintiff respectfully requests the Court hold a hearing on Defendant's Motion For Summary Judgment.

_____/s/_____
Frederick P. Charleston, Esq.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of December, 2003, a copy of the foregoing Plaintiff's Opposition To Defendant's Motion For Summary Judgment was mailed, first class postage prepaid, to Leslie Robert Stellman, Esq., and Steven B. Schwartzman, Esq., Hodes, Ulman, Pressin & Katz, 901 Dulaney Valley Road, Towson, MD. 21204.

_____/s/_____
Frederick P. Charleston, Esq.