IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| NORMAN L. NICHOLS, JR. | * | |
|    Plaintiff | * | |
| v. | * | CIVIL NO.  JPM02CV3523 |
| CAROLINE COUNTY BOARD OF EDUCATION | * | |
| | * | |
|    Defendant | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \*

**DEFENDANT'S REPLY BRIEF IN SUPPORT OF SUMMARY JUDGMENT**

Defendant, Caroline County Board of Education (hereinafter "Board") by its undersigned counsel, files this Reply to Plaintiff Norman L. Nichols, Jr.'s ("Mr. Nichols") Opposition to the Board's Motion for Summary Judgment ("Opposition").

**I. INTRODUCTION**

Mr. Nichols' support for his claim of discrimination is based on nothing more than his own subjective feelings and supposition. He believes -- and therefore asks this Court to accept as so -- that the Board terminated his employment because he is African-American, because he is a Jehovah's Witness, because he is male, and because he filed a charge of discrimination with the EEOC. Mr. Nichols believes -- and, therefore asks this Court to accept as so -- that Janet Fountain, Principal at Colonel Richardson Middle School ("CRMS"), an African-American female, and Dr. Larry Lorton, then-Superintendent of Schools for Caroline County, a Caucasian male, orchestrated his termination and discriminated against him in violation of Title VII and in violation of the First Amendment.

Despite the sheer multitude of allegations, Mr. Nichols has been unable to produce a scintilla of direct evidence of intentional discrimination or retaliation. Mr. Nichols has failed to rebut the Board's showing of its legitimate, non-discriminatory reasons for the disputed acts and has failed to support with admissible evidence, non-conclusory factual allegations sufficient to sustain his burden to show that race, gender, religion or retaliation were the true motivation for any of the Board's acts or that the Board violated his First Amendment rights. Consequently, notwithstanding Mr. Nichols' subjective belief that the Board targeted him for disparate treatment, an objective analysis of the summary judgment record refutes his beliefs as a matter of law. Summary judgment in the Board's favor is appropriate.

## II. PROCEDURAL BACKGROUND AND RELATED CLAIMS

In the Board's Memorandum in Support of Summary Judgment ("Board Memorandum"), the Board reviewed Mr. Nichols' prior federal court litigation and his administrative appeals before the Maryland State Board of Appeals ("MSBE"). This background is important because Mr. Nichols raises issues in his Opposition which have been addressed in prior litigation and/or which are currently the subject of collateral proceedings.

**A.  Mr. Nichols' claims of discrimination pre-dating Ms. Fountain's arrival as Principal should be dismissed as untimely and/or barred under the doctrine of <u>res judicata</u>.**

In his Opposition, Mr. Nichols claims that Board officials have discriminated against him in one way or another since the 1968-1969 school year. To the extent that Mr. Nichols is attempting to state a cause of action based on such stale claims, they must be dismissed as they are time barred, exceed the scope of the EEOC charge, and/or are barred by the doctrine of <u>res judicata</u>. The relevant EEOC Charge

of Discrimination is dated June 18, 2002.  (Opposition, Exh. 16).  Any allegations occurring more than 300 days prior to the charge are time-barred.[1]

In addition, this Court has previously ruled that the Board's actions pre-dating Ms. Fountain's arrival did not rise to the level of an adverse employment action and granted summary judgment to the Board.  See Nichols v. Caroline County Board of Education, 123 F. Supp. 2d 320, 325 (D. Md. 2000).  The Court concluded that Mr. Nichols failed to meet his burden to show that the Board acted with a racial motive when school officials took various actions which displeased Mr. Nichols.  Id. at 326.  As a result, any allegations related to Ms. Fountain's predecessors should be dismissed and not considered in the context of this litigation.  The Court's willingness to grant summary judgment in Mr. Nichols' earlier litigation belies Mr. Nichols' contention that summary judgment is not appropriate, where, as here, the plaintiff can produce no evidence of discriminatory intent.

