# NICHOLS VS. CAROLINE COUNTY

## DEPOSITION OF JANET FOUNTAIN

### SEPTEMBER 29, 2003

ART MILLER & ASSOCIATES
PHONE: 410-367-3838
FAX: 410-367-3883
www.artmiller.com

EXHIBIT 1

Page 85

1  in Exhibit 3 that you were going to work with Mr.
2  Nichols to develop a professional improvement plan?
3      A   Correct.
4      Q   Now, how did this, the plan itself,
5  actually come about, the physical aspect of it? Who
6  developed it and all of that kind of stuff?
7      A   With several discussions with Mr. Nichols
8  and I indicated what the expectations were as far as
9  planning or instructional effectiveness. Mr.
10 Nichols would indicate to put it in writing, tell me
11 what you want, put it in writing. So when we sat
12 down, Mr. Smith and I and Rozlyn, we sat down to try
13 to figure out exactly what we needed to do as far as
14 an improvement plan for Mr. Nichols. We took each
15 area and thought about those things that we have
16 indicated to Mr. Nichols on different occasions
17 under teacher's responsibilities and then come up
18 with a time line and then an indicator of success.
19 We did that for planning. We did the same thing for
20 instructional effectiveness. The time line as you
21 can tell is the same. The indicators of success

Page 86

1  were those things that we felt that there wouldn't
2  be anything that he didn't know that we were looking
3  for. So this plan was based on numerous
4  conversations with Mr. Nichols saying what do you
5  want, Ms. Fountain, put it in writing. So it's in
6  writing. So I thought of everything. Mr. Smith
7  remembered when he was in there, things that he had
8  mentioned to Mr. Nichols. I put down what I said to
9  Mr. Nichols and gave Mr. Nichols an opportunity to
10 look it over and we went from there.
11     Q   Who did the first draft of the plan, do
12 you know?
13     A   Mr. Smith and I were in there.
14     Q   Gene Smith?
15     A   Yes.
16     Q   Okay. Do you know what he used? Did he
17 use a model or anything to draft it, any idea?
18     A   Mr. Smith and I were figuring out based on
19 other improvement plans that we had seen, how to
20 word it and got some input from the instructional
21 supervisor.

# In The Matter Of:

*NORMAN NICHOLS v.*
*CAROLINE COUNTY BOARD OF EDUCATION*

*Hearing Volume 1*
*January 31, 2003*

*For The Record, Inc.*
*Court Reporting and Litigation Support*
*603 Post Office Road*
*Suite 309*
*Waldorf, MD  USA  20602*
*(301) 870-8025    FAX: (301) 870-8333*

*Original File 30131NIC.ASC, 265 Pages*
*Min-U-Script® File ID: 1241616184*

**Word Index included with this Min-U-Script®**

EXHIBIT 2

Page 546

[1] kind of the opening day, what he expected, and you would
[2] often see him in front of the class then.
[3]  Q: Did you see from time to time children from
[4] that class in the hallway?
[5]  A: Yes.
[6]  Q: During — not between classes, but during class
[7] periods?
[8]  A: Yes.
[9]  Q: Did you know what they were doing there?
[10]  A: They had removed from his room for — of
[11] course, when you talk to the kids, it was nothing. But,
[12] you know, obviously that's not true.
[13]  Q: Sure.
[14]  A: But they were put out of his room for, you
[15] know, whatever reason.
[16]  Q: Did you observe some students who never
[17] actually even entered the room, but simply stayed in the
[18] hall than getting in class?
[19]  A: Yes.
[20]  Q: And never came in at all?
[21]  A: Yes.
[22]  Q: Do you know why?
[23]  A: Sometimes according to the kids, again, you
[24] know, the children would say I'm just going to get kicked
[25] out, anyway, so I'm not even going in. Or Mr. Nichols

