**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**NORMAN L. NICHOLS, JR.** :

: **Civil Action No. JFM-02-CV-3523**

**Plaintiff** :

**v.**

:

:

**CAROLINE COUNTY BOARD OF EDUCATION** :

**Defendant** :

: : :

**PLAINTIFF'S SURREPLY TO DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Plaintiff Norman L. Nichols, Jr., by his undersigned attorney, respectfully files the following Surreply regarding Defendant's Motion for Summary Judgment.

## I. INTRODUCTION

In its Reply, Defendant takes issue with several of Plaintiff's assertions and contentions. There are also a significant number of positions taken by Plaintiff Defendant does not challenge. As such, this Surreply will primarily be limited to those positions which have been challenged. For the sake of clarity and efficiency, Plaintiff will respond in the order presented by Defendant. The headings will be set forth in the language used by Defendant.

## II. SURREPLY ARGUMENT

### A. Defendant's Introduction (I)

Contrary to Defendant's assertions, Plaintiff's case is clearly based upon more than his own subjective feelings and supposition. It is not simply his feeling and supposition that no other teacher in Caroline County history had ever been

downgraded and placed on a PIP at the same time. It is a fact that similarly situated Caucasian teachers were observed solely in their areas of certification prior to either being placed on a PIP or downgraded.

It is a fact that Plaintiff had not received an unsatisfactory rating in more than 30 years of teaching in the Caroline County School System.

It is a fact that on several occasions throughout his tenure, the Board has violated its own rules or State statutes and regulations in dealing with Plaintiff.

**B. (II A)Mr. Nichols' Claims of Discrimination Pre-Dating Ms. Fountain's Arrival As Principal Should Be Dismissed As Untimely And/Or Barred Under The Doctrine Of Res Judicata.**

Plaintiff did not present evidence of discrimination pre-dating Ms. Fountain's arrival for the purpose of seeking a remedy for that discrimination. That evidence was provided simply for the purpose of putting Mr. Nichols' history with the Board in proper context.

Likewise, the discussion of Plaintiff's previous lawsuit against the Board, Nichols v. Caroline County School Board, 123 F. Supp. 2d 320 (Md. 2000), was to provide the necessary backdrop for Plaintiff's claim of retaliation. For Defendant to suggest that as a result of that decision, any acts of the Board and/or its agents and employees should not be considered in this litigation is just plain wrong. Plaintiff is confident the Court will view this evidence in its proper context and accord it the appropriate weight to which it is due.

Defendant also contends that since Janet Fountain and Plaintiff are of the same race, Fountain cannot be guilty of race discrimination. In support of this contention, Defendant sites an Eleventh circuit case and two district court decisions from the Southern District of New York and Eastern District of Pennsylvania respectively. The eleventh circuit case, Elrod v. Sears, Roebuck and Co., 939 F. 2d 1466 (11th Cir. 1991) was a case brought under the federal age discrimination act (ADEA), not Title VII. The Court cited no authority for its view that because the

"primary players were all over age 40, he faced a difficult burden showing they discriminated against him. Likewise, Ziegler v. Delaware County Daily Times, 128 F. Supp. 2d 790 (E.D. Pa. 2001) was also an ADEA case.

Anderson v. Anheuser-Busch, Inc., 65 F.Supp. 2d 218 (S.D.N.Y. 1999) was a case brought under Title VII. In that case, an African- American Plaintiff was terminated by a white supervisor. However, because an African American administrator had some involvement in approving the termination, the Court did indeed indicate this fact made it more difficult for plaintiff to prove race discrimination. However, the Court also noted that the African-American administrator also had equal employment compliance responsibilities at the company which was perhaps more significant in the Court's finding than his race.

