IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NORMAN L. NICHOLS, J.R.

|  |  |
|---|---|
| | * |
| | * |
| v. | *   Civil No. JFM-02-3523 |
| | * |
| CAROLINE COUNTY BOARD | * |
| OF EDUCATION | * |
| | ***** |

OPINION

Plaintiff Norman L. Nichols, Jr. has brought suit against Defendant Caroline County Board of Education ("the Board"), claiming racial, gender, religious, and speech discrimination and retaliation in violation of Title VII.  Plaintiff asserts that defendant negatively evaluated him, downgraded his teaching certificate, and ultimately terminated him on the basis of unlawful discrimination and that defendant violated his First Amendment rights to freedom of speech and religion.  Now pending before the Court is defendant's motion for summary judgment.  For the reasons stated below, the motion will be granted.

I.

Plaintiff Norman Nichols, an African American member of the Jehovah's Witness religion, was employed as a full-time teacher with the Caroline County Board of Education beginning in September 1967.  He was initially certified to teach music in grades seven through twelve and, in 1980, received his certificate to be an administrative supervisor.  From September 1990 until April 2003, Nichols taught at Colonel Richardson Middle School ("CRMS").

Plaintiff alleges that throughout his tenure, the Board, through its agents, officers, and employees, unlawfully discriminated against him on the basis of race, sex, religion, and speech.  On June 21, 1999, Nichols filed a complaint with the Equal Employment Opportunity Commission

("EEOC") alleging racial discrimination based on then-principal Deborah Chance's request that Nichols present a doctor's note for an accumulated sick day, in addition to other actions taken by the assistant prinicipal at the time. Nichols subsequently brought suit against the Board for these claims in August 1999. This court granted summary judgment for the Board on November 28, 2000, and the Fourth Circuit affirmed this decision. Following the dismissal of plaintiff's claims, the Board requested that the Court impose sanctions against plantiff in the form of attorney's fees. The request was denied.

In September 1999, the Board appointed African American Janet Fountain as principal of CRMS. Fountain had known Nichols since prior to 1975 when they met through church. They dated for a year or so in the late 1970s. When the relationship ended, they lost touch until Fountain was appointed principal of CRMS. At the same time that Fountain was appointed principal, Gene Smith was assigned as assistant principal. Although Fountain became aware of Nichol's lawsuit after she began at CRMS, Smith did not know of the pending litigation.

From time to time, the Board would assign teachers, including Nichols, to teach classes outside their areas of certification in addition to those for which they had been certified. While Nichols had been assigned to teach courses outside his area of certification during the 1970s and 1980s, in the 1990s, he taught only music courses until the 1999-2000 school year.

The events giving rise to this action began during the 1999-2000 school year.[1] During that

---

[1]Plaintiff's claims of discrimination prior to the 1999-2000 school year exceed the EEOC charge authorizing this suit and are barred by the doctrine of res judicata. The relevant EEOC charge is dated June 18, 2002. Any allegations occuring more than 300 days before the charge do not fall within its scope and are time-barred. 42 U.S.C.A. §2000e-5. Furthermore, this court has already adjudicated Nichols's claims of discrimination pre-dating the 1999-2000 school year. In *Nichols v. Caroline County Board of Education*, 123 F.Supp.2d 320 (D.Md. 2000), the Court concluded that

school year, Nichols was assigned to teach music and computer literacy. Pursuant to Board policy

requiring periodic evaluation of a teacher's performance, Fountain, Smith, and Supervisor of Instruction

Rosalyn Fradel observed Nichols in his music and computer literacy classes.[2] Prior to that year,

Nichols had always been observed solely in his area of certification. During the 1999-2000 school

year, Nichols was observed two times in music and one time in computer literacy. Nichols received a

satisfactory final evaluation for that year.

At the beginning of the 2000-2001 school year, Fountain decided to reassign Nichols from

computer literacy to a health and nutrition class in addition to his music classes. Fountain had concerns

about Nichols's approach to computer literacy and had received complaints from students that his

course was uninteresting and rigid. John Barrett, a Caucasian teacher, was assigned to replace Nichols

in the computer literacy course.

During the 2000-2001 school year, Fountain and Smith observed Nichols four times- three

times in health and once in music. Fountain conducted two of the observations in health and nutrition,

and Smith observed Nichols once in health and nutrition and once in music. Based on these

_____

Nichols failed to make out a claim under Title VII because he produced no evidence indicating that the
Board took any adverse employment action against him. Thus, Nichols is precluded from relying on
any allegations of discrimination occurring before the 1999-2000 school year to support his claims in
the instant case.

[2]The Maryland Code of Regulations, which provides the minimum requirements for evaluation
of professionally certificated personnel, requires that a teacher holding a Standard Professional
Certificate shall be evaluated at least once annually. The evaluation shall be based on at least two
observations during the school year. Md. ADC 13A.07.04.02. Board policy requires that an
evaluation of a tenured teacher be based on at least three formal observations during the school year.
Board of Education Policy Handbook, IV.40.30 (Pl.'s Ex. 5).