What makes this current litigation suspect is the fact that Ms. Fountain is African-American and that Ms. Fountain and Mr. Nichols dated some twenty years ago.  Mr. Nichols has marshaled no evidence to show that Ms. Fountain is somehow biased against African-Americans, or men, or Jehovah's Witnesses.  The fact that Ms. Fountain is African-American weighs heavily against an inference of discriminatory animus.  See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1471 (11th Cir. 1991) (holding that when the decision-makers are in the same protected class as the employee complaining about an adverse employment decision, the employee faces a more difficult burden to establish that a discriminatory animus played a role in the complained-about decision); Andersen v. Anheuser-Busch, Inc., 65 F. Supp. 2d 218, 219 (S.D.N.Y. 1999) (if the decision-maker is in the same

---

[1] The Charge itself states that the discrimination occurred "between August 27, 2002 and May 13, 2002."  The first date it presumably references is August 2001.

3

protected class as plaintiff, claims of discrimination become less plausible); Ziegler v. Delaware County Daily Times, 128 F. Supp. 2d 790, 811, n. 47 (E. D. Pa. 2001) (noting that "the inference of discrimination is ... less since the decision maker was a member of the same protected class as the plaintiff).

> B. **Mr. Nichols' claims of procedural unfairness were fully litigated in proceedings before the MSBE.**

Mr. Nichols alleges that the Board violated Title VII when it failed to comply with Maryland regulations related to the observation and certification of teachers. Mr. Nichols first brought this claim to the attention of the MSBE when he appealed Ms. Fountain's decision to place him on second-class status. By decision dated March 27, 2002 (Opinion No. 02-11), the MSBE concluded that the Board did not violate Maryland law with respect to the number of observations conducted or the classes in which the observations took place. (Board Memorandum, p. 10). Mr. Nichols asked the MSBE to reconsider its decision and the MSBE denied his request. (Board Memorandum, Exh. 5). Mr. Nichols did not appeal this decision to the Circuit Court for Caroline County.

Mr. Nichols filed a second MSBE appeal, this time challenging the Board's decision to terminate his employment. In this proceeding, Mr. Nichols asked the MSBE to reconsider its decision regarding Ms. Fountain's placement of him on second-class status. The MSBE refused, stating:

> Given the State Board has already rendered a final decision on this issue and Appellant did not further appeal the matter to the Circuit Court, there was no basis for the ALJ to rehear matters relating to the reclassification.

(Board Memorandum, Exh. 6, MSBE Opinion No. 03-26, at pp. 3-4). The MSBE also rejected Mr. Nichols' claims of procedural unfairness in the MSBE process. Mr. Nichols filed a petition for judicial review of the MSBE's decision with the Circuit Court for Caroline County (Case No. 05-G03-008866)

pursuant to Maryland's Administrative Procedures Act (Md. Rule 7-201 et seq.). That petition is presently pending.

To the extent that Mr. Nichols is asking this Court to rule that the Board failed to comply with COMAR when Ms. Fountain and others observed Mr. Nichols out of his area of certification or more than three times during the school year, those issues are beyond the province of this Court. The MSBE has twice concluded that CRMS officials did not violate State law. Furthermore, even if Mr. Nichols could demonstrate that the Board failed to follow its own policies, this does not necessarily advance his case absent proof of a discriminatory motive.

In Vaughn v. Metrahealth Co., Inc., 145 F.3d 197 (4th Cir. 1998), the U.S. Court of Appeals for the Fourth Circuit ("Fourth Circuit") stated that the mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent. See also Settle v. Baltimore County, 34 F. Supp. 2d 969, 1005 (D. Md. 1999) (recognizing that mere violations of internal procedures do not demonstrate discriminatory intent). Mr. Nichols has failed to produce any evidence to show that Ms. Fountain (or others) failed to follow State law in an effort to target him as an African-American, as a male, or as a Jehovah's Witness, or because he filed a charge of discrimination.