Page 547

[1] said for me to not come in, you know, until I get myself
[2] straight or can behave in his class. You know, those
[3] types of comments.
[4]  Q: How many such children would you see at one
[5] time?
[6]  A: Probably never more than three. There have
[7] been that many. Generally it's one or two.
[8]  Q: Were they given activities to do when you saw
[9] them in the hall?
[10]  A: They weren't doing any activities. Now,
[11] whether they were given something or not, it seems
[12] unlikely that all of them would never be doing anything.
[13] But rarely would you see any of them working on any kind
[14] of a music activity, you know, or a book or that sort of
[15] thing. Or even a guitar.
[16]  Q: What would they do in the hall, then, if they
[17] weren't doing a visible activity or instructional
[18] activity?
[19]  A: Some of them would sit quietly. Some of them
[20] would roam. Some of them would sit on the heater and
[21] bang or kick. Some of them would just enjoy themselves.
[22] You know, as other people were in the hall, they would
[23] join in with whatever happened to be going on.
[24]  Q: When you say roam, what do you mean they would
[25] roam?

Page 548

[1]  A: Well, there was enough hallway there that they
[2] would, you know, run down to the corner and look into the
[3] rooms. Go down — there was also a little — a doorway
[4] or a hallway that some of them would go back in there.
[5] Kids that age can only sit so long and do nothing, so
[6] they find other things to do.
[7]  Q: Were they supervised by adults when they were
[8] sitting out in the hallway or roaming in the hallway?
[9]  A: Not unless Mr. Nichols was watching them and
[10] seeing where they were. If they got loud enough, there
[11] were times when he would come out and say, you know, stop
[12] doing that. Stop beating on the heater and things like
[13] that.
[14]  Q: Kids would actually eat on the heater?
[15]  A: Beat. Beat.
[16]  Q: Oh, I see.
[17]  A: Kick. They would kick it.
[18]  Q: Oh, okay.
[19]  A: That would get my attention very quickly, and
[20] usually before Norman would be out there, I would be,
[21] because it's one of those things could wipe me out.
[22]  Q: When kids were roaming the halls, as you put
[23] it, going down the other corridors, was there any adult
[24] supervision involved?
[25]  A: No, other than, you know, what teachers might

Page 558

[1] boom, you've got drums going and everything else. And I
[2] do know that you can hear that next door.
[3]   A: Yes, I can.
[4]   Q: So, again, the question was — well, there
[5] wasn't a question at all.
[6]   A: No.
[7]   Q: But it's one of the reasons why we just took
[8] Friday for that, so you could get some work done during
[9] the week.
[10]  A: Oh.
[11]  Q: Okay. Now, have you ever —
[12]  MR. STELLMAN: Objection.
[13]  MR. NICHOLS: I beg your pardon?
[14]  JUDGE: Go ahead. What's your next question?
[15]           BY MR. NICHOLS:
[16]  Q: Have you ever put any students in the hallway,
[17] Ms. Stein, for inappropriate behavior?
[18]  A: Upon occasion, yes, but not for any great
[19] length of time.
[20]  Q: Okay. Has the office administration ever
[21] talked to you about that as such? Have they seen
[22] students outside your classroom and talked to you about
[23] the students being outside your classroom at any given
[24] time?
[25]  A: Well, throughout the years with this many

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BARBARA ATKINS,  :
    Plaintiff  :
      :
v.  :    CIV. NO. AMD 03-418
      :
BALTIMORE COUNTY PUBLIC  :
SCHOOLS,  :
    Defendant  :

...oOo...

MEMORANDUM OPINION

Barbara Atkins, acting pro se and proceeding *in forma pauperis*, brought this action against her former employer, The Board of Education of Baltimore County, using one of the form employment discrimination complaints made available to litigants by the clerk's office. She checked off "sex," "color," and "race" as the bases for her claims. Defendant filed a motion to dismiss the sexual harassment claims ostensibly included in the pro se complaint. On May 16, 2003, the court conducted an on-the-record hearing/scheduling conference and for the reasons stated on the record, by order entered that same day, dismissed without prejudice the harassment claims. Thereafter, discovery proceeded in respect to Atkins's claims for disparate treatment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*

Discovery has concluded and now pending are defendant's "Motion for Partial Dismissal and for Summary Judgment" and plaintiff's motion to amend the complaint in order to assert claims pursuant to 42 U.S.C. §1981. No hearing is necessary. *See* Local Rule 105.6. For the reasons discussed below, the court shall allow plaintiff to amend her complaint

EXHIBIT 3

but, on the merits, grant the motion for summary judgment.

I.