But see the concurring opinion of united States Supreme Court Justice Thurgood Marshall in the case of Castaneda v. Partida, 430 U.S. 482 (1977) (a case alleging jury discrimination in Texas), in which he very eloquently dispelled the notion that members of a "protected group" cannot discriminate against members of that same group. In challenging the notion by Justice Lewis Powell that statistical disparities in the numbers of Mexican-American selected for jury service was not evidence of discrimination because Mexican-Americans had political dominance in the county on Texas in question, Justice Marshall stated as follows:

> "In every other case of which I am aware where the evidence showed both statistical disparity and discretionary selection procedures, this Court has found that a prima facie case of discrimination was established, and has required the State to explain how ostensibly neutral selection procedures had produced such non-neutral results. This line of cases begins with the decision almost a century ago in Neal v. Delaware, 103 U.S. 370 (1881), and extends to our recent decision in Alexander v. Louisiana, supra. Yet my Brother POWELL would have us conclude that the evidence here was insufficient to establish purposeful discrimination, even though no explanation has been offered for the marked under representation of Mexican-Americans on Hidalgo County grand juries. [430 U.S. 482, 503] □
>
> The sole basis for MR. JUSTICE POWELL'S conclusion lies in the third category of evidence presented: proof of "the political dominance and control by the Mexican-American majority in Hidalgo County," post, at 507-508.

> Like the District Court, he appears to assume - without any basis in the record - that all Mexican-Americans, indeed all members of all minority groups, have an "inclination to assure fairness" to other members of their group. Post, at 516. Although he concedes the possibility that minority group members will violate this "inclination," see post, at 514-515, n. 6, he apparently regards this possibility as more theoretical than real. Thus he would reject the inference of purposeful discrimination here absent any alternative explanation for the disparate results. I emphatically disagree.
>
> In the first place, MR. JUSTICE POWELL'S assumptions about human nature, plausible as they may sound, fly in the face of a great deal of social science theory and research. Social scientists agree that members of minority groups frequently respond to discrimination and prejudice by attempting to disassociate themselves from the group, even to the point of adopting the majority's negative attitudes towards the minority. Such behavior occurs with particular frequency among members of minority groups who have achieved some measure of economic or political success and thereby have gained some acceptability among the dominant group.□
>
> But even if my Brother POWELL'S behavioral assumptions were more valid, I still could not agree to making them the foundation for a constitutional ruling. It seems to me that especially in reviewing claims of intentional discrimination, this Court has a solemn responsibility to avoid basing its decisions on broad generalizations concerning minority groups. If history has taught us anything, it is the danger of relying on such stereotypes. The question for decision here is not how Mexican-Americans treat other Mexican-Americans, but how the particular grand jury commissioners in Hidalgo County acted. The only reliable way to answer that question, as we have said so many times, is for the State to produce testimony concerning the manner in which the selection process operated. Because the State failed to do so after respondent established a prima facie case of discrimination, I join the Court's opinion affirming the Court of Appeals." (footnotes omitted).

Justice Marshall's remarks take on even greater significance when it is noted that while Ms. Fountain may be of the same race as Mr. Nichols, Superintendent Lorton, who hired Ms. Fountain, and was intricately involved in the unlawful actions taken against Plaintiff, is Caucasian. Moreover, neither Ms. Fountain nor Dr. Lorton is of the Jehovah's Witness faith.

**C. (II B)<u>Mr. Nichols' Claims Of Procedural Unfairness Were Fully Litigated In Proceedings Before The MSBE</u>**

As indicated in Plaintiff's Opposition, this Court is not required to consider the administrative decisions related to Plaintiff's claims. The Court decides these matters <u>de novo</u>. Moreover, with regards to the October 25, 2001 decision of the Board to

downgrade Plaintiff's certificate, the Decision was a violation of procedural and substantive due process.

To the extent the Court does take these decisions into account, Plaintiff would note that he was not represented by counsel at any of those proceedings. Moreover, Plaintiff requests that the Court take note of the unfair and highly suspect manner in which his claims were treated. Finally, also as Plaintiff noted in his Opposition, unless this Court acts to find in Plaintiff's favor, these administrative rulings will have harmful effects not only upon Plaintiff but all teachers in the State of Maryland, and indeed to a great extent, throughout the country, as certification in a specific area will be of no consequence/significance in the teachers' observation and evaluation process. (See MD. Ann. Code, Education Article, section 6-104). With respect to Defendant's cite of Vaughn v. Metrahealth, Inc., and Settle v. Baltimore County, for the proposition that "the mere fact that an employer failed to follow its own internal procedures does not suggest that the employer was motivated by illegal discriminatory intent", the Court is likewise free to consider those violations in the context of the facts surrounding those violations. It is particularly appropriate in this case for the Court to infer illegal motives for not following policy in that Defendant sought to change the course of history in attacking this 30-year veteran of satisfactory work.