-3-

observations, Fountain and Smith gave Nichols an unsatisfactory evaluation at the end of the 2000-
2001 school year.  Nichols's performance throughout the 2000-2001 school year reflected excessive
disciplinary referrals of students, a lack of control over classroom activities, and inappropriate
imposition of religious content into his lessons despite reproach from school officials to refrain from
doing so.  *See* Def.'s Ex. 6, ALJ Proposed Decision, OAH Case No. MSDE-BE-01-200200005
(Apr. 21, 2003).

As a result of this unsatisfactory evaluation, Fountain recommended to Superintendent Larry
Lorton that Nichol's certificate be placed on second-class status for the 2001-2002 school year.[3]
Lorton accepted this recommendation and advised Nichols in a letter dated May 30, 2001, that failure
to improve his performance could result in a recommendation for termination of employment.  Def.'s
Ex. 15.  Nichols appealed the decision to downgrade his certificate.  The Board held a hearing and, on
October 25, 2001, unanimously affirmed Lorton's decision.  Nichols appealed the Board's decision to
the Maryland State Board of Education ("MSBE"), which subsequently affirmed the decision.

To assist Nichols in improving his performance during the 2001-2002 school year, Fountain
placed Nichols on a Performance Improvement Plan ("PIP"), which served as a written guide for him
to use in remedying the specific areas that Fountain indicated as needing improvement in his May 25,
2001 evaluation.  Among other things, the PIP required Nichols to submit lessons plans to Fountain one
week in advance and to periodically meet with Fountain and the instructional supervisor to discuss his

---

[3]Maryland law requires local superintendents to classify the certificate of each teacher as first or
second class at least once every two years. Md. Code. Ann., Educ. §6-102 (c). In determining the
class of the certificate, the superintendent is to consider the teacher's scholarship, executive ability,
personality, and teaching efficiency. *Id*. §6-102 (d).

progress.  Def.'s Ex. 16.  According to Fountain, on several occasions when they were scheduled to discuss Nichols's lesson plans or progress, Nichols was either unprepared or unwilling to engage in such discussions and rarely submitted his lesson plans in advance. On November 21, 2001, Fountain issued a written reprimand to Nichols after he again refused to discuss his performance under the PIP at a November 6, 2001 meeting and claimed that the PIP was intended to intimidate and harass him.  On December 19, 2001, Fountain and John Perry, Instructional Supervisor, gave Nichols an unsatisfactory mid-year evaluation.

Fountain later reprimanded Nichols for failing to submit his lesson plans and for giving his music class an inappropriate Easter assignment in which he required the students to use the Bible as a source to describe Jesus' crucifixion and resurrection, to give their interpretation of those events, and to write the chapter, verse, and name of the Bible used.  Subsequently, on March 25, 2002, Lorton instructed Nichols to refrain from interjecting his religious beliefs into his music class.[4]

After observing Nichols on eight different occasions during the course of the school year, on April 3, 2002, Fountain and Perry gave Nichols a final unsatisfactory evaluation for the year.  On April 19, 2002, Lorton advised Nichols that he intended to recommend to the Board that Nichols be terminated on the grounds of incompetency, neglect of duty, and/or insubordination.  Lorton notified Nichols of the recommendation on May 8, 2002, and placed Nichols on administrative leave.

Nichols appealed the termination decision to the Board.  Because of a procedural error, the parties agreed to have the appeal proceed directly to the State Board and be heard by an

---

[4]Lorton requested a response and explanation justifying the assignment by April 5, 2002. Nichols responded by refusing to justify the assignment and invoking the Fifth Amendment.

Administrative Law Judge ("ALJ") from the Maryland State Office of Administrative Hearings. The

parties further agreed that, pending the appeal, Nichols would remain on the payroll and would be

reassigned by Lorton as needed. Nichols was then reassigned to duties in the central office.

On April 21, 2003, the ALJ recommended that Lorton's decision to terminate Nichols be

upheld. Thereafter, on April 24, 2003, Nichols received notice from Lorton that Lorton was

immediately removing him from the payroll. The State Board ultimately affirmed the decision to

terminate Nichol's employment on July 23, 2003. On June 21, 2002, Nichols filed a charge of

discrimination with the EEOC, which then issued a Notice of Right to Sue on July 30, 2002.

Thereafter, Nichols instituted this suit alleging retaliation and discrimination on the basis of race, gender,

and religion in violation of Title VII, as well as speech and religious discrimination in violation of the

First Amendment.