  **C.** **The Court has previously ruled that Mr. Nichols may not include a breach of contract claim in this litigation.**

Mr. Nichols references an alleged August 1, 2002 agreement by which the Board would allow Mr. Nichols to remain on the school system payroll until the MSBE made a final decision on his termination. (Opposition, pp. 14-15). He previously tried to amend his complaint to add a Title VII retaliation claim related to this alleged contract. The Court denied his motion to amend. Mr. Nichols should be barred from now referencing such an allegation.

In fact, Mr. Nichols' breach of contract claim is still the subject of an investigation by the Maryland Commission on Human Relations ("MCHR"), pursuant to a charge of discrimination which he filed after this lawsuit began. A notice of right-to-sue letter has not yet been issued by the MCHR or the EEOC. Furthermore, Mr. Nichols has filed a breach of contract action in the Circuit Court for Caroline County (Case No. 05-C-03-008867). The Board has moved to dismiss this action for reasons including Mr. Nichols' failure to exhaust his administrative remedies and want of consideration. For these reasons, the Board submits that the Court cannot properly consider these claims in this litigation.

### III. SUBSTANTIVE CLAIMS

**A.     Mr. Nichols has offered no evidence to challenge the Board's determination that his performance, in the Board's view, was unsatisfactory.**

The heart of Mr. Nichols' complaint concerns the Board's increasing dissatisfaction with Mr. Nichols' performance as a teacher, which surfaced about one year after Ms. Fountain became Principal of CRMS. Yet Mr. Nichols has not offered any evidence, other than his own self-serving assertions, to prove that his performance was not unsatisfactory to the Board or that Ms. Fountain, Mr. Smith, Mr. Perry, or Dr. Lorton were motivated by unlawful considerations of race, gender, religion or retaliation.

While Mr. Nichols' own conviction that the Board discriminated against him is clear, his conclusory allegations and unsupported conjecture do not constitute evidence. See King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003); See also Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 763 (4th Cir. 1988), *vacated on other grounds*, 527 U.S. 1031 (1999) (holding that the mere assertion by the plaintiff that the plaintiff was more qualified than other candidates for a position is insufficient to establish pretext); Goldberg v. B. Green and Co., Inc., 836 F.2d 845 (4th Cir. 1998) (same); Featherstone v. United Parcel Service, 1994 WL 504804 (D. Md. 1994) (plaintiff's own bare allegations of

6

discrimination are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons); Chika v. Planning Research Corp., 179 F. Supp. 2d 575, 583 (D. Md. 2002) (summary judgment appropriate where the plaintiff produced no evidence to support his claim that his non-promotion was related to race, other than his own unfounded speculation); Hawkins v. Pepsico, 203 F.3d 274 (4th Cir. 2000) (holding that a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action).

There is simply no evidence in the record to dispute the Board's evaluations (as upheld by the MSBE) that Mr. Nichols demonstrated unsatisfactory performance. There is a glaring absence of testimony of other school system personnel, expert witnesses, or even co-workers to dispute the Board's characterization of Mr. Nichols' performance. The fact that Mr. Nichols taught successfully for thirty years is not sufficient evidence to cast doubt on the legitimacy of Ms. Fountain's evaluations of his teaching. The Court cannot infer an improper motive on the part of Ms. Fountain (and others) from the fact that Mr. Nichols had performed in an acceptable manner in prior years under prior supervisors.

Mr. Nichols now argues that, following the Board's termination, when the Board allowed him to remain on the payroll in an administrative position pending his administrative appeal, he performed satisfactorily. The Board does not dispute this. However, Mr. Nichols takes this a step further and argues that his satisfactory performance in a post-discharge accommodation raises an issue of whether he was truly meeting the Board's legitimate expectations. (Opposition, p. 15). At issue is whether the Board discriminated against Mr. Nichols, or retaliated against him when, on April 19, 2002, Dr. Lorton recommended his termination *as a teacher* on the basis of incompetency, neglect of duty, and/or insubordination, not whether Mr. Nichols performed satisfactorily in a post-discharge administrative position.