Atkins is African-American. She began her employment with defendant in September 1990 as an Administrative Secretary I. In 1992, she was reclassified to Administrative Secretary II. Throughout the 1990s, Atkins apparently continued to pursue post-secondary education opportunities and apparently earned one or more college degrees. Between October 1999 and August 2002, Atkins sought promotion to and/or selection for 24 job openings advertised by defendant. She was unsuccessful on each occasion, although she was successful in obtaining a lateral transfer to a different school at her request in July 2000.

Atkins firmly believes that her failure to secure promotions as described above was a result of race or gender discrimination. In February 2001, she met personally with the Superintendent of Schools to discuss her complaints of discrimination. The Superintendent, an African-American male, issued a written response to Atkins explaining why he found no basis in objective evidence to suspect that Atkins had been discriminatorily denied promotions.

On April 6, 2001, Atkins filed her charge of discrimination with the Maryland Human Relations Commission. In that charge, she alleged that defendant had discriminated against her on the basis of race, sex, and age in failing to select her for promotion to two specific openings that had been advertised in July 2000 and December 2000, respectively. The Human Relations Commission conducted an exhaustive investigation of Atkins's charge; the investigation was not limited to the two specific job opening mentioned by Atkins in her

-2-

discrimination charge but covered other failed promotional bids by Atkins as well. The summary judgment record reflects that defendant fully cooperated in that investigation and submitted a series of responses to requests for information from the Human Relations Commission.

In August 2002, during the on-going investigation conducted by the Human Relations Commission, Atkins abruptly resigned her employment. She stated in her letter of resignation and accompanying forms that the reason for her resignation was "the lack of promotional opportunities in the past 12 years and the lack of opportunity for professional growth and development."

On September 23, 2002, the Human Relations Commission issued it findings and conclusions. The Commission found no probable cause to believe that Atkins had been the victim of unlawful discrimination. Upon receipt of her notice of right to sue, Atkins timely filed the instant action on February 13, 2003.

II.

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In considering a motion for summary judgment, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmovant. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 547, 587-88

(1986). A party moving for summary judgment is entitled to a grant of summary judgment only if no issues of material fact remain for the trier of fact to determine at trial. *Id.* at 587. A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson*, 477 U.S. at 248. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248-49. The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). *See O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 545 (4th Cir. 1995), *rev'd on other grounds*, 116 S.Ct. 1307 (1996). "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 252; *Shealy*, 929 F.2d at 1012.

### III.

Although Atkins includes in her various opposition papers material she contends supports her ostensible claim of sexual harassment discrimination, for the reasons stated on

the record on May 16, 2003, the harassment claims have been dismissed without prejudice. The gravamen of the remaining claims is that as to one or more of her failed 24 attempts to obtain a promotion (or a different job classification) between October 1999 and August 2002, Atkins was denied the position she desired on account of race and/or gender. Defendant argues, correctly, that as to Title VII certain of Atkins's discrimination claims are time-barred because she did not file a charge of discrimination within 300 days of the adverse action, i.e., her non-selection. *See EEOC v. Commercial Office Prod. Co.*, 108 S.Ct. 1666, 1668 (1998)(stating that, under Title VII, a "complainant must file a discrimination charge with the EEOC within 180 days of the occurrence of the alleged unlawful employment practice or . . . if a complainant initially institutes proceedings with a state or local agency having authority to grant or seek relief from the practice charged, the time limit for filing with the EEOC is extended to 300 days."); *EEOC v. Techalloy*, 894 F.2d 676, 678-79 (4th Cir. 1990). Thus, for purposes of Title VII, only adverse actions that occurred on or after June 12, 2000, 300 days prior to April 6, 2001, are cognizable.