**D. (II C)The Court Has Previously Ruled That Mr. Nichols May Not Include A Breach Of Contract Claim In This Litigation**

Facts surrounding the "breach of contract claim" were not included for the purpose of seeking a remedy for the breach. Instead, they were included to put Plaintiff's claims in the proper context and provide further illustration of Defendant's unfair treatment of Plaintiff. Although the facts relevant to the claim occurred after the filing of the Charge of Discrimination, they should be viewed much the same as Defendant's including after-charge evidence and information (the administrative

decisions) to bolster its claim of lack of wrongdoing. Again, Plaintiff is confident that the Court will properly consider this evidence.

**E. (III A)Mr. Nichols Has Offered No Evidence To Challenge The Board's Determination That His Performance, In The Board's View, Was Unsatisfactory.**

Defendant begins this section of its Reply with the comment that "The heart of Mr. Nichols' complaint concerns the Board's increasing dissatisfaction with Mr. Nichols' performance which surfaced about one year after Ms. Fountain became principal of CRMS". By this statement, Defendant would have the Court believe that Nichols' performance had been unsatisfactory for quite some time and it just surfaced about a year after a brand new inexperienced principal took the reins. Defendant has of course offered absolutely no evidence of earlier deficient performance.

Also highly suspect are the observations of Plaintiff during the 2000-2001 school year as opposed to the 2001-2002 school year. In 2000-2001, he was observed primarily out of his area of certification; while during the 2001-2002 school year, he was observed primarily within his area of certification. Why the change?

Assuming there are no obvious reasons for Plaintiff's alleged poor performance suddenly surfacing after 30 years, the question is "what was different about Plaintiff in January, 2001" (when Plaintiff received his first less than favorable observation)? The answer is that the Court in the federal case had just ruled against Plaintiff, and Defendant's request for sanctions was denied. Suddenly, whatever constraints Defendant may have felt it was under were now loosened and it felt it was now safe to begin its move to ultimately terminate Plaintiff. Hence, what surfaced was not unsatisfactory performance, but the loosening of reins on Defendant.

As previously stated, Plaintiff has submitted significant evidence to show he was treated different from similarly situated employees. The most significant of this

evidence is that showing the difference in how he was observed and the specific observations used to find him incompetent. For example, as set forth in Plaintiff's Opposition, he was the only teacher whose placement on a PIP, and/or whose certification was downgraded, to be observed outside his area of certification. Such different treatment is discriminatory in that all similarly situated teachers were Caucasian; not of the Jehovah Witness faith; and who had not filed charges or claims of discrimination against Defendant.

It is true that the Board was dissatisfied with Plaintiff, but it had nothing to do with his performance, the Board's expectations were not legitimate.

Defendant's quote from King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003) (the mere assertion by the plaintiff that the plaintiff was more qualified than other candidates for a position is insufficient to establish pretext) is clearly misplaced. Plaintiff herein does not contend he was more qualified than other teachers – that he was just as qualified based on his thirty (30) years of satisfactory performance; and that he was treated different from his peers.

Moreover, it must be noted that the basis for defendant's contention that Plaintiff was deficit was based primarily on purely subjective evidence. While employers are free to use subjective criteria in making employment decisions, Courts have held that the use of subjective factors can be unfairly used to mask discrimination. See Cook v. Billington, 59 FEP 1010, 1013 (D.D.C. 1992) ("excessive subjectivity in employment decisions is traditionally viewed with skepticism by courts, as subjectivity is often a convenient pretext for discriminatory practices"); Lujan v. Walters, 813 F.2d 1051, 1057 (10th Cir. 1987) (the use of subjective criteria "may offer a convenient pretext for giving force and effect to prejudice"); Eldred v. Consolidated Freightways Corp.. 898 F.Supp. 928, 939 (D. mass. 1995).

The observation procedure used by Defendant to declare Plaintiff unsatisfactory was (and is) as subjective as a system can be. These observations are not videotaped or recorded in any way so that there is no independent way to truly assess a teacher's performance. Hence, a teacher is left to challenge the credibility of his or her superior, which is a difficult thing to do.