## II.

The Board has moved for summary judgment. Summary judgment is appropriate only where

there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter

of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986). A fact is material if it "might affect the outcome of the suit under the governing

law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a

verdict for the non-moving party." *Id.*

Where, as here, the non-moving party bears the ultimate burden of persuasion, "the burden on

the moving party may be discharged [on summary judgment] by 'showing'--that is, pointing out to the

district court--that there is an absence of evidence to support the nonmoving party's case." *Celotex,*

477 U.S. at 325, 106 S.Ct. 2548.  If the nonmoving party "fail[s] to make a sufficient showing on an

essential element of his case with respect to which he has the burden of proof," then "the moving party

is entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

## A.

To establish a prima facie case of disparate treatment under Title VII, the plaintiff has the

burden of showing:(1) that he is a member of a protected class; (2) that he suffered from an adverse

employment action; (3) that at the time the employer took the adverse employment action he was

performing at a level that met his employer's legitimate expectations; and (4) that the position was filled

by a similarly qualified applicant outside the protected class.  *King v. Rumsfeld*, 328 F.3d 145, 149

(4th Cir. 2003).

Once the plaintiff has made a prima facie case of discriminatory discharge, the burden of

production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse

employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct 1817, 1824,

36 L.Ed.2d 668 (1973); *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir. 1999).

If the employer meets this burden, the plaintiff must ultimately prove by a preponderance of the

evidence that the legitimate reasons offered by the employer were merely a pretext for discrimination.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147

L.Ed.2d 105 (2000); *Dennis v. Columbia Colleton Medical Center, Inc.*, 290 F.3d 639, 646 (4th

Cir. 2002).

Nichols clearly satisifies the first element of the prima facie case. Some of his allegations fail to meet the second element, however. Plaintiff claims that defendant discriminated against him by observing him more frequently than other teachers and conducting observations in classes outside his area of certification. Plaintiff further contends that his placement on a PIP, based upon observations of his performance outside his areas of certification, was discriminatory, as was the imposition of a PIP itself. He argues that although Caucasian teachers had been placed on PIPs in the past, all had been previously observed solely in their areas of ceritification.

These allegations of discrimination in the observation process and imposition of the PIP do not constitute the kind of "adverse employment actions" necessary to make out a prima facie case of disparate treatment under Title VII. The Fourth Circuit has held that the proper inquiry is whether there has been discrimination in "what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981). "There are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscriptions...of Title VII." *Id.* The Fourth Circuit has further held that an employment action is adverse only if it has an adverse effect on the "terms, conditions, or benefits of...employment." *Von Gunten v. Maryland*, 243 F.3d 858 (4th Cir. 2001) (quoting *Munday v. Waste Management of North America, Inc.*, 126 F.3d 239, 243 (4th Cir. 1997)).

The frequency and the method with which the Board conducted observations of Nichols and the resulting decision to place him on a PIP were all mediate decisions that did not adversely affect the

terms, conditions, or benefits of employment.[5] *See Von Gunten*, 243 F.3d at 868 (negative job

performance evaluation was not an adverse employment action where it did not jeopardize the terms,

conditions, and benefits of plaintiff's employment); *Nye v. Roberts*, 159 F.Supp.2d 207, 213 (D.Md.

2001) (noting that increased "surveillance" of an employee's activities does not constitute adverse

employment action); *Chika v. Planning Research Corp.*, 179 F.Supp.2d 575, 587 (D.Md. 2002).

The observations and the PIP were merely intermediate events intended to help evaluate and improve

Nichols's performance.  Neither the observations nor the PIP altered his compensation or benefits, and

he remained a teacher on the same terms and conditions.  The only actions by the Board that adversely

affected Nichols's job were the downgrade of his certificate to second class, which resulted in a

decrease in salary, and ultimately his termination.[6]

Limiting consideration of the disparate treatment claim to Nichols's certificate downgrade and

final termination, Nichols does not provide sufficient evidence that, at the time of these adverse

---

[5]In his appeal of the decision to downgrade his certificate before the MSBE, the MSBE rejected Nichols's argument that the Board's reclassification was improper because it resulted from observations outside Nichols's area of certification.  The MSBE noted that the Code of Maryland Regulations "does not require that...evaluations be based on two observations within the individual's area of certification." Def.'s Ex. 4, MSBE Opinion No. 02-11, p. 4.  Furthermore, nothing in the Code limits the number of observations that may be conducted.  In any event, mere procedural irregularities are insufficient to show discriminatory intent.  *See Vaughan v. MetraHealth Companies, Inc.*,145 F.3d 197, 203 (4th Cir. 1998) (mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that employer was motivated by illegal discriminatory intent); *Settle v. Baltimore County*, 34 F.Supp.2d 969, 990 (D.Md. 1999).

[6]Under Md. Code. Ann., Educ. §6-301, "a teacher or principal whose certificate is rated by a county superintendent as second class...may not receive a salary increment based on experience." Lorton so advised Nichols in a letter notifying Nichols of the downgrade of his certificate. Def.'s Ex. 15.

employment actions, he was performing at a level that met his employer's legitimate expectations.[7]

Nichols claims that he met any legitimate expectations because his method and style of teaching in the

2000-2001 and 2001-2002 school years were not substantially different from the method and style

which he had used in prior years, when he was always rated at least satisfactory.  Nichols argues that

because the Board has not shown that his performance was any different than it was when he was

receiving satisfactory evaluations, it cannot prove that he did not meet legitimate expectations in the

school years at issue.