B.   **Mr. Nichols cannot demonstrate that the various observations/evaluations were "adverse employment actions."**

There is no automatic presumption that every adverse personnel act directed at a protected employee results in a violation of Title VII.  See Goldberg, supra, at 849.  Title VII does not provide an employee with a panacea for every unfavorable act by an employer.  See Settle, supra at 987 (citing Page v. Bolger, 645 F. 2d 227 (4th Cir.) (en banc), *cert. denied*, 454 U.S. 892 (1981)).  Mr. Nichols' complaints that Ms. Fountain downgraded him to second class status, placed him on a Performance Improvement Plan ("PIP" or "Plan") or gave him unfavorable performance evaluations are not actionable events under Title VII.  The question for the Court is whether the Board discriminated against Mr. Nichols in the ultimate employment action of termination.  See Nye v. Roberts, 159 F. Supp. 2d 207 (D. Md. 2001) (holding that neither a reprimand nor increased "surveillance" constituted adverse employment actions).

As to the PIP, Ms. Fountain created a written Plan for Mr. Nichols for him to use as a means to make improvements in those specific areas that she viewed as unsatisfactory.  (Board Memorandum, p. 11).  In fact, Mr. Nichols asked her to put her instructions in writing:

> With several discussions with Mr. Nichols and I indicated what the expectations were as far as planning or instructional effectiveness.  Mr. Nichols would indicate to put it in writing, tell me what you want, put it in writing . . . So this plan was based on numerous conversations with Mr. Nichols saying what do you want, Ms. Fountain, put it in writing.  So it's in writing. . .  I put down what I said to Mr. Nichols and gave Mr. Nichols an opportunity to look it over and we went from there.

(Exh. 1, Fountain deposition, pp. 85-86).  Mr. Nichols demanded that Ms. Fountain put the Plan in writing.  He cannot claim that he was subject to an adverse employment action merely because the Plan was lengthier than he expected.  In short, the PIP was a tool to allow Mr. Nichols to know the Board's expectations and to give him the tools to meet those expectations.  The record evidence shows that Ms.

Fountain gave Mr. Nichols the Plan because she wanted him to know the Board's expectations, not because of his race, gender, religion, or in retaliation for engaging in protected activity.

    **C.    Mr. Nichols has not made a sufficient showing that similarly situated employees outside the protected class(es) received more favorable treatment.**

To prove a *prima facie* case, Mr. Nichols must show that similarly situated employees outside of his protected class(es) received more favorable treatment from Ms. Fountain. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Instead, Mr. Nichols argues that, for the first time in Board history, a teacher was given the "double whammy" of a second class certification and a PIP. While Mr. Nichols does identify several comparators, he has not established that any of these teachers were truly similarly situated.

Mr. Nichols asserts that the Board afforded Craig Henry, a Caucasian teacher, more favorable treatment because Mr. Henry was placed on a PIP, but not downgraded. Mr. Henry taught at Riverview Middle School, not CRMS, until he resigned in 1993. His principal was Henry Martin, not Ms. Fountain, and the Superintendent of School at the time was R. Allan Gorsuch, not Dr. Lorton. Mr. Henry resigned in lieu of termination (a choice which Dr. Lorton offered to Mr. Nichols). Nothing about Mr. Henry's situation parallels Mr. Nichols' circumstances. Even the grounds for termination are different; Mr. Henry was accused of promoting a personal business venture, not incompetence or insubordination. The comparison fails to have legal significance.