Nevertheless, timely exhaustion is of no moment as to the race discrimination claims because Atkins seeks to amend her complaint to include 42 U.S.C. § 1981 as a legal basis for her race discrimination claims. Because defendant will not be prejudiced by allowance of the belated amendment, the court shall permit Atkins to amend her complaint to include such claims. *See Mallory v. Booth Refrigeration Supply Co.*, 882 F.2d 908, 910 (4th Cir. 1989)(stating "the framework of proof for disparate treatment claims -- that is, whether the employer intentionally discriminated against the employee -- is the same for actions brought

under Title VII or § 1981"). Furthermore, contrary to defendant's contentions, failure to promote claims are cognizable under § 1981, as amended in 1991. *See Morrow v. Farrell*, 187 F.Supp.2d 548, 553-54 (D.Md. 2002); *Qualls v. Giant Food, Inc.*, 187 F.Supp.2d 530, 534-35 (D.Md. 2002). Thus, Atkins's failure timely to exhaust (or to exhaust at all) administrative remedies under Title VII is of no moment in respect to any race discrimination claims, as defendant concedes that the relevant period of limitations for such claims is three years, i.e., all race discrimination claims based on adverse actions occurring on or after February 16, 2000, are cognizable. Only one of the 24 adverse actions Atkins complains of here falls outside of the period of limitations, namely, an October 1999 job opening. (As to any gender discrimination claims, of course, defendant correctly contends that Title VII is the relevant benchmark.).

In any event, the court elects to determine the pending motion on the merits. Atkins has produced no direct or circumstantial evidence that her non-selection for any job opening was motivated by race or gender. Thus, to avoid summary judgment, she must resort to the long-established burden shifting regime crafted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, she must project evidence sufficient to establish, by a preponderance of the evidence, a prima facie case of discriminatory treatment. *Id.* Once she does so, the burden of production shifts to the defendants to rebut the presumption of discrimination by articulating a legitimate non-discriminatory reason for its selection of someone other than Atkins. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *Gillins v. Berkeley Elec. Cooperative, Inc.*, 148 F.3d 413, 416-18 (4th Cir. 1998). If the defendant

meets its burden of production, the presumption of discrimination or retaliation created by the prima facie case is rebutted and "drops from the case," *Burdine*, 450 U.S. at 255 n. 10, and plaintiff bears the ultimate burden of projecting evidence sufficient to prove her non-selection constituted discriminatory treatment. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-11 (1993).

The Supreme Court clarified the plaintiff's burden at the pretext stage of a *McDonnell Douglas* analysis in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). The Court reiterated that evidence of pretext, combined with the plaintiff's prima facie case, does not *compel* judgment for the plaintiff, because "[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 519 (1993)). However, *Reeves* made plain that, under the appropriate circumstances, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.*

In this case, plaintiff has simply failed to marshal any substantial evidence whatsoever to support her contention that the reasons proffered by defendant for her non-selection for any of the job openings properly before the court, i.e., a better-qualified person was selected, is false, or that, in fact, she was better qualified than the final selectee. (Indeed, as defendant cogently argues, to the extent that job openings were filled by females, as most were, Atkins fails to establish a prima facie case of gender discrimination; and to the extent that job

openings were awarded to African-Americans, as at least half a dozen or so of the various openings were, Atkins fails to establish a prima facie case of race discrimination.) The law is well-settled that a job applicant's subjective (and even sincere) belief that she is better qualified than competitors in the employment market is insufficient to sustain a claim of discriminatory employment action. *See Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 763 (4th Cir.1998) ("[t]he mere assertion [by the plaintiff] that [the plaintiff] was more qualified is insufficient to establish pretext"), *vacated on other grounds,* 527 U.S. 1031 (1999); *Goldberg v. B. Green and Co., Inc.,* 836 F.2d 845 (4th Cir.1988)(same). As a matter of law, that is all that Atkins has offered in opposition to defendant's motion for summary judgment.* The court is sympathetic to the burdens on a pro se litigant to build her case in a legally sufficient manner, but the court must apply the law in an even-handed fashion.

IV.

For the reasons stated above, defendant is entitled to judgment as a matter of law. An order follows.

Filed: January 5, 2004

_____
ANDRE M. DAVIS
UNITED STATES DISTRICT JUDGE

---

*Atkins also seeks to assert a retaliation claim by way of her amended complaint. Although defendant argues incorrectly that § 1981 does not permit claims of retaliation, *see Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 190 (4th Cir.2001); *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 105 (2d Cir. 2001), on the merits, Atkins has no more projected evidence of a retaliatory motive in her non-selection than she has projected evidence of a discriminatory motive. Accordingly, any § 1981 retaliation claim fails as a matter of law.