In addition, the scoring procedure for the year-end evaluation is even more subjective. For example, in looking at the final evaluation before Plaintiff was recommended for termination he received a "1" for Professional Ethics/Interpersonal Relationships". In that section, there are eight (8) sub-sections, beginning with "Dresses Appropriately". Because there is no indication as to how each of the sub-sections were scored or rated, it is impossible to determine the basis for the rating – which again, in this instance, was a "1". Was Plaintiff given a "1" for inappropriate dress or for not attending work regularly and on time (no. C) or failing to maintain the required legal confidentiality (no. H). There is no way to know. Accordingly, how can the legitimacy of the evaluative process be judged? (See Def. Exh. 24).

It is then not surprising that Defendant also argues that there is no evidence in the record to dispute the board's evaluations, That there is a "… glaring absence of testimony of other school system personnel, expert witnesses, or even co-workers to dispute the Board's characterization of Mr. Nichols' performance." This is clearly a disingenuous argument. As indicated above, these "observations" are not preserved for future critique and review. As such, of what value and significance would the use of an expert be? To what could he testify other than that the substantive things sought to be evaluated in the observation are legitimate and proper?

Similarly, co-worker testimony would be of little value. First, co-workers are never present when these observations are done. Consequently, even if a co-worker teacher were to testify regarding his or her knowledge of Plaintiff's

performance, Defendant would still be free to contend that during his observations, Plaintiff was not satisfactory, notwithstanding good performance when observed by co-workers.

Finally, Defendant objects to Plaintiff's argument that his post-charge performance is the proper barometer for determining whether he was performing at an acceptable level to establish the second prong of the prima facie case (that at the time the employer took the adverse employment action, Plaintiff was performing at a level that met his employer's legitimate expectations). The record reflects that notwithstanding Defendant's Notice to Plaintiff on May 8, 2002 that he was being recommended for termination, he was not actually discharged until the State Board ruled on July 23, 2003. (Def. Exh. 7). Hence, at the time of the adverse employment action, i.e. termination, Plaintiff was performing satisfactorily.

The actions taken by the Board's Superintendent, Dr. Lorton, supports Plaintiff's position as to when termination took place. As indicated in Plaintiff's Opposition, Plaintiff's OAH hearings took place in January – February, 2003. On April 21, 2003, the ALJ recommended that Lorton's recommended termination be upheld. (Def. Exh. 6). Thereafter, On April 24, 2003, Superintendent Lorton hand-delivered a letter to Plaintiff advising that based upon the ALJ's recommendation, he was immediately removing Plaintiff from the payroll. (Pl. Exh.13).

After Plaintiff complained to Dr. Lorton that he had violated the August 1, 2003 Agreement, Lorton, then, on May 13, 2003 sent him a letter indicating that he was rescinding the termination, and instead, placing him on suspension without pay pending the State Board ruling. (See Pl. Exh. 14). He gave no reason for this action other than he felt he had the authority to do so. As indicated above, the State Board affirmed the decision to terminate Mr. Nichols on July 23, 2003 (Def. Exh. 7). Hence, Plaintiff's termination became final on that date.

**F. (III B.) <u>Mr. Nichols Cannot Demonstrate That The Various Observations/Evaluations were "adverse employment actions."</u>**

Defendant's assertions in this section of its Reply are equally curious. It suggests that neither the downgrading of Plaintiff's certificate nor the placing of Plaintiff on a PIP constitutes an adverse employment action. This is simply wrong. First, with respect to the downgrading, Plaintiff literally lost the opportunity for the year-end bonus of $2,000 per year to which holders of first-class certificates are entitled. To date, Plaintiff has lost $6,000. At the end of this school year, it will be $8,000. Loss of certification may also affect future salary increases.

With respect to the PIP, it is clear that the use of the PIP in this case was to set the stage for Plaintiff's termination. As evidenced by the facts and documents in this case, the PIP was lengthy and arduous and was prepared without any real basis for its creation. As also pointed out, the Board had no written guidelines for preparing the PIP, further causing grief to Plaintiff. See Sur. Exh. 1, Fountain depo. pp. 95-96). The Board cannot point to any other teacher with such an exhaustive, primitive plan. As indicated previously, Plaintiff was treated like a rookie teacher with no experience or track record.