   In support of the contention that he fulfilled the Board's legitimate expectations, Nichols offers

no evidence except his own subjective self-assessment.  Plaintiff's perception of his job performance

cannot establish a genuine issue as to whether he was meeting defendant's legitimate expectations.

*King*, 328 F.3d at 149; *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960-961

(4th Cir. 1996) ("'It is the perception of the decision maker which is relevant,' not the self-assessment

of the plaintiff."  (citation omitted)).  In *King*, the Fourth Circuit rejected the plaintiff's own subjective

claims of satisfactory job performance and suggested that the plaintiff could establish that his work met

his employer's legitimate expectations by offering qualified expert testimony as to (1) the employer's

_____

   [7]Nichols claims that he was not terminated until April 24, 2003, when Lorton declared
Nichols's termination official in accordance with the ALJ's ruling.  At that time, Nichols was assigned to
administrative duties in the central office.  He argues that his performance in that capacity met the
Board's legitimate expectations and that, therefore, he has made out a prima facie case of disparate
treatment.  However, Nichols has not alleged disparate treatment in his position at the central office.
Nichols's discrimination claims arise out of defendant's treatment of him during his employment as a
teacher and his subsequent downgrade and termination from his teaching position.  Thus, the issue is not
whether Nichols met his employer's legitimate expectations in his post-discharge administrative
position; rather, the question is whether he performed satisfactorily at the time he was terminated from
his position as a teacher.

legitimate job performance expectations and (2) evaluation of the plaintiff's performance in light of those expectations. 328 F.3d at 149-150.

Nichols does not offer expert testimony or any testimony other than his own, on either of these two inquiries. The Board's legitimate expectations are detailed in the observation and evaluation forms used to assess a teacher's performance and, in Nichols's case, were also specifically outlined in the PIP created to assist in improving his performance.[8] Nichols does not contest any of these expected duties and responsibilities, nor does he provide objective evidence of his performance in light of these detailed expectations.[9]

On the other hand, defendant conducted numerous observations of Nichols and met with him on several occasions throughout the 2000-2001 and 2001-2002 school year to assess his performance

---

[8]Fountain explained that she had several discussions with Nichols about the school's expectations regarding his planning and instructional effectiveness as a teacher. She put the PIP in writing pursuant to several requests from Nichols to do so. Def.'s Reply, Ex. 1, Fountain Dep. Fountain, Fradel, and Nichols all signed the plan. Thus, Nichols cannot now claim that he did not know what defendant's legitimate expectations were.

[9]Although Nichols does not argue that the criteria used to evaluate his performance were illegitimate, he alleges that the observation and scoring procedure were subjective and are therefore insulated from any meaningful review. While subjective decision-making may provide an opportunity for unlawful discrimination, "subjective considerations are not unlawful per se." *Lewis v. Bloomsburg Mills, Inc.*, 1982 WL 482, *22 (D.S.C. 1982). Evaluations of teacher performance cannot realistically be made based on objective standards alone. *See Vanguard Justice Soc. Inc. v. Hughes*, 471 F.Supp. 670, 748 (D.Md. 1979). Whether an inference of discrimination may be drawn from the presence of subjective criteria depends on the facts of the case. *Lewis*, 1982 WL 482 at *22. Ultimately, the plaintiff has the burden of showing that the subjective standards used were mere pretext for actual discrimination. Nichols has not shown that the Board's method of evaluation was unfairly subjective or that any such subjectivity was used to mask discriminatory intent. Any inference of unlawful subjectivity is weakened by the fact that Nichols's performance was evaluated according to detailed uniform criteria, all of his observations and evaluations were documented, and four different people participated in the observation and evaluation process.

in light of the expectations Fountain, Smith, Perry, and Fradel had discussed with him. The observation forms and final evaluations document Nichols's shortcomings and the areas in which he needed improvement, including his inadequate planning and preparation, teaching methods, and classroom management. Nichols's unsatisfactory behavior was also documented in the reprimands issued to him by Fountain and the memoranda Fountain wrote summarizing the meetings she had with Nichols about his performance under the PIP and his failure to cooperate throughout the PIP process. See Def.'s Ex. 17-23, 26. These memoranda reveal that Nichols often came to scheduled meetings unprepared and without materials such as lesson plans, classroom management plans, and classroom policies and procedures, which were requested of him in advance. He also refused to discuss the administration's expectations of him and his performance under the PIP. Nichols was further reprimanded by both Fountain and Lorton for the Easter assignment he gave his students, instructing them to reference Bible passages in contravention of the PIP directive that he refrain from discussing topics with religious overtones.[10]