Employees are not similarly situated merely because their conduct might be analogized. Rather, in order to be similarly situated, the other employees must report to the same supervisors as the plaintiff, be subject to the same standards governing evaluation and discipline, and must have engaged in conduct similar to the plaintiff's. See Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236 (S.D.N.Y. 2001);

Finley v. Federal Express Corp., 1998 WL 709066 (D. Md. 1998) (court held that employees were not similarly situated because the employment decisions at issue were not made by the same supervisor); see also 45C Am. Jur. 2d Job Discrimination § 2507 (individuals must be similarly situated in all material respects).

Mr. Nichols compares himself to Candy Craft, a teacher at Federalsburg Elementary School who, in August 1994, was placed on a PIP but not downgraded. Ms. Craft was evaluated by Assistant Principal Susan K. Frank, not Ms. Fountain, and was initially placed on a PIP by Principal Dale Kevin Brown, not Dr. Lorton. She is thus not a similarly situated employee.

Mr. Nichols argues that Ms. Fountain humiliated him by requiring him to meet with her and to turn in lesson plans on a monthly basis. But a review of Ms. Craft's personnel records shows that Principal Brown made a similar request of Ms. Craft. He asked her to turn in weekly lesson plans and admonished her when she refused. According to Ms. Craft's personnel records, Principal Brown observed the following:

> As indicated in August, 1994 during the discussion of your Professional Development Plan, one of the requirements you needed to meet weekly was the submission of thorough and complete lesson plans. . . . You failed to submit your plans and/or indicate to me that there was a situation that prohibited you from adhering to the directive given you prior to the beginning of this school year.
>
> I view your unwillingness to comply [with] my request as insubordination.

(Opposition, Exh. 22, at p. CCBE000880). Other than being similarly asked to submit periodic lesson plans, Ms. Craft is, by no means, similarly situated to Mr. Nichols.

Mr. Nichols also compares himself to Elaine Stein, a teacher at CRMS. Mr. Nichols claims bias in the fact that school officials admonished him for placing disruptive students in the hall but not her. He cites no evidence that his gender was a factor and no evidence as to how many students Ms. Stein

sent to the hall. Mr. Nichols cannot establish an adverse action in the Board's criticism of his disciplining of students. Nonetheless, Ms. Stein testified that she often observed Mr. Nichols' students in the hall, generally one or two at a time. (Exh. 2, Stein testimony, pp. 546 - 548). According to Ms. Stein, Mr. Nichols' music students often roamed the halls unsupervised for the entire period. She admitted that she occasionally put students in the hall, but not for any great length of time. Id., at p. 558. The Court has no basis to determine that Ms. Stein's conduct was similar to Mr. Nichols, that she was treated more favorably because of her gender, or that the Board's criticism of Mr. Nichols constituted an adverse employment action.

 Mr. Nichols complains that school officials formally observed him too often. Ms. Fountain justified the number of observations in that she had assigned Mr. Nichols to teach a new course (health and nutrition) and she wanted to make sure that he was successful. (Board Memorandum, p. 7). Ms. Fountain observed him teach music as well, both formally and informally. Surely it is the principal's right to observe teachers to ensure adequate performance. (Board Memorandum, p. 7). Does Mr. Nichols suggest that a principal may only observe a teacher three times in a school year, or that a principal must observe each teacher the same number of times? Is it a violation of Title VII for a school administrator to observe one teacher more often than another? In any event, the number of times that Ms. Fountain observed Mr. Nichols was neither abusive nor substantially different than for any other teacher.