**G. (III C.) <u>Mr. Nichols Has Not Made A Sufficient Showing That Similarly Situated Employees Outside The Protected Classes Received More Favorable Treatment.</u>**

In this section of the Reply, Defendant contends that three (3) of the teachers utilized by him to show differential treatment are not similarly situated employees. At the same time, however, Defendant compares Plaintiff's treatment to two of those teachers – Candy Craft, and Elaine Stein. Defendant cannot have it both ways.

Defendant is correct in stating that the individuals sought to be used as comparisons must be similarly situated in all material respects. With respect to Mr. Henry and Ms. Craft the test is met in that the policies which have been discriminatorily applied to Plaintiff, i.e., for observations, downgrading of certifications,

evaluations, and the use of the PIP are all School system-wide policies allegedly applied on a uniform basis to tenured teachers. In other words, the test in this case for a similarly situated employee would be (1) a teacher who has tenure: (2) a teacher who is certified in a specific area; (3) a teacher who has had to be put on a PIP; and (4) a teacher who is employed by the same County Board of Education and subject to the same Board's policies as all other teachers within the system. Perhaps the comparisons are not perfect, but they meet the materially test because of their countywide application.

It is also noted that the case cited by Defendant involved a private employer (UPS) and not a school system governed by federal, state and local laws.

Finally, even if Defendant's contention (that 'similarly situated" employees must have the same supervisors) has merit (which Plaintiff disputes based on the facts and circumstances herein), clearly Ms. Stein and Mr. Barrett meet the test as they shared supervisors with Plaintiff.

**H. (III D.) Mr. Nichols Has Not Presented Any Evidence To Demonstrate That The Board's Stated Reasons For Termination Are Pretextual**

While defendant is correct in stating that to prove pretext, a plaintiff must show that the proffered reason is untrue, and that unlawful discrimination was the real reason for the discrimination. However, it is incorrect to suggest that Plaintiff has that burden at this point in this case. The burden of proving unlawful discrimination only accrues when the case is being presented to the jury. Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133 (2000) (under the appropriate circumstances, a "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.)" At this summary judgment stage, Plaintiff has only to show that the proffered reason is incorrect. This is a motion for summary judgment, not for judgment notwithstanding the verdict.

Moreover, despite Defendant's protestations to the contrary, and citing the cases of Hawkins v. Pepsico, Inc., 203 F.3d 274 (4th Cir. 2000), Beall v. Abbott Lab, 130 F.3d 614, 618-20 (4th Cir. 1997); and Atkins v. Baltimore County Schools, No. AMD-03-418 (D.Md., Jan. 5, 2004), Plaintiff has clearly set forth much more than just his personal assessment of his qualifications. To be sure, Plaintiff has in fact set forth sufficient material facts in genuine dispute to show that unlawful discrimination occurred.

**I. (III E.) Mr. Nichols Has Introduced No Evidence To Show That Board Officials Were Biased Against Members Of the Jehovah's Witness Faith.**

In its Reply (at page 14), Defendant contends that "Mr. Nichols gave his music class an assignment requiring students to use the Bible to describe Jesus' crucifixion and resurrection, to give their interpretation of those events, and to identify the chapter, verse, and name of the Bible used. This is an inaccurate interpretation of this assignment. During his hearing before the Administrative law Judge on February 6, 2003, Mr. Nichols described his assignment and the purpose it was to achieve. That testimony is attached hereto as Sur. Exh. 2, Nichols test., pp. 971-974). Excerpts from it are as follows beginning at p. 972, line 16:

> "A. No. You see the major point in having the kids first of all to look up music that was focused on the holiday is so that they could better understand it. In other words, understand it not only the lyrics but Also where are the lyrics coming from, where does a song come from."

Defendant also contends that Plaintiff disregarded the Board's "specific instruction in his PIP" that he "refrain from discussion of topics that have religious overtones". Plaintiff would note that no other teacher was given such admonition. Additionally, the instruction was so vague and overbroad as to constitute a nullity. Does it mean that if he simply mentioned the word "Christmas" or "Easter" or "Ramadan" or "Jewish" that he would violate this restriction? What constitutes

"discussion of topics with religious overtones"? Contrary to Defendant's representation, the above admonition can hardly be classified as "specific".