---

[10]Nichols was admonished for giving a similar assignment the previous year, and in 2002, at least two parents complained to the Board about the Easter assignment. According to Lorton, Nichols had a "well known and longstanding practice of inappropriately inserting [his] personal religious beliefs into the classroom...[T]his practice has been the subject of various conferences and hearings over the last year or two at least." Def.'s Ex. 29. Although Nichols contests the Board's interpretation of the assignment and the validity of the PIP instruction to refrain from discussing topics with religious overtones, he does not dispute the fact that he violated this prohibition and that such violation was part of the Board's articulated reason for his termination. For the purposes of establishing a Title VII claim, it is irrelevant whether the Board was justified in directing Nichols to refrain from religious discussion or subsequently reprimanding him for doing so. The court is not concerned with the fairness or correctness of the proffered reason for the defendant's adverse employment action, so long as that reason was the true basis of the action. *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). The only relevant inquiry is whether the real motivation for the action was discriminatory. *Id*. Nichols has not shown that the Board discriminated against him specifically *because* of his religious

Although Nichols contends that his performance was not significantly different from previous years in which he received satisfactory ratings, the observations and evaluations conducted in his last two years of teaching indicate that his performance was deficient in a number of areas.  Whether his teaching had remained the same over the years was a matter for the Board to decide, not Nichols. Prior satisfactory evaluations, standing alone, do not raise an inference of discriminatory intent.

Furthermore, the State Board upheld both the decision to downgrade Nichols's certificate as well as the decision to terminate his employment.  The State Board's opinion affirming the downgrade noted that Nichols had a history of performance problems, including "excessive disciplinary referrals of students, lack of control over classroom activities, and imposition of his individual sectarian beliefs on his classroom students despite repeated admonishment from school officials and direction to cease such activity." MSBE Opinion No. 02-11 (March 27, 2002).  The State Board determined that this history of problems together with Nichols's overall performance evaluation for the 2000-2001 school year demonstrated deficiencies in teaching efficiency, executive ability, and personality, which justified the certificate downgrade. *Id*.

The State Board further affirmed the ALJ's determination that Nichols's discharge was appropriate.  The ALJ noted that Nichols's teaching procedures and methodology needed improvement on many levels and that, despite his over thirty years of teaching, "several consecutive years of unsatisfactory performance including 2000-2001 and 2001-2002 is sufficient justification for the Board to terminate him."  ALJ Proposed Decision, OAH No. MSDE-BE-01-200200005 at 27.

---

affiliation with the Jehovah's Witness faith.

The ALJ concluded, and the State Board affirmed, that Nichols's failure to improve his performance after being placed on second class status and his failure to comply with the PIP constituted "willful neglect of duty", "insubordination", and "incompetence". *Id*; MSBE Opinion No. 03-26.

Further casting doubt on Nichols's discrimination claim is the fact that Fountain, the person Nichols has identified as the instigator of the defendant's unlawful actions, is also African American, and assistant principal Smith, who worked with Fountain in evaluating Nichols, is male. The fact that two of the primary decision makers were members of the same protected class as Nichols weakens any inference of discrimination. *See Love v. Alamance County Bd. of* Educ., 757 F.2d 1504, 1509 (4th Cir. 1985); *Demesme v. Montgomery County Government*, 63 F.Supp.2d 678, 683 (D.Md. 1999) ("The fact that the decision makers were of the same protected class suggests no discriminatory motivation."), *aff'd*, 208 F.3d 208 (4th Cir. 2000); *DeWitt v. Mecklenburg County*, 73 F.Supp.2d 589, 598 (W.D.N.C. 1999) (where the challenged employment decisions were made by a member of plaintiff's own class, plaintiff's unsupported allegations are particularly unpersuasive).

### B.

Even if Nichols were able to state a prima facie case of disparate treatment, the Board has articulated legitimate, non-discriminatory reasons for his certificate downgrade and final termination. Nichols has provided no persuasive evidence to disprove these reasons or to show that they are pretext for racial, gender, and religious discrimination. Plaintiff points to several other teachers as comparators to show that he was treated differently based on his race, gender, and religion. To show discriminatory intent, however, Nichols must show that *similarly situated* employees outside of his protected class were treated more favorably than he was. *See McDonnell Douglas*, 411 U.S. 792, 804, 93 S.Ct.

1817, 1825 (evidence that other employees engaged in conduct similar to plaintiff's and were treated more favorably is especially relevant to showing pretext). To be valid comparators, other employees must be similarly situated in all relevant respects. *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir. 1994); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000); *Grey v. Potter*, 2003 WL 1923733, *11 (M.D.N.C. 2003). They "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *see also Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997); *Finley v. Federal Exp. Corp.*, 1998 WL 709066, *5 (D.Md. 1998) (because employment decision was not made by the same supervisor, plaintiff and other employee were not similarly situated).