 Even if Ms. Fountain (and others) scrutinized Mr. Nichols more closely than other teachers, this, in and of itself, is not an adverse employment action. See Von Gunten v. Maryland, 243 F.3d 858, 867-70 (4th Cir. 2001) (the court determined that hyper-scrutinizing the plaintiff's sick leave, requiring doctor's notes, following the plaintiff around, questioning her activities and downgrading her

11

performance evaluation did not constitute an adverse employment action); Chika v. Planning Research Corp., 179 F. Supp. 2d 575 (D. Md. 2002) (plaintiff failed to establish an adverse employment action with respect to his allegations that he was more closely monitored after he filed a charge of discrimination); Lester v. Natsios, -- F. Supp. 2d --, 2003 WL 22705534 (D.D.C. 2003) (excessive supervision and scrutiny, including having to submit a weekly calendar, unreasonable work assignments, and inaccurate performance appraisals did not rise to the level of an adverse employment action); Nye, supra, (letter of reprimand, substandard performance evaluation, and increased surveillance of activities did not constitute adverse employment actions). The mere fact Ms. Fountain (and others) formally observed Mr. Nichols more often than other teachers (of various races, religions and gender) does not create a Title VII claim for discrimination.

       **D.**     **Mr. Nichols has not presented any evidence to demonstrate that the Board's stated reasons for termination are pretextual.**

To establish pretext, a plaintiff must show both that the defendant's proffered explanation was untrue, **and** that unlawful discrimination was the real reason for the termination. Finley, supra. Mr. Nichols has the burden of showing not merely that he disagreed with the school officials' assessment of his performance, but that their assessment was dishonest or not the real reason for his termination. See Hawkins v. Pepsio, Inc., 203 F.3d 274 (4th Cir. 2000). Mr. Nichols has only set forth the "unremarkable fact" that he disagreed about their assessment of his teaching. His perception of the quality of his work is "close to irrelevant." Id., Beall v. Abbott Lab., 130 F.3d 614, 618-20 (4th Cir. 1997) (absent evidence of improper motive, the employer's method of evaluating an employee's job performance must be left to the employer's discretion), see also Atkins v. Baltimore County Public Schools, No. AMD 03-418 (D. Md. Jan. 5, 2004) (the plaintiff's "sincere" belief that she was better qualified than competitors in the

employment market was insufficient to sustain her burden of proof in a failure to promote case) (Attached hereto as Exhibit 3).

What evidence has Mr. Nichols set out to prove that Ms. Fountain was not truly dissatisfied with his performance? He has not taken issue with certain conduct that led Ms. Fountain to recommend his discharge. Mr. Nichols taught an Easter lesson with religious overtones despite being told not to. He pleaded the "5th Amendment" when Dr. Lorton asked him to justify the assignment.

Mr. Nichols admits that he was initially pleased that Ms. Fountain was appointed as Principal. (Opposition, p. 4). He further admits that at the end of Ms. Fountain's first year as Principal (the 1999 - 2000 school year), Ms. Fountain and Mr. Smith gave him a satisfactory evaluation (teaching both music and computer literacy). (Opposition, p. 5). This satisfactory evaluation came nearly one year after Mr. Nichols filed his EEOC charge (on June 21, 1999).

Mr. Nichols' first unsatisfactory evaluation came at the end of the 2000-2001 school year. (Opposition, p. 8). The observations and the evaluations themselves are a part of the record. Mr. Nichols does not dispute the specifics of any particular evaluation. For example, he admits that, on May 21, 2001, Mr. Smith observed that Mr. Nichols did not have a lesson plan. Mr. Nichols offers no evidence to contradict Mr. Smith's observation that, on May 21, 2001, Mr. Nichols did not vary his instructional techniques. There is nothing to indicate that Ms. Fountain, Mr. Smith, or Mr. Perry were dishonest in their observations.

Mr. Nichols refused, time and time again, to discuss his lesson plans, classroom management plan or outline. (Board Memorandum, pp. 11-12). He did not submit weekly lessons plans to Ms. Fountain as the PIP required. (Board Memorandum, p. 13). Ms. Fountain warned him that his failure to address the issues in the PIP would result in further disciplinary action. (Board Memorandum, pp. 12-

13). Still, Mr. Nichols took no steps to comply with the Plan. It is clear that he, and he alone, is responsible for the Board terminating his employment.