With respect to whether some Board officials and agents (specifically Ms. Fountain and Dr. Lorton) were biased against Plaintiff because he was of the Jehovah Witness faith, it should be noted that Dr. Lorton testified at his deposition that he was aware of Mr. Nichols' religious affiliation before the negative actions against him began in January, 2001. (Pl. Exh. 17, Lorton depo, p. 10-11). Likewise, Ms. Fountain so testified. In fact, she <u>offered</u> that when she first knew Mr. Nichols he was a "Methodist" then became a "Baptist" and finally a member of the Jehovah Witness faith. (See Sur. Exh. 3, Fountain depo., p. 13-15).

Moreover, Lorton testified that Mr. Nichols had a past history and practice of using "heavy Christian theme" in his music classes; and that he had not been disciplined for it (Pl. Exh. 17, Lorton depo, p. 12-14); and that he could not dispute Mr. Nichols' representation that he had never been disciplined with respect to how he ran his music class prior to the 2000-2001 school year (Pl. Exh, 17, Lorton depo., p. 21). Lorton further testified that he knew of no other teachers of the Jehovah Witness faith in the Caroline County School System. (Pl. Exh. 17, Lorton depo., p. 173). Similar testimony was provided by Gene Smith. (Pl. Exh. 8, Smith depo., p. 10-11).

Hence, contrary to defendant's assertions, there is sufficient evidence in the record that no members of the Jehovah Witness faith suffered such unlawful acts at the hands of the Board's agents and administrators as Plaintiff.

Defendant also takes issue with Plaintiff's representation that his Easter assignment was prescribed by COMAR's multicultural guidelines by complaining that he never taught equivalent lessons discussing music in the Hindu, Buddhist, Jewish or Islamic religions. However, Defendant ignores the fact that annually, Mr. Nichols' classes discussed and studied Christmas religious music without opposition.

In essence, there was nothing wrong with the Easter project. In fact, Mr. Nichols has testified without dispute that he had given similar lessons before without objection. (Pl. Exh. 1, Nichols Aff., para. 24). The difference was that one parent did object (after the fact) and Defendant used that solitary objection to punish Plaintiff. Of course, as pointed out in Plaintiff's opposition, Defendant does not always accede to parental objections with respect to religious issues ((See Pl. Exh. 17, Lorton depo, p. 132-133 wherein Lorton testified that he refused to alter the daily pledge of allegiance to remove the "under God" reference when parents complained).

**J. (III F.) Mr. Nichols Has Not Demonstrated A Causal Connection Between His EEOC Charge And Any Adverse Employment Action.**

Defendant is correct that the time between the taking of the protected activity and the claimed adverse action is relevant to whether or not a causal connection can be shown between the protected activity and the adverse action. In this case, the protected activity was the filing of earlier charges against the Board which culminated in a lawsuit against the Board. The cases cited by Defendant in support of its contention that too much time elapsed between the relevant acts to show or infer retaliation do not in fact support its position.

For example, in Dowe (Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653 (4th Cir. 1998)), there was no proof that the employer was aware of the EEOC claim when he terminated Plaintiff. Moreover, over three (3) years passed between the filing of the charge and termination.

In Causey v. Balog, 162 F.3d 795 (4th Cir. 1998), the Court held that the 13 month period between the filing of the charge and Plaintiff's termination was too long to establish causation "absent other evidence of retaliation". Unlike Plaintiff herein, Causey introduced no other evidence to show the necessary causal connection. Additionally, as in Dowe, there was no evidence that the terminating official was aware of the charge of discrimination.

In Conner v. Schnuck Markets, Inc. 121 F.3d 1390, 1395 (10th Cir. 1997), the four (4) month period between Plaintiff's filing of a charge of discrimination and the adverse action, was sufficient for Plaintiff to make out a prima facie case. Conner was unsuccessful because he could not prove pretext. Moreover, Conner was not a Title VII case – it was brought under the Fair Labor Standards Act (FLSA).