        None of the other teachers Nichols uses as comparators were similarly situated to Nichols. Nichols argues that Craig Henry, a Caucasian teacher at Riverview Middle School received more favorable treatment because he was placed on a PIP but not downgraded and was only terminated after five years of documented problems. The comparison between Nichols and Henry is inapposite, however. Not only did Henry work at a different school, under a different principal and superintendent, but his grounds for termination were entirely different as well. Henry was terminated for promoting a personal business venture, using class time and school resources. There is no reasonable comparison between his termination and Nichols's discharge for incompetence and insubordination.[11]

---

[11]Plaintiff attempts to establish pretext for defendant's alleged gender discrimination by comparing himself to Candy Craft, a teacher at Federalsburg Elementary School. Like Henry, Craft

Nichols further compares himself to Elaine Stein, a Caucasian teacher at CRMS.  Nichols claims that the Board discriminated by admonishing him for placing disruptive students in the hall but not reprimanding Stein for doing the same.  Plaintiff has presented no evidence as to the number of students Stein placed in the hall or whether the school administration was aware of the fact that she occasionally did so.  *See King*, 328 F.3d at 151 (to establish that plaintiff and another teacher were similarly situated, plaintiff must proffer evidence that school administrators believed that the other teacher had engaged in the same misconduct as plaintiff).  Furthermore, the Board's allegedly discriminatory admonishment of Nichols cannot be the basis of comparison in Nichols's disparate treatment claim because Nichols has not shown that such admonishment was an adverse employment action. *See Nye*, 159 F.Supp.2d at 213 ("Reprimands do not automatically affect the terms and conditions of employment," and therefore do not qualify as adverse employment actions.).  His lack of control over disruptive students was just one of many reasons the Board downgraded his certificate and eventually terminated his employment.  Nichols has proffered no evidence that Stein exhibited the same myriad deficiencies that led to Nichols's downgrade and termination.

Nichols further argues that he was treated differently from other Caucasian tenured teachers in the manner and frequency with which the school administration observed him in the classroom.  Nichols complains that he was observed four times during the 2000-2001 school year, whereas other tenured teachers were observed three times or less.  Plaintiff also asserts that he was treated differently because

---

was placed on a PIP without having her certificate downgraded, and she was observed solely in her area of certification.  Also like Henry, Craft is not similarly situated to Nichols because she worked at a different school and was evaluated by different supervisors.

he was the only teacher to be placed on a PIP and downgraded at the same time, and he was the only

tenured teacher placed on a PIP whose observations were primarily outside his area of certification.

As discussed above, however, Nichols cannot establish a disparate treatment claim based on the nature

and frequency of defendant's performance observations.  Such observations do not constitute adverse

employment actions.  There is no maximum permissible number of observations that may be conducted

in a school year, but only a prescribed minimum of three observations for tenured teachers.  No

invidious motive may be inferred from the fact that Nichols was observed four rather than three times in

a school year, and, indeed, it would be entirely reasonable for school administrators to observe more

frequently a teacher whose performance presented a growing concern, as Fountain suggested.  Finally,

there is no requirement that teachers be observed in their areas of certification, and failure to do so

does not amount to an adverse employment action.

Nichols attempts to show that the Board's legitimate reasons were pretext for religious

discrimination by comparing himself with other employees who he alleges engaged in discussion of

religious topics without reprimand.  Nichols argues that he overheard Harry Hopkins, a history teacher

at CRMS, discussing the Buddhist religion in his classroom.   However, Nichols has provided no

evidence as to the context of this discussion, the manner in which it was presented, and the extent to

which it was perceived as imposing religious beliefs on students.  He simply stated that he assumed

Buddhism was discussed as a religious historical phenomenon. Def.'s Ex. 11, Nichols Dep, p. 137-

138.  There is no indication that this legitimate discussion of Buddhism is in any way similar to the

assignment Nichols gave his students to use the Bible in discussing Jesus's crucifixion and resurrection.

Nichols also alleges that Dr. Dewitt, a reading counselor, had a student recite the Serenity

Prayer and that Assistant Principal Smith quoted from Solomon of the Bible and would include the phrase "one nation under God" while leading the students in the Pledge of Allegiance.[12]  Not only has Nichols failed to show how these religious references are similar to his religious lessons, but he has also failed to show that Dewitt and Smith dealt with the same supervisors and were subject to the same standards as Nichols.

Nichols's opinion that he engaged in conduct similar to other teachers and performed comparably is not sufficient to prove pretext.  "[T]o prove that he was similarly situated to his colleagues in terms of his job performance would, in the absence of evidence to that effect from the employer or its job performance reviews, require an expert to form an opinion based on reasoned analysis as to how [plaintiff] and the other teachers were performing and as to how their performances measured against one another. Such is not the stuff of lay, fact testimony." *King*, 328 F.3d at 153. Nichols has provided no direct objective evidence that his job performance was similar to that of other teachers, nor has he proffered any expert opinion evaluating his performance as compared to others.