Although Mr. Nichols contends that Ms. Fountain placed him on an unrealistic and "gruesome" PIP, he provides no facts to establish why he could not have complied with the PIP. Both Ms. Fountain and Mr. Smith explained that the purpose of the PIP was to show Mr. Nichols how he could achieve satisfactory performance, not to punish him or to insure failure. (Board Memorandum, p. 11).

### E. Mr. Nichols has introduced no evidence to show that Board officials were biased against members of the Jehovah's Witness faith.

Mr. Nichols gave his music class an assignment requiring students to use the Bible as a source to describe Jesus' crucifixion and resurrection, to give their interpretation of those events, and to identify the chapter, verse, and name of the Bible used. (Board Memorandum, p. 14). He gave this lesson despite a specific instruction in his PIP "to refrain from discussion of topics that have religious overtones." (Board Memorandum, p. 27). The Board did not instruct him to refrain from teaching only Christian lessons. This admonition was not directed at him as a Jehovah's Witness, but rather, related to the nature of the lesson plan itself (the lesson plan was not strictly a teaching related to Jehovah's Witnesses).

Mr. Nichols contends that other teachers have mentioned religious topics without identifying their religion. If the basis of his complaint is that the Board instructed him as a Jehovah's Witness not to discuss religion, than references to the religious instruction by others, such as Mr. Hopkins or Dr. Dewitt, should have identified the teacher's religion in order to show disparate treatment. See Chika, supra at 585 (the plaintiff's allegations of racially disparate treatment are insufficient to justify an inference of discrimination where the plaintiff failed to establish the race of the other employees).

14

Mr. Nichols contends that his Easter assignment was prescribed by COMAR's multicultural guidelines, but there is no testimony in the record that he ever taught equivalent lessons discussing music in the Hindu, Buddhist, Jewish, or Islamic religions. The Board allowed Mr. Nichols to express his religious beliefs by displaying the Bible and the Watchtower on a table in his classroom. (Board Memorandum, p. 28). There is no evidence that school officials were aware of comments in the classroom made by Mr. Hopkins or Dr. Dewitt. School officials were aware of Mr. Nichols' Easter lesson because parents complained.[2]

### F. Mr. Nichols has not demonstrated a causal connection between his EEOC charge and any adverse employment action.

In June 1999, Mr. Nichols filed an EEOC charge. The Board did not recommend his termination until April 2002. This nearly three year interval weighs against a finding of a causal connection. Mr. Nichols himself admits that for the first year after Ms. Fountain arrived as Principal things went fine. Ms. Fountain's first unsatisfactory evaluation of Mr. Nichols' performance occurred in May 2001, nearly two years after Mr. Nichols filed this EEOC charge.

In <u>Dowe v. Total Action Against Poverty in Roanoke Valley</u>, 145 F.3d 653 (4th Cir. 1998), the Fourth Circuit stated that "[a] lengthy time lapse between the employer becoming aware of the protected activity and the adverse employment action . . . negates any inference that a causal connection exists between the two." As the court added:

> Indeed, were this not the case, an employee could guarantee his job security simply by filing a frivolous complaint with the EEOC on his first day of work. Title VII was not enacted to guarantee tenure in the workplace.

---

[2] As to Mr. Nichols' claims with regard to the Pledge of Allegiance, in October 2003 the U.S. Supreme Court agreed to hear a case involving whether schoolchildren can be allowed to recite the Pledge of Allegiance voluntarily. <u>Oak Grove Unified School District v. Newdow</u>, 328 F.3d 466 (9th Cir. 2002), <u>cert.</u> <u>granted</u> 124 S.Ct. 384 (2003). Regardless of the outcome of that appeal, there is no basis for suggesting that the Pledge of Allegiance is in the same category as the blatantly sectarian lesson that Mr. Nichols sought to teach about the resurrection of Christ.