In Hughes v. Derwinski, 967 F.2d 1168, 1174 (7th Cir. 1992), the first disciplinary letter issued to the plaintiff was only four (4) months after the Charge was filed, but another three (3) years passed before he got the second disciplinary letter. Hence, it was the three (3) year period, and not the four (4) month period which created problems for Plaintiff in showing a causal connection. Moreover, the Court stated that the temporal proximity of plaintiff's firing and the issuance of the other letter, standing by itself, did not sufficiently raise the inference that plaintiff's filing was the reason for the adverse action.

In Cooper v. City of North Olmsted, 795 F.2d 1265 (6th Cir. 1986), the Court simply stated that the four (4) month period between the filing of the charge, and the adverse action did not infer retaliation – suggesting that this period was not so great that a causal connection could not be inferred. Unfortunately, the Court gave no explanation for its decision to reverse the district court finding of retaliation other than that it was clearly erroneous.

In Robinson v. S.E. Transp. Authority, Red Arrow, 982 F.2d 892, (3rd Cir. 1993), the Plaintiff in fact proved his retaliation claim. The Court found that an intervening pattern of antagonism towards Plaintiff as in this case.

Finally, in Olivares v. NASA, 934 F. Supp. 698, 705 (D.Md. 1996), plaintiff appeared pro se. Unlike Plaintiff herein, he could not establish blatant violations of the employer's own policies towards him. Also, unlike Plaintiff herein, Olivares apparently had a long history of complaining about every little thing which happened

to him, and the Court expressed its displeasure with his constant raising of frivolous claims.

Mr. Nichols, on the other hand, has clearly shown that his life at Colonel Richardson Middle School changed just after the federal court decision in November, 2000, and the subsequent denial of sanctions about three (3) weeks later. What had been satisfactory performance all of a sudden became unsatisfactory. What followed was a pattern of simply documenting the record to attempt to justify his dismissal. Included in this effort was the unprecedented actions heretofore documented: (1) the observing of his classroom performance in areas out of his area of certification; (2) the downgrading of his certificate at the same time as placing him on a PIP; and (3)using observations primarily out side his area of certification to place him on a PIP, and to downgrade his certificate.

**K. (III G.) <u>Mr. Nichols Is Not Entitled To Protection Under The First Amendment Because He Was Not Speaking On A Matter Of Public Concern.</u>**

Defendant contends that Plaintiff's First Amendment claim is really one of disparate treatment. Plaintiff would submit that there are aspects of his constitutional claim which overlap with his Title VII claim. Nonetheless, he maintains that his rights to academic freedom were violated when, among other things, he was told that his Easter assignment to his students should (or would) be pulled. (See Sur. Exh. 2, Nichols test., p 971).

## III. <u>CONCLUSION</u>

Once again, Plaintiff urges the Court to note that If Defendant's Motion for Summary Judgment is not denied, then Maryland State Board of Education Opinions 02-11 (Def. Exh. 4) and 03-26 (Def. Exh. 7) will be sanctioned, and the result will be a complete alteration of the observation and evaluation process of all

certified teachers in the State of Maryland if not the entire country. This would then erode and undermine the present certification system in Maryland – rendering it null and void. Moreover, Plaintiff has clearly shown that Defendant's proffered reasons for his treatment are simply not true. As such, he is entitled to have a jury decide whether the false reasons are in fact based upon unlawful discrimination. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000).

Accordingly, for the above reasons, those set forth in this Surreply, his previously filed Opposition, or whatever other reasons the Court deems just and proper, Plaintiff requests the Court deny Defendant's motion for summary judgment and allow this matter to proceed to a jury as there are several significant material issues of fact in genuine dispute as set forth on pages 15-16 of Plaintiff's Opposition, which Defendant has not disputed.

Respectfully Submitted,

___/s/_____________________
Frederick P. Charleston, Esq.
Bar No. 02933
2530 N. Charles St., Suite 201
Baltimore, Maryland 21218
(410) 662-0010

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 12th day of February, 2004, a copy of the foregoing Plaintiff's Surreply To Defendant's Reply To Plaintiff's Opposition To Defendant's Motion For Summary Judgment was mailed, first class postage prepaid, to Leslie Robert Stellman, Esq., and Steven B. Schwartzman, Esq., Hodes, Ulman, Pressin & Katz, 901 Dulaney Valley Road, Towson, MD. 21204.

_______/s/_______________________
Frederick P. Charleston, Esq.