To establish pretext, a plaintiff must show both that the employer's explanation for the adverse employment action is untrue *and* that the real reason for the action is unlawful discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993); *Vaughan v. MetraHealth Companies, Inc.*, 145 F.3d 197, 202 (4th Cir. 1998).  The plaintiff has the ultimate burden of persuading the trier of fact that the defendant engaged in intentional discrimination.  "The factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its

_____

[12]The Serenity Prayer states: "God grant me the serenity to accept the things I cannot change, the courage to change the things I can, and the wisdom to know the difference."

-18-

action does not *compel* judgment for the plaintiff. The ultimate question is whether the employer

intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even

obviously contrived, does not necessarily establish that the plaintiff's proffered reason ... is

correct.'"*Reeves*, 530 U.S. at 146-147, 120 S.Ct. at 2108 (quoting *St. Mary's*, 509 U.S. at 511,

524, 113 S.Ct. 2742).

Nichols has proffered no direct or circumstantial evidence of discriminatory intent on the part of

Fountain, Lorton, or any of his other evaluators.  He provides no proof that they were dishonest or

acted in bad faith in giving him poor evaluations.  Nichols admits that no one ever said anything to him

intimating that his race played any role in the decisions to downgrade his certificate or terminate his

employment. Def.'s Ex. 11, Nichols Dep., p. 114.  Nothing in the record suggests that Fountain,

Lorton, or the Board based their decision to downgrade and terminate Nichols on anything but the

sincerely held belief that his performance was unsatisfactory.[13]  While Nichols contends that he sensed

animosity between him and his supervisors and that his negative observations, downgrade, and

placement on a PIP were fueled by such animosity, he has not shown that any of his supervisors acted

with intentional racial, gender, or religious discrimination.[14]  Although Nichols has argued that the

---

[13]Nichols suggests that Fountain "had an axe to grind" and was therefore biased against him because of their dating relationship twenty-seven years earlier.  However, this allegation of personal animosity is not sufficient to establish a Title VII claim unless Nichols can show that Fountain and the Board treated him differently on account of his race, gender, or religion.

[14]In support of his allegation that Lorton and Fountain discriminated against him because he was a Jehovah's Witness, Nichols asserts that the fact that they knew he was a Jehovah's Witness before they took adverse employment action indicates bias.  However, mere knowedge of Nichols's religious affiliation does not prove that defendant acted with discriminatory intent, nor does the fact that Lorton and Smith knew of no other teachers of the Jehovah's Witness faith in Caroline County.

downgrade and termination were unjustified because his performance remained satisfactory, "it is not

[the court's] province to decide whether the [defendant's] reason was wise, fair, or even correct,

ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette v. Corning Inc.*,

133 F.3d 293, 299 (4th Cir. 1998).  Other than his own subjective intuition that defendant acted with

racial, gender, and religious animus, plaintiff has produced no objective evidence of discriminatory

motive.

C.

Nichols next claims that the Board retaliated against him for filing a discrimination claim with the

EEOC in June 1999, and subsequently filing a lawsuit against the Board in August 1999.  To establish a

prima facie case of retaliatory discharge, Nichols must show: (1) that he engaged in protected activity;

(2) that the Board took adverse employment action against him; and (3) that a causal connection

existed between the protected activity and the adverse action. *Williams v. Cerberonics, Inc.*, 871

F.2d 452, 457 (4th Cir. 1989).  Once this prima facie case is established, the burden shifts to the

Board to prove that it had legitimate nonretaliatory reasons for the adverse action. *Id.*  If the employer

meets the prima facie case, the burden of proof then shifts to the plaintiff to establish by a

preponderance of the evidence that the proffered reasons are pretextual. *Id.*

Nichols argues that the first clear act of retaliation against him occurred on January 5, 2001,

less than forty-five days after his lawsuit was dismissed and less than three weeks after Judge Harvey

denied defendant's motion for sanctions against Nichols.  On that date, Nichols received his first

negative observation of the school year, which was conducted by Fountain outside his area of

certification.  As discussed above, however, a negative observation is not an adverse employment

-20-

action for purposes of showing discriminatory retaliation. The negative observations Nichols received

from that date on had no effect on the terms, conditions, or benefits of his employment. *See Von*

*Gunten*, 243 F.3d 858 (holding that the standard of adverse employment action for a retaliation claim

is "any retaliatory act or harassment if, but only if, that act or harassment results in an adverse effect on

the 'terms, conditions, or benefits' of employment") (citation omitted). Moreover, neither the dismissal

of the lawsuit, nor the denial of sanctions can serve as the point of reference for Nichols's retaliation

claim because neither constitutes protected activity. Nichols engaged in protected activity when he filed

the EEOC claim and when he subsequently instituted the lawsuit. Thus, Nichols must show a causal

connection between these protected activities and the only adverse employment actions he has alleged-

the downgrade of his certificate and ultimate termination.

The record establishes that although Fountain knew about Nichols's lawsuit when she started at

CRMS, she did not give him a negative observation until a year later. In fact, almost two years had

passed from the time Nichols filed the EEOC claim and the time defendant downgraded his certificate.

The evidence of retaliatory action here is too attenuated to permit an inference of causation.