Id. See also King, supra, at 151 (the plaintiff's firing came two months and two weeks after the employer received notice of the EEOC charge and such time was "sufficiently long so as to weaken significantly the inference of causation between the two events"); Causey v. Balog, 162 F.3d 795 (4th Cir. 1998) ("A thirteen month interval between the charge and termination is too long to establish causation absent some other evidence of retaliation."); Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1395 (10th Cir. 1997) (four month lag between protected activity and termination is not sufficient to justify an inference of causation); Hughes v. Derwinski, 967 F. 2d 1168, 1174 (7th Cir. 1992) (disciplinary letter issued four months after discrimination charge is not causally linked to adverse employer action); Cooper v. City of North Olmsted, 795 F.2d 1265, 1272 (6th Cir. 1986) (discharge four months after filing of discrimination charge not causally linked to adverse employer action); Robinson v. S.E. Pa. Transp. Authority, Red Arrow, 982 F.2d 892, 895 (3rd Cir. 1993) (indicating doubt that discharge could be causally linked to an employee's protected action taken almost two years previously absent an intervening pattern of antagonism and retaliation).

As the court stated in Olivares v. NASA, 934 F. Supp. 698, 705 (D. Md. 1996), "the fact that an employee may have filed an EEO claim gives him no license to vilify supervisors or co-workers or indeed to make every response of theirs to such vilification the basis of a claim of retaliation."  Mr. Nichols' claim of retaliation cannot proceed because he has not established that the school officials' evaluation of his performance was dishonest, nor has he established that Ms. Fountain, Mr. Smith, or Mr. Perry were motivated by retaliation in their negative views of his teaching.  All he has is own belief in his teaching style, nothing more.  Other than the Board's knowledge of his EEOC charge at the time of the observations, Mr. Nichols has offered no evidence of retaliatory design.  The Court cannot infer retaliation from evidence that does no more than suggest it as a possibility.  See Settle, supra, at 993.

### G. Mr. Nichols is not entitled to protection under the First Amendment because he was not speaking on a matter of public concern.

Mr. Nichols has not established that in giving an Easter lesson to his music class, he was speaking on a matter of public concern. (Board Memorandum, p. 36); see also Connick v. Myers, 461 U.S. 138 (1983). Mr. Nichols claims that other teachers were allowed to speak of religious matters. In this manner, he is basically asserting a disparate treatment claim, not a First Amendment claim. Clearly, the Board allowed Mr. Nichols to speak on religious matters, as the Board allowed him to keep the Bible and the Watchtower on display in his classroom. (Board Memorandum, p. 28). The Board even allowed him to offer religious material to a student. Id. But, as a teacher, Mr. Nichols does not have the right to determine what is appropriate to include in the curriculum and cannot claim a First Amendment right to teach what he sees fit. See Boring v. Buncombe County Bd. Of Educ., 136 F.3d 364, 369 (4th Cir. 1998). Because Mr. Nichols has not made a showing that he was engaged in Constitutionally-protected speech, this claim too, must be dismissed.

### IV. CONCLUSION

For the foregoing reasons, the Board contends that summary judgment should be granted.

                                                        /s/
Leslie Robert Stellman
(Federal Bar No. 1673)

/s/
Steven B. Schwartzman
(Federal Bar No. 04686)
HODES, ULMAN, PESSIN & KATZ, P.A.
901 Dulaney Valley Road - Suite 400
Towson, Maryland  21204
410-339-6746
410-938-8909 fax

Attorneys for Defendant

### CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of January 2004, a copy of Defendant's Reply Memorandum in Support of its Motion for Summary Judgment was e-filed and mailed by U.S. mail, postage prepaid to Frederick P. Charleston, Esquire, 2430 North Charles Street, Suite 201, Baltimore, Maryland  21218.

/s/
Steven B. Schwartzman

G:\files\STEVE\Caroline County BOE-Nichols\summary judgment\Defendant's Reply Brief in Support of Summary Judgment.doc