The Fourth Circuit has recognized that "[a] lengthy time lapse between the employer becoming

aware of the protected activity and the alleged adverse employment action...negates any inference that

a causal connection exists between the two." *Dowe v. Total Action Against Poverty in Roanoke*

*Valley*, 145 F.3d 653, 657 (4th Cir. 1998); *see also Causey v. Balog*, 162 F.3d 795, 803 (4th Cir.

1998) (holding that a "thirteen month interval between the [EEO] charge and termination is too long to

establish causation absent other evidence of retaliation"); *Hooven-Lewis v. Caldera*, 249 F.3d 259,

278 (4th Cir. 2001) ("a six month lag is sufficient to negate any inference of causation"); *Conner v.*

*Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir.1997) (four month lag between protected activity and termination not sufficient to justify an inference of causation); *Church v. Maryland*, 180 F.Supp.2d 708, 745 (D.Md. 2002) (lapse of fourteen months between plaintiff's protected activity and her termination does not permit an inference that the two are causally connected). Sufficient time passed between Nichols's protected activity and his downgrade and termination to destroy any inference of a causal connection between the two. Because Nichols cannot show causation, he fails to make out a prima facie case of retaliation.

Moreover, Nichols cannot succeed on his retaliation claim for the same reasons he cannot succeed on his disparate treatment claims. As discussed above, the Board has offered legitimate, non-discriminatory reasons for Nichols's negative evaluations, certificate downgrade, and discharge. Nichols has not provided sufficient evidence to show that these reasons are pretext and that the Board acted with a retaliatory motive in downgrading and discharging him.

## D.

Finally, Nichols claims that defendant took adverse employment action against him for discussing religious topics in the classroom and that such action violated his First Amendment rights to freedom of speech and religion. To prevail on a First Amendment retaliation claim, Nichols must show: (1) that he engaged in protected expression regarding a matter of public concern; (2) that his interest in First Amendment expression outweighs his employer's interest in efficient operation of the workplace; (3) that he was deprived of some valuable benefit; and (4) that a causal relationship exists between his protected expression on matters of public concern and the loss of the benefit. *Peters v. Jenney*, 327 F.3d 307, 322 -323 (4th Cir. 2003).

The initial inquiry in determining whether a public employee is entitled to the protection of the First Amendment is whether his speech addresses a matter of public concern. *Seemuller v. Fairfax County School Bd.*, 878 F.2d 1578, 1581 (4th Cir. 1989). Generally, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest," such speech is not constitutionally protected. *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690 (1983); *see Urofsky v. Gilmore*, 216 F.3d 401, 407 (4th Cir. 2000) ("critical to a determination of whether employee speech is entitled to First Amendment protection is whether the speech is 'made primarily in the [employee's] role as citizen or primarily in his role as employee.'" (citation omitted)). "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id*. at 146.

In *Boring v. Buncombe County Bd. of Educ.*, 136 F.3d 364, 369 (4th Cir. 1998), the Fourth Circuit held that the selection of a play by a high school drama teacher did not involve a matter of public concern because the choice was made by the teacher in her capacity as a school employee in a matter relating to curriculum. Similarly, Nichols's religious Easter assignments and discussions of religious issues in class are curricular matters, and perhaps personal religious matters, raised by Nichols in his capacity as a teacher. They cannot be characterized as issues of political, social, or other concern to the community.

Nichols claims that his right to academic freedom was violated when he was told not to speak on religious topics. However, the concept of academic freedom has never been recognized as

-23-

conferring upon teachers the control of public school curricula. *Boring v. Buncombe County Bd. of Educ.* 136 F.3d 364, 369 (4th Cir. 1998) (citing *Kirkland v. Northside Independent School District,* 890 F.2d 794 (5th Cir.1989), *cert. denied,* 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990)).  "Public school officials have control of the curriculum of the school irrespective of teachers' First Amendment rights." *Newton v. Slye*, 116 F.Supp.2d 677, 684 (W.D.Va. 2000).

Not only was Nichols's Easter assignment not a matter of public concern, it was also proscribed by the Board's approved curriculum and the PIP developed for Nichols.  Nichols had been reprimanded in the past for giving students assignments that promoted a singular religious viewpoint and had been formally restricted in his PIP from infusing lessons with religious content.  The school administration had full authority to circumscribe the curriculum in this fashion despite any claim to academic or religious freedom that Nichols might raise.[15]  Because Nichols engaged in unprotected speech, he cannot establish a claim for violation of First Amendment rights or First Amendment retaliation.

For the foregoing reasons, defendant's motion for summary judgment will be granted.

A separate order is being entered herewith.


Date: February 23, 2004                    /s/_____
                                           J. Frederick Motz
                                           United States District Judge

---

[15]The Board accomodated Nichols's religious expression by allowing him to keep a copy of the Bible and various religious publications on a table behind his desk.  Nichols admits that he was never prohibited or discouraged from displaying this material.